# EXHIBIT 1

**Online Reputation Assessment & Repair**

**Expert Witness Report**

**Regarding:**

*Plaintiffs Adam M Ludwin, Esq.; Ludwin Law Group, P.A.; and Joanna Zeitlin*

*v.*

*Defendant Matthew B. Proman, a/k/a Matt Proman*

**Prepared By:**

Sameer Somal, CFA
CEO, Blue Ocean Global Technology

April 20th, 2022

## Table of Contents

*Section 1: Expert Witness Engagement* .................................................................. *4*

    Engagement Summary: ............................................................................. 5

    List of Documents Reviewed: .................................................................. 7

*Section 2: Expert Witness Qualifications* .............................................................. *8*

    Sameer Somal Bio: .................................................................................. 9

    About Blue Ocean Global Technology: .................................................. 10

    Articles Authored by and Featuring Sameer – Appendix A ..................... 11

    Recent Speaking Engagements and References – Appendix A ................ 11

    Continuing Legal Education (CLE) Programs – Appendix A .................... 11

    Expert Witness Case History: ................................................................. 12

    Statement of Compensation: ................................................................. 13

*Section 3: Internet Defamation* .......................................................................... *14*

    Digital Reputation .................................................................................. 15

    Internet Defamation .............................................................................. 17

    Defamation vs. Freedom of Expression ................................................ 34

    Unforgiving, Defining and Viral Nature of the Internet ......................... 35

    Digital Crisis .......................................................................................... 38

*Section 4: Online Reputation Management* ......................................................... *41*

    Online Reputation Management ............................................................ 42

    Rebuild .................................................................................................. 43

    Monitor ................................................................................................. 47

    Repair .................................................................................................... 48

*Section 5: The Nuances of Digital Reputation Repair* ........................................... *50*

    Online Reputation Management (ORM) ................................................. 51

    Suppression and Search Engine Optimization (SEO) ............................. 52

    Suppression & Reverse SEO .................................................................. 54

    Content Removal ................................................................................... 57

*Section 6: Internet Defamation Legal Cases* ....................................................... *63*

    Internet Defamation Legal Cases, Decisions and Awards: ..................... 64

***Section 7: Assessment of Damages*** .................................................................................. **78**

**Inventory of Mr. Adam Ludwin's and Ms. Zeitlin's Links and Media – Appendix C** ......................... 79

**Negative Link Analysis – Appendix D** ............................................................................... 79

**Examination of Reputational Impact Due to Online Search** ........................................... 80

**Rationale for Recommendation of Damages** .................................................................. 84

**Summary Findings** ...................................................................................................... 86

**Reputational Damages** ............................................................................................... 109

**Compensatory and Punitive Damages** ......................................................................... 109

**Damages Cited from Internet Defamation Cases:** ....................................................... 116

***Works Cited*** ........................................................................................................... **118**

***Appendices*** ........................................................................................................... **120**

**Appendix A:** ............................................................................................................... 120

Articles Authored & Featuring Sameer ............................................................................ 120

Recent Speaking Engagements & References .................................................................. 120

Continuing Legal Education (CLE) Programs ..................................................................... 120

**Appendix B:** ............................................................................................................... 120

Sample Campaign Websites and Profiles ........................................................................ 120

**Appendix C:** ............................................................................................................... 120

**Appendix D:** ............................................................................................................... 120

Negative Link Analysis .................................................................................................. 120

**Appendix E:** ............................................................................................................... 120

Inventory of Mr. Adam Ludwin's and Ms. Zeitlin's Links, Media& Case Evidence ................ 120

**Appendix F:** ............................................................................................................... 120

Internet Defamation Legal Cases ................................................................................... 120

# Section 1: Expert Witness Engagement

-----------------------------------------

Engagement Summary

List of Documents Reviewed

**Engagement Summary:**

I was engaged by the plaintiffs, Mr. Adam Ludwin, Ludwin Law Group, and Ms. Joanna Zeitlin, to ascertain the damages associated with the statements and posts made by Mr. Matthew Proman on social media and digital media platforms. These statements were made against Mr. Adam Ludwin, his profession as an attorney, and his wife Ms. Joanna Zeitlin.

A large portion of my professional time as CEO of Blue Ocean Global Technology is spent on actual digital reputation client situations. As such, I feel confident in my ability to approach this case from the lens of both an expert witness and a professional with a track record of successfully mitigating reputational damages originating from false or defamatory statements published on the internet.

As a digital reputation expert, I apply my cumulative knowledge and experience to assess an individual's damages and recommend the appropriate course of action to remediate damages moving forward.

As a starting point, I drafted a list of questions to help guide my evaluation process:

1. Whether the facts of the case present clear evidence of Internet Defamation against any of the three named Plaintiffs, Adam Ludwin, Ludwin Law Group, P.A., and/or Joanna Zeitlin.
2. Whether the content of the Internet Defamation is true.
3. Whether the evidence supports a finding that the Internet Defamation suffered by Adam Ludwin, Ludwin Law Group P.A., and/or Joanna Zeitlin was intentional.
   a. If the evidence supports the conclusion that the Internet Defamation was intentional, does the evidence also support a finding of malice by Defendant?
4. How did the defamatory publications spread across the internet?
5. The number of defamatory publications, whether websites, articles, or media references remain "live" and viewable by the public to date.
6. The effect defamatory publications have upon influencing the opinions of individuals who did not know Adam Ludwin, Ludwin Law Group P.A. and/or Joanna Zeitlin prior to being subjected to the Internet Defamation.
7. The effect defamatory publications have upon influencing the opinions of existing or known associates of Adam Ludwin, Ludwin Law Group P.A., and/or Joanna Zeitlin
8. Which search engines feature or featured the defamatory publications
9. Whether the defamatory content compromised the professional reputations of Adam Ludwin, Ludwin Law Group P.A., and/or Joanna Zeitlin.
10. Whether the defamatory content compromises the personal reputations of Adam Ludwin, and/or Joanna Zeitlin.

11. Identifying keywords which display search engine results with the published defamatory content for Adam Ludwin, Ludwin Law Group P.A., and/or Joanna Zeitlin.

12. Whether the defamatory publications circulated on the internet appear in the first ten search engine result pages (SERPs).

13. Whether the defamatory publications circulated on the internet appear in the first twenty-five search engine result pages (SERPs).

14. Whether the defamatory publications transcend domestic geographical boundaries and appear in searches regarding Adam Ludwin, Ludwin Law Group P.A., and/or Joanna Zeitlin on an international scale.

15. Whether the defamatory publications appear on credible authoritative websites or are the publications drafted in such a way as to provide the reader the indicia of credibility.

16. Whether the circumstances of this case affect the ranking of defamatory publications' appearance in the search engine results for identified keywords.

17. Countermeasures which can be employed to mitigate the appearance of the defamatory content on the first twenty-five search result pages.

18. Whether defamatory content can be removed.

19. Methods which can be utilized to rehabilitate online reputational damages resulting from Internet Defamation.

20. Future efforts required to insulate reputation from continued damages caused by prior posts, as well as damages from future defamatory posts made on the internet.

21. Assessment of cost for Adam Ludwin to repair his personal and professional digital reputations.

22. Assessment of cost for Joanna Zeitlin to repair her personal and professional digital reputations.

23. Assessment of cost for Ludwin Law Group P.A. to repair its digital reputation.

24. Manifestation of Internet Defamation in terms of physical and emotional distress for Adam Ludwin and/or Joanna Zeitlin.

25. Whether Internet Defamation has caused real-life instances where the defamatory posts have been acknowledged by people known or unknown to Adam Ludwin, Ludwin Law Group P.A., and/or Joanna Zeitlin and the associated harm to their respective reputations.

**List of Documents Reviewed:**

"Adam Ludwin and Joanna Zeitlin Expert Witness File"

- Case Documents
- Composite Exhibit A
- Exhibit B
- Exhibit C

Proman Defamation Evidence—Google Search Results

Criminal Complaint filed against Matthew Proman

Amended Criminal Complaint filed against Matthew Proman

Defendant's Motion to Stay

Adam Ludwin and Joanna Zeitlin Defamation Third Party Removal Quote

## Section 2: Expert Witness Qualifications

----------------------------------------

Sameer Somal Bio

About Blue Ocean Global Technology

Articles Authored & Featuring Sameer – Appendix A

Recent Speaking Engagements & References – Appendix A

Authored Continuing Legal Education (CLE) programs – Appendix A

Expert Witness Case History

Statement of Compensation

**Sameer Somal Bio:**

Sameer Somal is the CEO and Co-founder of Blue Ocean Global Technology.

Mr. Somal frequently speaks at conferences involving digital transformation, online reputation management, internet defamation, search engine optimization, social media, and professional ethics.

Fundamental to his work at Blue Ocean Global Technology, Mr. Somal leads a team of multi-industry professionals focused on public relations, law, digital marketing, and web development. Through Blue Ocean Global Technology, Mr. Somal helps clients build, monitor, and repair their digital presence/reputations.

Mr. Somal is a member of the Legal Marketing Association (LMA); and the Education Advisory Council (EAC). In collaboration with the Philadelphia Bar Foundation, Mr. Somal has co-authored Continuing Legal Education (CLE) programs;

Mr. Somal also proudly serves on the boards of the CFA, Institute Seminar for Global Investors, College Possible, and Girl Power Talk. Mr. Somal is a member of the International Business Fellows (SIBF), and has also received the distinction of "Iconic Leader Creating a Better World for All" by the ALL Ladies League and the Women Economic Forum.

**About Blue Ocean Global Technology:**

Blue Ocean Global Technology is a team of global professionals committed to learning, excellence, and helping our clients achieve optimal results when it comes to repairing, building, and protecting online reputations.

Blue Ocean Global Technology creates and promotes top digital assets which accelerate the growth and brand equity. We effectuate comprehensive reputation management services, which often include Search Engine Optimization (SEO), Social Media Marketing (SMM), and web development. When an individual or organization faces crisis, legal, or public relations issues that involve the internet, we specialize in mitigating the impact of the defamatory content and repairing their negative reputational damages.

**Articles Authored by and Featuring Sameer – Appendix A**

**Recent Speaking Engagements and References – Appendix A**

**Continuing Legal Education (CLE) Programs – Appendix A**

**Expert Witness Case History:**

1. *Atmosphere Hospitality Management LLC v. Zeljka Curtulloet al*, in the  United States District Court for the Western Division of South Dakota.
2. Christopher Brown v. Damon Dash; Poppington LLC d/b/a Dame Dash Studios; The Dash Group LLC; and Raquel Horn, in the United States District Court, Central District of California.
3. *Iryna Boyko v. Benny The Bum's Restaurant and Vladimir A. Mosendz,* Court of Common Pleas for Philadelphia, PA.
4. K.G.S., individually, and as Guardian and Next Friend of Baby Doe v. Thehuffingtonpost.com, Inc., d/b/a The Huffington Post; Mirah Riben; David G. Kennedy; The Kennedy Law Firm; Amber Geislinger; WALA-TV; Meredith Corp.; WBRC, LLC; Raycom Media, Inc.; and Fictitious Parties "A-Z," in the Circuit Court of Jefferson County, Colorado.
5. *Monique Bunn v. Damon Anthony Dash, Dame Dash Studios d/b/a Poppington LLC, Raquel Horn and The Dash Group LLC*, in the United States District Court, Southern District of New York.
6. *Nokaj v. NEDM*, et al in the United States District Court, Southern District of New York.
7. *Susan Edwards v. Aegis Wealth Group LLC d/b/a Everspire, and Gerilyn Merrill, in the* Third Judicial District Court for Salt Lake County, Utah.

**Statement of Compensation:**

Sameer is compensated at $600/hour for this engagement, which includes research, investigation, testing, analysis, writing, document review, drafting response, and any additional time required to author this expert witness report. All payments are made to Blue Ocean Global Technology, LLC.

# Section 3: Internet Defamation

-----------------------------------------

Digital Reputation

Internet Defamation

Online Defamation of Mr. Adam Ludwin and Ms. Joanna Zeitlin

How Is Internet Defamation Different From Defamation Off The Internet

Internet Defamation in The Age of Social Media

Defamation Vs Freedom of Expression

Unforgiving, Viral Nature of The Internet

Digital Crisis

**Digital Reputation**

Traditionally, a professional reputation would be built mostly by word-of-mouth. While useful, this could limit your brand's exposure. Before the internet became enmeshed in our lives, when we experienced poor service or observed something we didn't like, we would complain to friends and family. Over time, those family and friends would spread the news even further, which would affect a person's reputation.

In the age of the internet, it now takes seconds for people to publish something online that, regardless of whether the publication is truthful, can cause significant damage to a person or business's reputation because the defamatory content can quickly spread to millions of people on the internet.

In the grand scheme of history, the internet has existed for only a very brief period of time, even if you include its origins as a US Department of Defense project in the 1960s and 1970 (Featherly, n.d.)[1]. Over the past 20 years, the internet was adopted by millions, and then billions, of people. Since the turn of the new millennium, online searches and our reliance on all things digital have become a reality for a majority of the world's population. Social media is now a primary medium and location for spending time and communicating information. Although each person's motivation for using social media (and the internet in general) varies, the central purpose is almost always to share and to learn. The internet gives its users nearly unlimited opportunities and avenues through which to share opinions, talents, thoughts, pictures, videos, and even private and confidential information across communities and groups of followers, both small and large. This exponentially expands people's potential exposure to undesirable or offensive content. Internet users have both the freedom and the burden of determining the truth of the shared content they see—and of reacting accordingly.

Over the past 10 years, our lives have moved online. Whether it's Google Maps, Facebook, Amazon, Yelp, or Uber, we are increasingly dependent on the internet and our smartphones. Internet users have grown by 82 percent, almost 1.7 billion people, since January 2012(Kemp, 2017)[2]. That translates to almost 1 million new users every day or more than 10 new users every second. According to Statista, as of April of 2020 over approximately 4.6 billion people, encompassing 59 percent of our global population, were active internet users, and of these around 3.8 billion were active social media users (Johnson, 2021)[3].

While many people view their social media and professional lives as separate, technology has blurred the lines between the two. According to a recent survey by CareerBuilder, roughly 70 percent of employers regularly use social media to assess prospective hires, and 48 percent have used social media to check in on current employees (CareerBuilder, 2018)[4]. More than half of surveyed employers have opted not to hire a candidate after finding questionable content on

**Page 15 of 120**

their social media feeds. Moreover, 18 percent of employers have fired an employee for issues related to social media posts.

Every internet search yields a Search Engine Results Page (SERP). Every second, there are 63,000 Google searches, which total to 5.5 billion per day (Reid, 2017)[5]. We Google everything because it is fast, easy and we literally have all of the information in the world at our finger tips, for better or worse. People perform these searches for countless reasons whether they are casually Googling for the best local restaurant, or looking to make decisions that could affect their lives like hiring an attorney/law firm, like Adam Ludwin and Ludwin Law Group, P.A. If an individual searches the internet for information about lawyers or law firms and are faced with making a decision between an attorney/law firm with positive information, an attorney/law firm with no information or an attorney/law firm with negative information – true or not – they will typically forego hiring the attorney/law firm with the negative information because the internet is a double-edged sword. With access to all information at our fingertips, so is the availability of the identity of alternative attorneys/law firms and the market has become increasingly competitive. Consequently, there is no reason for a consumer, employer, to conduct an in-depth investigation which would determine whether the negative content is true or not.

The value of an individual or company's digital first impression and online presence are critical. A digital first impression can cement the image of an individual or entity like Adam Ludwin, Joanna Zeitlin, and the law firm of Ludwin Law Group, P.A. Many of the opportunities presented to us come based on our reputations. A digital reputation is now the foundation for how people are perceived and subsequently judged. Our dependence on the internet has "linked" a individual or entity's digital reputation with opportunities, success and affects quality of life.

When content is false and is part of a larger story line defining an individual, like the large volume of cohesive defamatory posts made Defendant against Adam Ludwin, Joanna Zeitlin, and the law firm of Ludwin Law Group, P.A., the proliferation of the false content can be disastrous to the lives of internet defamation victims. While it is ideal that content be verified for accuracy, it is regretfully not possible in the case of many internet defamation victims such as Adam Ludwin, Joanna Zeitlin, and the law firm of Ludwin Law Group, P.A. This is at the heart of why this defamation is so catastrophic. When someone receives and believes the false publications, they do not have the option of an alternative narrative. The public typically either assumes that the defamatory publications are true, or are otherwise deterred from entering a relationship with the individual or entity.

Because most people conduct research and judge an individual or business by the information found online, it is vital that the information available is truthful. Unfortunately for Plaintiffs, Adam Ludwin, his wife, Joanna Zeitlin, and the law firm of Ludwin Law Group, P.A.  their

respective digital reputations and identities have been both defined and destroyed by false website posts created by Defendant, Matthew Proman.

Eric Schmidt, a CEO of Google was quoted as stating "Identity will be the most valuable commodity for citizens in the future, and it will exist primarily online." —Eric Schmidt, CEO of Google (2001 – 2011). Mr. Schmidt's quote has only grown in relevance with the growth and infiltration of the internet into our daily lives.

**Internet Defamation**

Internet Defamation is the act of negligently or intentionally publishing false statements about an individual to third parties, via the internet, which are injurious to a party's reputation.

Under Florida law, the elements of a defamation claim are:

1) a defendant published a false statement;
2) about the plaintiff;
3) to a third party; and
4) the falsity of the statement caused injury to the plaintiff.

Matonis v. Care Holdings Grp., L.L.C., 423 F. Supp. 3d 1304, 1315 (S.D. Fla. 2019)

Additionally, a plaintiff must also prove that the defendant's fault in publishing the statement amounted to at least negligence.

Moreover, in the State of Florida, communications may be classified as actionable, *per se*. When a publication is classified defamation, *per se*, its victim is relieved from the need to plead or prove malice (except where a privilege is involved) or special damage because malice and the occurrence of damage are both presumed from the nature of the defamation. *See* Rubinson v Rubinson, 9:20-cv-80527-KAM, order entered July 24, 2020, *citing* Wolfson v. Kirk, 273 So. 2d 774, 777 (Fla. Dist. Ct. App. 1973).

In the Southern District of Florida it has been held that "A written publication constitutes libel per se under Florida law if, when considered alone and without innuendo, it (1) charges that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession." Id. *citing* Alan v. Wells Fargo Bank, N.A., 604 F. App'x 863, 865 (11th Cir. 2015).

Regarding whether the statements charge that a person has committed an infamous crime, Defendant's allegations charge Adam Ludwin, Joanna Zeitlin and Ludwin Law Group, P.A. with committing infamous crimes.

Defendant's statements charge that  Joanna Zeitlin has committed the following crimes:

1. The crime of prostitution;
2. The crime of having sexual intercourse with others with the knowledge that she is infected by with a sexually transmitted disease.

Moreover, Defendant's statements charge that Adam Ludwin has committed the following crimes:

1. **Felonies** under the Florida Communications Fraud Act;
2. **Felonies** for assault with a deadly weapon, which prosecuted as aggravated assault;
3. **Felonies** for illegal use of controlled substances;
4. **Felonies** for bank fraud;
5. **Felonies** for securities fraud;
6. **Felonies** for money laundering;
7. **Felonies** for theft of property valued in excess of $100,000.00;
8. **Felonies** for aggravated identity theft;
9. **Felonies** for wire fraud;
10. **Felonies** for credit card fraud; and
11. **Felonies** for pimping and pandering.

Unquestionably, Defendant's statements subject Adam Ludwin to hatred, distrust, ridicule, contempt or disgrace, and are the type that tend to injure Adam Ludwin in his profession as lawyer throughout the State of Florida, through the United States, and internationally.

Adding to the traumatic nature of Defendant's statements was the fact that:

- wife involved;
- accused of criminal threats of murder;
- police report;
- domestic violence injunction filed, which included fraudulent threats of murder against Adam Ludwin;
- Defendant filed a complaint with the Florida Bar attempting to procure a revocation of Adam Ludwin's license to practice law;
- Attempted to get Adam Ludwin disqualified from cases where he was actively representing a party.

As for the theory that the statements may interfere with a claimant's profession, Florida law recognizes two iterations.  "One iteration finds actionable any language that 'tend[s] to injure a person in [his] office, occupation, business, or employment and which in natural and proximate consequence will necessarily cause injury.'" Scobie, 2013 WL 3776270, at *2 (*quoting* Metropolis Co. v. Croasdell, 145 Fla. 455, 199 So. 568, 569 (Fla.1941)).  "Another iteration requires language that 'imputes to another conduct, characteristics, or a condition incompatible with the proper

exercise of his lawful business, trade, profession or office.'" Id. (*citing* Fun Spot of Fla. v. Magical Midway of Cent. Fla., Ltd., 242 F.Supp.2d 1183, 1197 (M.D. Fla. 2002)).

"Where courts have found conduct to be incompatible with one's profession, the conduct referred to in the defamatory statement went directly to a person's ability to perform duties essential to his or her employment, or was sufficiently related to skills required of the profession." Rubinson v Rubinson, at Pg. 8., *citing* Klayman v. Judicial Watch, Inc., 22 F. Supp. 3d 1240, 1249 (S.D. Fla. 2014), aff'd (Feb. 17, 2015).

**Online Defamation of Mr. Adam Ludwin and his wife Ms. Joanna Zeitlin**

The internet defamation timeline started in this case where Adam Ludwin, representing a client who was seeking to recover over $150,000 for yacht repair services rendered to Defendant in a case in the Federal District Court for the Eastern District of New York.

On September 26, 2018, Defendant had published the first of many completely false, malicious, and inflammatory internet posts about Adam Ludwin, which included Mr. Ludwin's name, email address, cell phone number, and business address, on "ripoffreport.com" and "complaintsboard.com" (Please refer Appendix D & Page 5-9). The posts falsely accused Mr. Ludwin of scamming and defrauding Mr. Proman and many others.

On September 27, 2018, the same day Mr. Ludwin discovered the defamatory post, Mr. Ludwin sent Defendant a "cease and desist" demand letter via email to Defendant's attorney at the time (Please refer to Appendix E & Page 2 & 3). Undeterred by Mr. Ludwin's cease and desist letter, Defendant began maliciously publishing a succession of escalating false and defamatory posts which were calculated at destroying the reputations of Adam Ludwin, Joanna Zeitlin and Ludwin Law Group, P.A.

On October 1, 2018, Defendant escalated his accusations against Mr. Ludwin and sought to compound the damage inflicted against Mr. Ludwin by publishing additional false and defamatory statements on "ripoffreport.com." The posts falsely claimed Mr. Ludwin had a history of controlled-substance abuse and questioned his practice as a lawyer (Please refer to Appendix D & Page 7-8).

Attacking Mr. Ludwin was not sufficient or malicious enough for the Defendant, Proman. Proman then escalated the damage and undue pressure against Mr. Ludwin by attacking and publishing false and malicious posts regarding Joanna Zeitlin, Mr. Ludwin's then-fiancé and now wife. It is material to note that Joanna Zeitlin had nothing to do with the case against Defendant beyond the fact that she was Adam Ludwin's fiancé. In an attempt to harass, intimidate, and subject Mr. Ludwin to such an overwhelming degree of shame that Mr. Ludwin would either comply with Defendant's demands or withdraw as an attorney on the case altogether Defendant, Proman, initiated a fraudulent and malicious campaign to ruthlessly target Adam Ludwin on the home front by destroying the reputation of Joanna Zeitlin.

On October 1, 2018, Defendant reprehensibly and maliciously began publishing false and defamatory posts regarding Ms. Zeitlin on numerous websites, including "reportcheatingwife.com" and "liarsandcheaters.com." The published content claimed to reveal her as an escort/prostitute who has slept with over 500 men, most of whom are married, and claimed she had been working as a prostitute for the past 10 years.



Appendix D & Page 19-20



Appendix D & Page 19-20



### Is Joanna Zailin A Former Floozy?

THIS IMAGE WAS REMOVED
DUE TO A DMCA REQUEST

Oct 8th, 2018 – 9:36 AM

Oct 8th, 2018 – 9:36 AM

**THE DIRTY ARMY:**  Some people say **Joanna Zeitlin** residing in West Palm Beach Florida was (or still is)is an floozy that has slept with over 500 men, most married, and has been working the game for the past 10 years mostly in South Florida. She has allegedly gained financial success in the floozy industry and is known in the secret community for her "kinky role playing services" and "unique acts and techniques" and making her clients fantasies come true. Joanna currently fronts what appear to be a normal conservative day to day life. Her current boyfriend is a FL resident and gun fanatic Adam Ludwin who was probably also one of her former clients. Both are known throughout West Palm Beach and Del Rey Beach, FL for their "anything goes" swinger parties. one would think Joanna currently has enough excitement in her life and her escort life is in the past. However, in an unfortunate turn of events, recently Joanna quietly took on a new Miami client seeking discrete sexual services later to learn that her new client was one of her current boyfriend Adam Ludwin's former college friends. Oops! But it gets better... Rumor has it that Adam found out when his friend told him about this new floozy he has been seeing gave him DRDs and he was freaking out. He showed Adam a picture of the girl he hired and to Adam's surprise it was her girlfriend Joanna! Don't be fooled by her polished clean-cut look she is approachable for the right price, but make sure you way out the risk/reward being that she is DRD positive. You may get more than you bargained for. As a former colleague of her I could not sit on my hands and keep my opinion quiet about Joanna's slamming and disturbing behavior. I felt the need to write about this so people considering hiring Joanna for her service know the potential risks. Proceed with caution with shit one, good luck!

🏷 West Palm Beach          💬 Comment

**Find Out Dirt On Anyone - Click Here**

Appendix D & Page 19-20

The maliciousness of Defendant to proactively defame Adam Ludwin and Joanna Zeitlin continued. Defendant's statements charged Adam Ludwin as bring one of Joanna Zeitlin's former prostitution/escort clients. Defendant fabricated complete lies and stated that Adam Ludwin and

**Page 23 of 120**

Joanna Zeitlin were known throughout West Palm Beach, Florida and Delray Beach, Florida, for their "anything goes" swinger parties.



Oct 8th, 2018 – 9:36 AM

**THE DIRTY ARMY:**  Some people say **Joanna Zeitlin** residing in West Palm Beach Florida was (or still is)is an floozy that has slept with over 500 men, most married, and has been working the game for the past 10 years mostly in South Florida. She has allegedly gained financial success in the floozy industry and is known in the secret community for her "kinky role playing services" and "unique acts and techniques" and making her clients fantasies come true. Joanna currently fronts what appear to be a normal conservative day to day life. Her current boyfriend is a FL resident and gun fanatic Adam Ludwin who was probably also one of her former clients. Both are known throughout West Palm Beach and Del Rey Beach, FL for their "anything goes" swinger parties. one would think Joanna currently has enough excitement in her life and her escort life is in the past. However, in an unfortunate turn of events, recently Joanna quietly took on a new Miami client seeking discrete sexual services later to learn that her new client was one of her current boyfriend Adam Ludwin's former college friends. Oops! But it gets better... Rumor has it that Adam found out when his friend told him about this new floozy he has been seeing gave him DRDs and he was freaking out. He showed Adam a picture of the girl he hired and to Adam's surprise it was her girlfriend Joanna! Don't be fooled by her polished clean-cut look she is approachable for the right price, but make sure you way out the risk/reward being that she is DRD positive. You may get more than you bargained for. As a former colleague of her I could not sit on my hands and keep my opinion quiet about Joanna's slamming and disturbing behavior. I felt the need to write about this so people considering hiring Joanna for her service know the potential risks. Proceed with caution with shit one, good luck!

🏷 West Palm Beach     💬 Comment

**Find Out Dirt On Anyone - Click Here**

Appendix D & Page 19-20

On October 3, 2018, Defendant made false statements regarding Mr. Ludwin and published them on "cheatland.com." They included false statements including that Mr. Ludwin was armed and dangerous. Additionally, Defendant falsely stated that Mr. Ludwin's behavior is aggressive and erratic, before implying that Mr. Ludwin was under the influence of alcohol or controlled substances when engaging with clients and prospects.

← Is this

**Ripoff Report**

About you?

**Click here now.. (/corporate-advocacy-program/change-report-from-negative-to-positive)**

Beware of Adam Ludwin, believe it or not he is was convicted by plea a few years ago. You should know this before ever engaging with him. Not only he has a conviction but also he is a dangerous gun fanatic and has a history of issues with controlled substances and driving while intoxicated!

I wouldn't leave my kids near him. It's not clear how he is still a member of the FL bar and holds and active law license but it's clear that he shouldn't be practicing law. It seems like his website is down and he doesn't even work for a firm of have any partners, he is almost a ghost trying to lay low.

Report Attachments:



(/1024x768/docs/r1463141-scmvwo-8cosx4rao5.png)

This report was posted on Ripoff Report (/) on 10/01/2018 03:11 PM and is a permanent record located here: https://www.ripoffreport.com/reports/adam-ludwin-esq/delray-beach-florida-33483/adam-ludwin-esq-convicted-attorney-delray-beach-florida-1463141 (/reports/adam-ludwin-esq/delray-beach-florida-33483/adam-ludwin-esq-convicted-attorney-delray-beach-florida-1463141). The posting time indicated is Arizona local time. Arizona does not observe daylight savings so the post time may be Mountain or Pacific.

https://www.ripoffreport.com/reports/adam-ludwin-esq/delray-beach-florida-33483/adam-ludwin-esq-convicted-attorney-delray-beach-florida-1463141          2/5

Appendix E & Page 26

Then, on October 8, 2018, Defendant reposted the foregoing false statements regarding Adam Ludwin and Joanna Zeitlin on "thedirty.com".



Please refer Appendix D & Page 20

On October 8, 2018, Defendant made false statements and published them on "cheaterreport.com." The statements falsely accused Mr. Ludwin of being associated with criminals (please refer Appendix E). It also stated that Mr. Ludwin had a bad temper and had been involved in numerous "incidents" and that is usually seen with working girls, accusing him of cheating on his then fiancée and now wife, Joanna Zeitlin.

On October 8, 2018, Defendant made false statements and published them on "shesahomewrecker.com" which included the same false statements Defendant published on "cheaterreport.com" (please refer Appendix E).

Defendant also created fraudulent accounts under Mr. Ludwin's identity on "Linkedin" and "AVVO" in an attempt to post false information about Mr. Ludwin and further damage his reputation (please refer Appendix E and Page 32-36).

On October 9, 2018, Defendant made false statements and published them on "exposecheatersonline.com" (please refer Appendix E & Page 12) which included statements previously posted about Ms. Zeitlin. He falsely accused her of gaining financial success in the escort industry and of being known in the secret community for her kinky role-playing services, unique acts and techniques and "making her clients' fantasies come true…"  He then fabricated

another false story about her and posted the same, which read, "Don't be fooled by her polished clean-cut look she is approachable for the right price."



Appendix E & Page 12

On October 9, 2018, Defendant published foregoing false statements and published them on "reportcheatingonline.com," "internetcheaters.com," and "reportcheater.com." (please refer Appendix E).

**Page 27 of 120**

The attempts to destroy Mr. Ludwin's reputation were malicious and intentional to the extent that Mr. Proman did not limit his erroneous campaign to online defamation. He proactively and maliciously tried using every possible means to compromise Mr. Ludwin's (and his family's) ability to live a dignified and normal life.

During litigation, the Defendant, while representing himself pro se made repeated physical and other threats against Mr. Ludwin, demanding that Mr. Ludwin conform to the Defendant's demands and force Mr. Ludwin's clients to settle that case (please refer Appendix E). Defendant's threats were reported to the Federal Bureau of Investigation (FBI), which investigated the Plaintiff, Adam M. Ludwin, Esq.'s, complaint against Defendant. They found the complaint to be credible (please refer to Appendix E).

Concerned that Defendant's actions would be disclosed to the Court, Defendant planned and implemented a fraudulent and criminal scheme wherein he filed a false police report stating that the undersigned threatened to murder the Defendant. In fact, Defendant falsely reported to the Beverly Hills Police Department that Mr. Ludwin stated to Defendant, "I'll put a bullet in your f*ckinghead and you won't be missed" (please refer to Appendix E & Page 59-62).

On April 15, 2019, Defendant took the false police report and filed a fraudulent complaint for a restraining order against Mr. Ludwin, which was directly based on the allegations in the aforementioned false police report. Defendant even presented the false report as evidence for the Court to grant an injunction against Mr. Ludwin. Mr. Proman also made false statements under oath in his complaint for injunctive relief against Mr. Ludwin (please refer Appendix E).

Again, if it was not enough that Mr. Ludwin had been subjected to a fraudulent police report and a fraudulently procured injunction. On May 17, 2019, Defendant took both the foregoing fraudulent procured police report and injunction and utilized them as evidence supporting a bar complaint filed by Defendant against Mr. Ludwin with the Florida Bar. This was fraudulently filed by Defendant under penalty of perjury (please refer Appendix E).

While Defendant has testified under oath that he was not directly or directly responsible for the false website posts, a portion of the website posts were traced back to an IP address that was traced directly to his home address through subpoenas issued in the other federal case. A copy of the IP address trail is attached. This is clear evidence of Mr. Proman's maliciously initiating the defamatory campaign against all the three plaintiffs (please refer Appendix E & Page 71-74).

Additionally, the case documents relating to the defamation campaign orchestrated by Mr. Proman are available online. This creates an additional layer to the existing defamatory posts by Defendant and, in my opinion, further amplifies the negative sentiment against the Plaintiffs. These are all clear examples of Mr. Proman's proactively exhausting many avenues to intentionally target and harm Mr. Ludwin, his firm, Ludwin Law Group, and his wife, Ms. Zeitlin.

**Page 28 of 120**

**How Is Internet Defamation Different from Defamation Off the Internet?**

In the physical world, it is easier to identify the person making a statement, and the damage caused can be assessed from the number of people that it might have reached. But in the case of Internet Defamation, the medium of publication is the internet, and the reach of libelous content involves a massive scope because that content can be read by almost anyone and it will remain ever-present on the internet. Consequently, damages associated with Internet Defamation are exponentially more damaging and more complex. Unfortunately, Adam Ludwin, Joanna Zeitlin, and Ludwin Law Group, P.A. have experienced and continue to experience the expensive and inherently unique and complicated set of issues damages presented by Internet Defamation, especially when compared to defamation that was traditionally present in the physical world.

**Internet Defamation in the Age of Social Media**

The traditional avenues for communication used to be physical print media, television, and radio, and each limited in their respective ways. Conversely, with society's mass adoption of social media and the internet, the use of traditional media has become fragmented. Social media is now an integral part of the internet in terms of the methods of communication in modern society(Lewis, 2015)[6]. It possesses qualities that make it a preferred platform for sharing thoughts and comments with the world, for better or worse.

The ways in which traditional avenues of communications mitigated the threat of damage to a person's reputation included, but are not limited to, the following:

- **Affordability**

In a time when mass printing, television and radio were the preferred avenues of communication to the masses, it would have been an expensive undertaking to publish defamatory content to thousands of people, let alone the tens of millions of individuals who have access to the internet.

Conversely, the internet is widely available to almost everyone. Consequently, everyone on the internet can be accessed by anyone desiring to publish content, whether defamatory or otherwise, without any upfront cost. Indeed, Defendant Proman's publications of defamatory content would have required no greater investment then the time it took Defendant to create an account with fake or personal information, draft or cut and paste the false publication and press "submit."

Moreover, the devices on which the internet can be accessed are generally affordable, carried with us wherever we go in the form of mobile phones, and are even available to access for free at public institutions. Accessing the internet has become very affordable for almost everyone resulting in a huge number of users who either might be the source of defamatory content, or may form part of the greater audience libelous content can reach in a matter of seconds.

- **Convenient Use**

The use of social media, and more specifically the use of various web applications, has made it very convenient for individuals to share their thoughts and opinions about any topic, person, or entity. Anyone having access to the internet can therefore conveniently share their thoughts, materials, or videos by using a website, blogs, vlogs, or comment sections. Hence, someone can participate in any discussion without expertise or being a trained professional in the field. Social media platforms and applications also facilitate the download of any

material posted online very quickly and easily. This convenience of use has opened an opportunity for sharing unrestricted and non-scrutinized content online, which can be viewed by anyone worldwide. It has therefore become more susceptible to posts that threaten individuals' rights of privacy and reputation.

- **Widespread Outreach**:

As discussed earlier, social media platforms reach anyone without the traditional restrictions associated with geographical location. This content can be accessed by users located anywhere around the world, thus exponentially expanding the potential for damages realized by victims. Moreover, the global nature of social media platforms connects a world-wide audience to a variety of content, which can make a precise quantification of damage incurred by victims as a result of defamatory content impractical.

With respect to the internet defamation of Mr. Adam Ludwin, his law firm, Ludwin Law Group, and his wife, Ms. Joanna Zeitlin, social media played a critical role. Mr. Proman used the internet as his primary weapon to create fake stories around Mr. Ludwin, his practice as a lawyer, and even his wife, Ms. Zeitlin. The internet, Google search results, and social media platforms work together in such a way that a single post can reach millions of people in no time and amplify the story's exposure.  In this case, Defendant Proman, made a calculated effort to post and repost defamatory content against Adam Ludwin, Joanna Zeitlin, and Ludwin Law Group, P.A. on various sites thus it compounded the effectiveness of Defendant's defamatory campaign. Defendant's multi-pronged efforts cumulatively lead to more people viewing the negative content and multiplication of the damages inflicted upon Plaintiffs.

As part of my investigation in this case, I interviewed Adam Ludwin and in describing his experience regarding the defamatory posts made by Defendant Proman, Mr. Ludwin represented to me that "The problem with Google searches is that if you're not there, and then all of a sudden, you go from 0 to 10, that becomes your identity."

Mr. Ludwin's experience clearly stems from the fact that the websites Defendant, Proman, strategically selected to post defamatory statements have a monthly domain traffic of almost 265,000 viewers. That is 260,000 people per month who have access to the Defendant's false and malicious publications. In attempt to further damage Adam Ludwin's reputation, Mr. Proman even created fake profiles in Adam Ludwin's name on the widely accessed professional social media platforms of LinkedIn and Avvo.

This materially affected Mr. Ludwin's personal and professional reputation. Since social media is used as a platform for free expression, whether someone agrees or not, it is dangerous to anyone who is a victim of defamation. The evidence contained within Appendix C, Appendix D, and Appendix E clearly show the extent to which complete strangers were engaging with the

defamatory posts, and the types of comments they were writing. It is clear that the negative information disseminated by Mr. Proman was rooted in malice. While a positive social media reputation can help people gain the necessary spotlight and create opportunities, it can also be misused to harm innocent people when they are defamed by false representations of fact, as was the case with Adam Ludwin, Joanna Zeitlin, and Ludwin Law Group, P.A. Defendant Proman's, defamatory publications compromised their standing in the society and the ability to live their lives as they were before Defendant's defamatory posts. Adam Ludwin's business is adversely impacted by the defamation because everyone, including prospective clients who do not know him, who search for Adam Ludwin, Joanna Zeitlin or Ludwin Law Group P.A. on the internet now perceive them within the context of the false and damaging posts.

Talking about her professional life, Ms. Zeitlin is employed at  Johnson & Johnson and it is difficult to work in such a reputed company because of the stringent background checks done on each employee before they join Johnson & Johnson. In addition, they conduct regular background checks, which include Joanna Zeitlin's digital reputation because Johnson & Johnson understands the value of society's perceptions regarding the Johnson & Johnson brand, which includes allegations made on the internet about each and every employee. Moreover, Ms. Zeitlin reported that she was interrogated by her immediate and regional supervisors at Johnson & Johnson, regarding the very posts made by Defendant, Proman, because they were discovered in one of Johnson & Johnson's periodic background searches of Joanna Zeitlin. Ms. Zeitlin reported experiencing overwhelming shame and embarrassment as a result of the interrogation by her superiors and Ms. Zeitlin being forced to share the source of the posts and explain the fact that she was not a prostitute. Ms. Zeitlin continues to live in fear that she may not be promoted to management at Johnson & Johnson because of the defamatory content which Defendant, Proman, posted about her on the internet and which now will become a permanent stain on Joanna Zeitlin's personnel file.

During my interview with Mr. Ludwin, he recounted an instance where his professional career had been, and continues to be, adversely impacted by the Defendant's defamatory posts. Mr. Ludwin's business had been failing and one of Ms. Zeitlin's clients was close friends with an attorney who operates a large maritime law firm in Miami, Florida, who was looking to hire new attorneys. Ms. Zeitlin naturally referred to her husband, Mr. Ludwin, to be interview for the position and a meeting had been scheduled to meet with Mr. Ludwin. However, in advance of the meeting the law firm had searched the internet to research Adam and discovered the defamatory posts made by Defendant, Proman, and in turn contacted Mr. Ludwin and canceled the meeting, advising that the could not even consider Mr. Ludwin for a position at the firm as long as the defamatory content was present on the internet.  Mr. Ludwin advised that he was devastated at this news and felt substantial anxiety because he felt stuck in such a position that

he could not work for someone else, his business was failing and he could not prove to everyone that the posts about him were false.

**Defamation vs. Freedom of Expression**

Freedom of speech and expression, as recognized by the principles of human rights, has always been in conflict with the legislation and principles set down to prevent defamation and protect the privacy of individuals. The expansion of the internet and the establishment of an online world have empowered individuals to share their thoughts, opinions and ideas with large online audiences, seemingly unchecked. As explained, any post or comment made online can reach an expansive audience in a viral matter overnight. This is the power of the internet.

The individual expression published online is protected under the principles of human rights and freedom of speech and expression, but such freedoms must be tempered with the fundamental rights to be free from invasion of privacy and the damages associated with defamation. There has been a continuous debate and battle between these conflicting forces. The ongoing conflict between defamation laws and human right to freedom of speech continues due to the fact that, on one hand, the principle of human rights supports the idea that freedom of opinion and freedom of expression are indispensable conditions for the full development of the person (O'flaherty, 2015)[7]. On the other hand, defamation laws restrict the publication of statements that might do harm to the reputation of the individual.

Even though most of the international human rights instruments recognize the restrictions that must be imposed on speech in the interest of protecting the reputation and privacy of the individual, at times local defamation laws that are not crafted carefully may pose a threat to free expression. Due to the alarming effect of the internet, where a statement posted online can domino in a matter of minutes, it is also necessary under the established laws of our democracy to impose certain restrictions to protect people's privacy and reputation.

Consequently, the legislature has imposed the will of the public by enacting laws which value and protect the reputation of individuals who have been damaged by defamatory publications. While, freedom of speech enjoys legal protections, such protections are not afforded to those who bear false witness and publish false statements to third parties.

The existence of this debate and the degree to which Adam Ludwin, Joanna Zeitlin, and Ludwin Law Group, P.A. have been defamed highlights the negative ramifications resulting from abuse of digital communication mediums and a lack of oversight which protects against people intentionally ruining someone's life. In the present case, Defendant orchestrated the defamatory campaign by posting false content, reposting false content over and over again on various websites, which together had monthly domain traffic of almost 265,000 people per month. This cumulative internet traffic amounts to Defendant's defamatory post being published to over 3 Million people per year. Additionally, Defendant calculated and planned the said campaign by creating fake online profiles of Mr. Ludwin on LinkedIn and Avvo, mainstream social media platforms with billions of active users. As a modern society, we cannot accept such egregious

behavior, especially with such power to harm at our fingertips, and others must be deterred from such actions in the future.

### Unforgiving, Defining and Viral Nature of the Internet

The internet has become an integral part of contemporary life and the preferred medium of communication for billions. Many use it for personal expression, while others see it as a powerful tool to make an impact on society. Unfortunately, some on the internet have ulterior motives, sharing false information to intentionally mislead people and influence their beliefs and actions, rather than disseminating authentic news and data.

News we encounter online can often be either untrustworthy, false, or biased, especially on social media. People often fall prey to sensationalism or accept particular information as truth if it conforms to their personal opinions. As our dependence on the internet accelerates, certain risks grow in tandem. The circulation of false content damages people's reputation and compromises their ability to live a normal life in a matter of minutes. Content consumed from the internet absolutely must be verified by checking it against other sources and channels to avoid building opinions on false, incomplete, or intentionally deceptive information.

Online publishers are in an escalating race for traffic and engagement. Platforms will leverage and publish content that increases readership—whether or not that content is factual—if it provides a competitive advantage. Platforms seek to position themselves high on search engines' algorithms and then ride the wave of trending news. The appeal of a viral video or news story entices media companies to seek out content that will allow them to leapfrog the competition. The temptation is often overwhelming; some platforms will publish incomplete stories just to get ahead of the trend, and, embracing the idea of asking for forgiveness rather than permission, will make the necessary corrections to the stories only after the stories have garnered viral attention and millions of views. This allows the platforms to remain in the "trending" category, while emotionally engaging with or even instigating their audience. A major factor that determines whether a news story will "go viral" is that it must elicit a strong reaction, and whether that reaction is positive or negative (or the underlying story true or not) barely matters (Lehr, n.d.)[8]. The publisher just needs to evoke a reaction, any reaction. If a story is interesting enough and a media company wants to be the first to publish it, before any other platforms can release their own version, doing so without actually checking the facts becomes very tempting, and easy.

To remain relevant in the current media market, news channels and media platforms constantly strive to keep up with the latest trends and venture to produce interesting content. They may "run to stand still," indulging in topics or news—true or not—just to maintain their position and viewership in an ever-shifting marketplace. Even when a news site makes a serious error and addresses it by removing or correcting the offending article or post, this does not guarantee that the story, or its initial effects, will go away.

Viral news stories are often reposted, rewritten, republished, or syndicated on other (affiliated and non-affiliated) sites, networks, and social media platforms, sometimes attracting a viewership of millions long after the original story has been debunked. It is a vicious cycle: the viral spread of a story or piece of information triggers a cascade of internet searches on the topic. This in turn leads to search engines and social media algorithms identifying and optimizing for keywords related to that topic, which spreads the news even further. Furthermore, when users engage with the story by sharing, "reacting to," or commenting on it, search engines track that interest and adjust to it—again, regardless of the actual veracity of the story in question—often pushing it (and other related stories) higher up in search engine results.

The Chicago Tribune highlighted research conducted jointly by Columbia University and the French National Institute, which found that 59 percent of links shared on social media are shared without their related stories having been read first (Dewey, n.d.)[9]. This underlines the fact that people are generally uninterested in investing the time and effort necessary to confirm the truth of a matter and will often blindly accept information served to them via social media if it strikes them emotionally or confirms their beliefs.

With respect to the internet and the nature of "viral" content, two basic ideas must be explored: novelty seeking and the information gap theory of curiosity. First, our brains are hardwired to search for novelty(Cooper, 2013)[10]. We can grow tired of seeing the same ideas repeatedly over a long period of time. New and unique things catch our eye. This phenomenon has reached the point where people using GoFundMe and other fundraising sites to cover their medical expenses will try to make their stories unique and novel so they will go viral(O'Neil, 2017)[11]. In response to seeing new things, we have become motivated to explore more, which on the internet, is always just one click away. This leads to the second issue: George Loewenstein's information gap theory of curiosity asserts that human beings will often act to fill the gap between what they know and what they want to know(Lehrer, 2010)[12]. We are, by nature, obsessed with information and have a deep curiosity about the world and the social media feeds provide us both novelty and new knowledge more easily and faster than any previous form of media in human history. Our natural curiosity can be satisfied with a click or a scroll down an endless social media feed.

A strong or surprising news story can garner a lot of attention. Humans can feed on confirmation bias and having their existing beliefs reinforced. When people encounter reinforcing information online, they typically share it, which means everyone in their social circle is exposed to the same information, further strengthening the bias. This burst of sharing leads to search engines identifying the topic as "trending" and to stronger optimization of keywords in search results. This cascade of events can be incredibly dangerous, such as when, in the wake of a disaster or crisis, people increasingly seek out not the facts of breaking news, but websites pushing conspiracy theories and dangerous misinformation (Starbird, 2017)[13].

**Page 36 of 120**

Regretfully, negative information on the internet can create a kind of domino effect in the media, with news sites and platforms publishing increasingly loud, buzzy headlines in hopes of attracting more attention and staying in the loop of the latest trending news and topics. In the internet age, both companies and individuals must focus on Online Reputation Management (ORM) to be successful, desirable, and to be aligned with their clients, employers, partner, and investor preferences. One such phenomenon which speaks to the heart of this alignment is the development of the "Cancel Culture."

**Cancel Culture**

Cancel culture is the phenomenon of promoting the "canceling" of people, brands and even shows and movies due to what some consider to be offensive conduct is not a recent societal concept. (Kato, 2021)[14].

Cancel culture is an extension of or a contemporary evolution of a much bolder set of social processes that we can see in the form of banishment…" "[They] are designed to reinforce the set of norms." Id. Dr. McCorkel also acknowledged that while it depends greatly on the issue at hand, there's a difference between canceling a type of behavior that is collectively agreed on as "bad" utilizing #MeToo and condemning workplace sexual harassment, for example, and canceling one particular person without discourse. Id

Adam Ludwin, Joanna Zeitlin, and the law firm of Ludwin Law Group, P.A.  are among the most vulnerable to damages resulting from Internet Defamation.  "… for all the fear that cancel culture elicits, it hasn't succeeded in toppling any major figures — high-level politicians, corporate titans — let alone institutions. Those most vulnerable to harm tend to be individuals previously unknown to the public, like the communications director who was fired in 2013 after tweeting, from her personal account, an ill-thought-out joke about Africa, AIDS and her own white privilege (she landed another job six months later) or the data analyst who was fired last spring after tweeting, in the wake of protests against the death of George Floyd in police custody, a study that suggested that riots depressed rather than increased Democratic Party votes (his employer has denied that the tweet was the cause for his dismissal)" (Mishan, 2020)[15].

The defamatory statements published against Adam Ludwin and Ludwin Law Group, P.A. include allegations which society deems abhorrent, shameful and even criminal such as: fraud, scamming, disloyalty, assault, attempted murder, use of controlled substances, embezzlement, and theft.

The defamatory statements published against Joanna Zeitlin include allegations which society deems repugnant, shameful, and even criminal such as: prostitution, obtaining and transmitting sexually transmitted diseases as a result of fornicating with "over 500 men," and prostitution.

Such heinous defamatory posts on the internet evoke the same behaviors observed in the "cancel culture" phenomenon. Like other individuals and entities previously unknown to the public which are the most vulnerable victims of the cancel culture, Adam Ludwin, Joanna Zeitlin, and the law firm of Ludwin Law Group, P.A., continue to be subject to the danger of disassociation or banishment with each and every personal interaction or perspective business opportunity between Adam Ludwin, Joanna Zeitlin, and the law firm of Ludwin Law Group, P.A, and members of the general public because after members of the general public are subject to the defamatory allegations about Plaintiffs on the internet, they have the power to determine whether they chose to actively condemn Adam Ludwin, Joanna Zeitlin, and the law firm of Ludwin Law Group, P.A, without discourse. Consequently, Adam Ludwin, Joanna Zeitlin, and the law firm of Ludwin Law Group, P.A., continue to be damaged by Defendant Proman's actions.

**Digital Crisis**

If the past few years in business have shown us anything, it is that a digital crisis can come from almost anywhere and, more dangerously, can be created out of almost nothing(Somal, 2020)[16]. The speed at which information travels on the internet means that the veracity of a crisis is almost immaterial. As our reliance on the internet has made absolutely clear, a controversy can arise based upon: a factually accurate premise, mistake or misunderstanding, or in some cases, the issue may be a complete fiction.

Currently individuals and entities are held to a higher standard whereby the public is looking for companies and people to do what is morally right. Moreover, public opinion is often hungry for controversy driven by emotion regardless of whether the controversy is based on facts or fiction. These decisions are made so quickly that individuals have almost no hope of eliminating the damages caused by them in a timely manner. Moreover, the internet is set up in a way that is easy to post defamatory content but it is costly and time-consuming to take it down.

A narrative amplified by the internet, regardless of its legitimacy, can quickly become set in stone. Individuals and small business owners who, traditionally, do not depend on their online reputation are the most vulnerable to the damages caused by a digital crisis. Their comparative disadvantage relative to large corporations is rooted in their lack of resources, relationships, and clarity on how to prepare for or react to defamatory content flooding the internet. Moreover, because the individuals and small business owners who did not traditionally maintain an online presence, when the internet is flooded with defamatory content, the defamatory content is either prioritized by internet search engines because of target algorithmic attacks by the entities utilized by the individual initially publishing the defamatory content which leads to either:

    a) The defamatory content is the only content visible on the internet due to a prior lack of digit presence by the defamed party; or

**Page 38 of 120**

    b)  The defamatory content appearing as a priority in the search engine results, thereby suppressing any truthful content and forcing the truthful content to appear far down in search results.

In my opinion, as a result of the false, malicious, and targeted nature of the false content, as well as the number of defamatory publications, the reputation of all the three Plaintiffs, Adam Ludwin, Joanna Zeitlin, and the law firm of Ludwin Law Group, P.A., are in a state of 'crisis' and damages incurred by Plaintiffs continue to be compounded on a daily basis.

The inventory of defamatory posts by Defendant over numerous sites declare that Joanna Zeitlin is a "cheating wife" and an "escort," who is responsible for transmitting sexually transmitted diseases. The posts falsely also allege that Adam Ludwin is being investigated and is otherwise responsible for securities fraud, money laundering, and misuse of his clients' confidential information. Such statements directly call into question Adam Ludwin professional and ethical reputation as a practicing attorney. The expansive portfolio of negative digital content created and reposted by Defendant is a clear example of the unforgiving, definitive, and viral nature of the internet. Moreover, because the false content published by Defendant appears to be supported by a larger story line about Adam Ludwin, Joanna Zeitlin, and the law firm of Ludwin Law Group, P.A., the proliferation of the false content, as well as the corresponding damages incurred by Plaintiffs, have been exacerbated.

Mr. Ludwin is hired and engaged by clients and performs in his capacity as a member of the Florida Bar and an officer of the court solely based on his character. Defendant in this case possessed a clear intention of defaming and framing Mr. Ludwin, his law firm, Ludwin Law Group P.A.. As a result of the defamatory posts, Mr. Ludwin's veracity for truthfulness as an attorney has been challenged.

Ms. Zeitlin has been humiliated due to the defamatory posts against her existing online reputation. She was openly questioned by her employer and continues to live in fear because these posts define and adversely affect her personal and professional credibility. Additionally, the ease of availability of case documents over the internet compounds the negative impression created because of such defamation.

I have firsthand experience working with lawyers, law firms, and bar associations.  As a member of the 2021 and 2022 Legal Marketing Association Education Advisory Council, defamation is something I specifically address with national attorneys and law firm audiences. We provide guidance to lawyers on reputational risk and why they must protect themselves against the exact defamation that Adam Ludwin and his law firm, Ludwin Law Group, are victims of.

Based on the prior extensive involvement of Defendant in matters involving Internet Defamation and my observations of Defendant's numerous defamatory posts, all of which incorporated

**Page 39 of 120**

pieces of truth to enhance the believability of the posts, it is indisputable that Defendant's fraudulent scheme was calculated and knowingly implemented in a manner which could only have been intended to maximize damages upon Adam Ludwin, Joanna Zeitlin, and the law firm of Ludwin Law Group, P.A. Moreover, my beliefs regarding Defendant's malicious intent to maximize damages is supported by Defendant's own written statements to other victims of Defendant's defamatory campaigns, wherein Defendant stated in his own words:

"I am taking your friend down online, with everything I have, everything. I will take off work the next two days to assure I achieve success… I can't wait to see her face when she sees what I accomplish with my 1st amendment rights."  Bates Stamp Ludwin001128

"I will be posting to every site and creating my own to tell my story… I sure as heel [sic] will use my 1st amendment rights to globally voice my opinion of Sam… Google her name in 5 days and you will see, I'm not sitting on my hands anymore." Bates Stamp Ludwin001128

"You're a whore… Prepare for the social media campaign of the decade… I'm putting a story together which should rank High on google… I'm going to launch google attack on your sister" Bates Stamp Ludwin001131

"This is not going away… I'm not going away" Bates Stamp Ludwin001131

"I'm about to destroy her career…her reputation…her life… with every resource I have… I promise…she will never book an acting till [sic] the rest of her life… or get a job … I will stop at nothing… I am willing to risk it all…" Bates Stamp Ludwin001131

"I will engage every blogger, host, PR site [sic] and flood all the social media with the truth about you. And once I have done that,,, I will do it again, and again, and again. I want you to wake up every day and feel what you made me feel, and I promise on my father's grave, you will." Bates Stamp Ludwin 001172

## Section 4: Online Reputation Management

-----------------------------------------

What is Online Reputation Management (ORM)?

Rebuild

Monitor

Repair

**Online Reputation Management**

As a direct consequence of Defendant's defamatory posts, Adam Ludwin, Joanna Zeitlin, and the law firm of Ludwin Law Group, P.A. will incur substantial expenses/damages managing their online reputation in order to remediate damages which continue to be inflicted as a result of Defendant's targeted scheme of defamation.

Online Reputation Management (ORM) refers to the strategy and tactics used to always present your personal and/or professional brand in the best possible light on the internet. Generally speaking, it involves promoting positive brand messaging and managing negative criticism in the most appropriate manner.

Blue Ocean Global Technology defines ORM as the process of building, monitoring, and repairing the digital content that appears when you or your company are searched for on the internet. Essentially, it is how you ensure that the trust, positive energy, and the relationship capital you have with professional and personal relationships are appropriately represented online. The emergence of social media allows negative content and false information to be shared easily and circulated among large numbers of internet users. This could be an offensive comment on your company's Facebook page, a fake or negative Google review, or a past legal issue.

Your online reputation determines how others perceive you and/or your business when they search for your name directly, or stumble on it online. Consequently, Online Reputation Management (ORM) proactively influences what information people will find.

**Rebuild**

After a defamatory content begins to damage an individual or entity's reputation, steps must be taken to rebuild your online reputation, which includes efforts to proactively influence the impressions left on internet users, especially those who are seeking to learn more about you. Building a strong online reputation is critical to all individuals and entities and is of essential importance to those seeking to market themselves professionally effectively and/or grow. An agile public relations strategy that includes publishing positive online content and monitoring public perception are part of the core strategy that will be required to rebuild Adam Ludwin, Joanna Zeitlin, and the law firm of Ludwin Law Group, P.A.'s reputations and help protect them from the negative and defamatory content published by Defendant which continues to appear in top tier search results to date, and Plaintiffs' continue to accrue on a daily basis.

While digital media has greatly improved the public's access to both individuals' and companies' identities and brands, digital media has also vastly increased the risk of negative exposure. Social media platforms such as Facebook, Twitter, Instagram, LinkedIn, and YouTube, along with search engines like Google, Yahoo, and Bing, have disrupted and realigned the global economy by providing instant access to unfiltered information. Search Engine Results Pages (SERPs), which generally show news, videos, images, and third-party content, now represent a key foundational pillar of a person's overall reputation and brand. Moreover, unlike in traditional media where a negative news story appeared only for a short span of time, negative stories in search engine results will often remain on the internet in perpetuity. Fortunately, these results can be properly managed and influenced to a certain degree through various tools such as Search Engine Optimization (SEO) techniques within an ORM campaign.

Active social media presence is now the most effective tool for publicly sharing information and has replaced the traditional "word of mouth" buzz. Actively posting pictures and links across popular social media communities help direct traffic to your website and brand. Active social media management plays a crucial role for individuals and companies trying to combat negative or false information like the defamatory posts made by Defendant and includes actions like ongoing blogging where you publish your own content and blogging not only reinforces a positive digital footprint for you and your brand, but it can also help deal with the effects false content.

Search engine results (SERPS) typically are comprised of three different types of content that can define your personal or business online presence:

1) Managed Content: Content you can control. This includes everything that's published on your own website(s), along with articles, videos, etc., that you publish elsewhere online;

2) Partially Managed Content: Review sites like Yelp, Avvo, and Trustpilot serve partially managed content. For example, you can create and edit your own business profile, but you cannot prevent other people from publishing content about you or your firm. In the

case of a negative review, you can offer your support by responding immediately, thereby demonstrating your willingness to resolve the issue; and

3) Unmanaged Content: This includes everything from news about you to blog posts and photos that you cannot influence because you have no control over the original content source. Unmanaged content is the most dangerous form of online content to your brand, and is the reason companies have evolved to protect and manage online reputations.

Whenever negative information is published about a person online, it takes a substantial and coordinated effort to rebuild the person's damaged reputation and, to be effective, should utilize all three of the foregoing types of content. Moreover, the process required to rebuild a reputation which could have taken years to develop is often stressful, expensive and time-intensive.

The success, development and financial prosperity of Adam Ludwin's career and the law firm of Ludwin Law Group P.A. directly correlates a favorable digital reputation. Because Adam Ludwin is an attorney and Ludwin Law Group P.A. is a law firm, Defendant's false publications have left Adam Ludwin and Ludwin Law Group P.A. in a particularly precarious position. Consequently, both the damages incurred, and the corresponding costs associated with rebuilding the damaged online reputations is multiplicative and will require significant upfront and ongoing investments of time, energy, and financial resources.

It is important to consider the fact that Mr. Ludwin has already taken efforts to remove the defamatory material involving him and his wife, Ms. Zeitlin, that have surfaced on the internet. (Refer Appendix C). However, the malicious and deceptive content created by Mr. Proman remains and is easily perceived as truthful by someone searching on certain keywords. The situation is made worse by the ease of accessibility of both the defamatory and negative case documents online. Whenever potential clients searches for information on Mr. Ludwin online, they can view defamatory posts and the case documents, and they may believe that he is not a competent attorney since he himself is entangled in a set of legal issues.



Appendix C & Page 14



Appendix C & Page 17



Appendix C & Page 18

**Monitor**

Of course, all this effort will go to waste if you don't know what is being said about you. Proactive anticipation of potential crises is the most effective way to mitigate or even completely avoid negative fallout. To put it simply, you need to be aware of what people are saying about you online, and the most effective way of doing this is continuously monitoring mentions of your identity and brand on the internet. This is more complicated than reputation building, and more difficult than just assigning someone to review and post on your behalf on social media. It should include not only full and continuous oversight of your internet presence, but also an evaluative comparison of your actual online reputation and the narrative you are trying to create for yourself. Monitoring is the key to addressing potentially harmful rumors and falsehoods before they erupt into a full-blown crisis. Unfortunately, people, and even thriving businesses, can be blindsided by defamatory content on the internet. Monitoring is a proactive step towards managing that risk.

**Repair**

A negative reputation can change the trajectory of your life or business, and adversely affect your personal well-being. Defamatory content erodes trust and compromises opportunities. Public relations firms and digital reputation specialists focus on the reduction and removal of online content to repair your online profile. Experienced companies have effective strategies in place for replacing negative search results with positive coverage.

There are several strategies available to repair a digital reputation. Digital reputations are constantly evolving, and it has become necessary to adapt personal and/or professional online presence accordingly. Digital reputation repair is a continuous process that demands periodic reassessment, the addition of new digital tools when appropriate, and modifying said process according to updates and changes to various search engines' algorithms for ranking content.

These ongoing changes to ranking algorithms can make obtaining success from SEO techniques challenging, even for experienced service providers with a track record of results. Search engines seek to deliver the most accurate and helpful results, which include balancing positive and negative content.

Hundreds of calculations and contributing factors are involved in search engine results. Specific aspects of those algorithms, and an associated scoring or ranking framework, apply to Online Reputation Management. Research on all aspects of each unique situation is required of each Online Reputation Management repair case. It requires a customized approach each time. To identify the best solution for an individual, Online Reputation Management professionals conduct thorough analyses of both positive and negative assets, and then test the feasibility of both the removal and suppression of content.

An integrated team of professionals, including technical experts, analysts, engineers, and programmers, consistently study and navigate digital trends in analytics, keyword research, link analysis, and SERPs, to conduct highly efficient and effective SEO campaigns. Keywords & URL targeting may be used to mitigate negative links and safeguard against future damage to your reputation.

In a reputation repair campaign, the focus is on a particular keyword. The fact that we have three impacted individuals or entities means that it will require at least two separate targeted campaigns. We may be able to accomplish the desired results within 2 campaigns instead of requiring three campaigns because of the overlap of Ludwin between Adam Ludwin, the individual, Ludwin Law Group P.A., the entity. Regardless, a separate reputation repair campaign will be required for Joanna Zeitlin.

Based on the extensive proliferation of the false content published by Defendant about Adam Ludwin, Joanna Zeitlin, and Ludwin Law Group P.A. and the duration which the content has remained on the internet, **it is going to require approximately 180 hours per month to keep the false content published by Defendant suppressed and minimize future damages**. However, this does not affect the prior damages inflicted upon Adam Ludwin, Joanna Zeitlin, and Ludwin Law Group P.A., and because we are on deadline with the internet, the defamatory information will always be there if someone wants to find it.

## Section 5: The Nuances of Digital Reputation Repair

-----------------------------------------

Implementing a comprehensive Online Reputation Management (ORM)

Suppression & Search Engine Optimization (SEO)

Reverse SEO

Sample Campaign Websites and Profiles - Appendix B

Content Removal

**Online Reputation Management (ORM)**

The comprehensive ORM plan required to rebuild Adam Ludwin, Joanna Zeitlin, and Ludwin Law Group P.A.'s reputations will integrate numerous disciplines which include: SEO, public relations, content marketing, social media marketing and monitoring, community management, web analytics, and psychology and website engineering integrated with relevant content which is calculated to create a positive impact on a digital presence on social media, online review websites, forums, and blogs.

**Suppression and Search Engine Optimization (SEO)**

Suppression and search engine optimization starts with content creation. Addressing defamatory, erroneous and negative content on search engines is a complicated and time intensive process. A major component of reputation repair and suppression campaigns is creating content. Creating content would include written articles on actual professional lives of Mr. Ludwin, Ms. Zeitlin and Ludwin Law Group. It would also include personal information, details and content related to the lives of Mr. Ludwin and Ms. Zeitlin. They may or may not be comfortable with revealing this personal information based on the incident that took place which can make this process even more difficult.

In order to influence search engine results on the keywords listed, we are going to need a diverse and expansive library of content related to written articles, press releases, blog, webpages, videos, images, podcasts, etc. Naturally, Mr. Ludwin, Ms. Zeitlin and Ludwin Law Group are quite sensitive to their reputation and as such would want to approve of and be involved in the process of content creation and signing off the content before it is published. That is where an inherent investment of time is involved by all the three plaintiffs.

SEO is an invaluable technique which will help promote identified websites and specific digital assets and help them to appear higher on Search Engine Results Pages (SERPs). The ORM plans required to rebuild the digital reputations for Adam Ludwin, Joanna Zeitlin, and Ludwin Law Group P.A. will involve significant SEO engineering. SEO is a foundational tool used within many successful ORM campaigns. SEO improves a target webpage's visibility through on-site optimization and managing the technical aspects of the page, such as creating HTML code, meta descriptions, and tags. As part of a content marketing strategy, SEO tactics help optimize a website's content by using specific keywords, off-site optimization, which requires us to build quality inbound links that can serve to verify or "vouch" for a promoted website or digital asset to Google's software search algorithms which continuously crawl the web to find updated site information.

An effective SEO strategy may include:

1) Optimizing pages of specific websites to appear atop of SERPs and rank for target keyword phrases;
2) Featuring genuine social media profiles that accurately represent who you are;
3) Optimizing articles, landing pages, and media to populate when an interested person Googles you or your brand's name; and
4) Influencing search engines to highlight positive content about you, while simultaneously pushing negative or irrelevant content down to where it is less likely to be seen.

Another strategy we will need to implement to repair the digital reputations of Adam Ludwin, Joanna Zeitlin, and Ludwin Law Group P.A. involves creating "backlinks" to strengthen the authority and ranking features of the digital content which was created and we are now seeking to promote.

Despite our ongoing efforts and comprehensive ORM plans, Google's algorithm prioritizes specific pages depending on content and other factors, including, for example, backlinks and the number of identical keyword searches on the internet. For example, past searches are accounted for in perpetuity within search activity. Because of the volume, diversity, and severity of the of the defamatory content created and published by Defendant, the reputations of Adam Ludwin, Joanna Zeitlin, and Ludwin Law Group P.A., will continue to negatively impact search engine results relating to Adam Ludwin, Joanna Zeitlin, and Ludwin Law Group P.A. for many years, if not decades, to come.

SEO can help with Online Reputation Management (ORM), and it is essential for building a positive reputation. Reverse SEO is the cornerstone of ORM repair cases. ORM campaigns usually include a dedicated but flexible SEO strategy to achieve optimal results. When conducting an ORM campaign, websites and profiles are identified for consideration to post content. Those digital assets are then strengthened via target content through optimization techniques (such as backlinking) within the aforementioned SEO mandate. Appendix B includes a sample list of websites and profiles which would be created and integrated within a comprehensive ORM for individuals like Adam Ludwin and Joanna Zeitlin.

Sample Campaign Websites and Profiles – Appendix B

**Suppression & Reverse SEO**

Reverse SEO is accomplished when SEO and ORM considerations are integrated effectively to mitigate the reputational impact of negative search results appearing prominently on Google search results.

Targeted suppression campaigns for related keywords focus on creating specialized content and tactfully optimizing the featured group. When done correctly, and in accordance with Google's policies and best practices, these efforts directly 'suppress' or 'push down' the defamatory web pages that are adversely affecting a person or company's reputation. Specific strategies, for example, targeting landing pages fueled by Facebook ads and Google AdWords to drive traffic in support of the reputation repair, are often considered.

Consistent with industry language and established practices, ethical and organic baseline suppression campaigns often require a minimum of one year for measurable and material progress, even under an aggressive mandate. Repairing the reputation of Mr. Ludwin, his law firm business and his wife Ms. Zeitlin is definitely a very difficult case relative to a 'baseline' campaign. The challenge of rehabilitating their online reputation reflects the depth and breadth of the web of defamatory information ruining their online identity.

Influencing search engine rankings must be gradual and organic. When the goal is influencing Google to favor (and disfavor) specific content, it is naturally counterintuitive to what the algorithm wants to rank. Generally speaking, Google seeks to provide a balance of information, and this of course refers to accounting for and integrating all perceived positive and negative information available for display within specific Search Engine Results Pages (SERPS).

An Online Reputation Management company would seek to mitigate as much negativity as possible to achieve sustainable results that are more permanent in nature. Links will move gradually in the client's favor, and there will also be natural partial reversals. This give and take is necessary, so as not to abruptly change the search results for a particular keyword otherwise it could be considered manipulation and 'blackhat' practices, and thus a violation of Google's terms and conditions.

Effective suppression focuses on making a growing group of positive current assets, and being sure they're stable, before strategically cross-pollinating that content. Integrated technical and public relations teams collaborate to evolve their approach and create priorities according to the most recent results throughout a Reverse SEO & Suppression campaign. The links will fluctuate up and down on the targeted 45 keywords identified when repairing Mr. Ludwin's, his law firm's and his wife's digital presence. The overall aim here is to create long-term stability. Until then, weekly, and even daily, fluctuations in search engine results are to be expected.

The following are guidelines for creating new positive assets (which may be posted or backlinked to some of the sample websites mentioned in Appendix B) within digital reputation repair campaigns:

- High quality, original, and technically accurate content – search engines reward authentic and resourceful content;
- Keyword density – too many instances of primary or secondary keywords will penalize a particular page for the target search engine results page
- Relate URLs to primary key words – URL customization when creating new positive assets can significantly improve authority for specific search queries, especially when the URL closely matches the key search phrases;
- Web property cross-linking – embed hyperlinks and use links in newly created digital assets to cross-pollinate page authority and significantly improve campaign suppression results.
- Thorough optimization – cover all on-page SEO ranking factors and control all possible static quality elements for each positive asset. The success of a suppression campaign is always subjective and flexible because results are dictated by search engines. Google is highly secretive with respect to their complex search algorithm. Suppressed negative links can easily reappear on search engines, even from a seemingly minor update to the search algorithm. Major Google algorithm updates include:
  - 2020 Google Featured Snippet Deduplication – Updated featured snippet rankings that list websites so that they are not repeated within organic listings;
  - 2019 Google BERT – Updated algorithm model with deep learning and natural language processing so as to better understand nuances of context;
  - 2017 Google Fred – Updated algorithm to penalize websites that violate Google's webmaster guidelines, notably blogs with low-quality posts;
  - 2016 Google Possum – Updated algorithm to ensure that local results correlate better with searcher's location;
  - 2015 Google RankBrain – Updated algorithm as part of Hummingbird to factor in lack of query-specific relevance features, poor user experience, and shallow content;
  - 2015 Google Mobilegeddon – Updated the algorithm to provide a boost to mobile friendly pages when searching Google from mobile devices;
  - 2014 Google Pigeon – Updated algorithm for local searches and created a more integrated relationship between local and core search;
  - 2013 Google Hummingbird – Updated the algorithm to positively impact best results for specific queries, particularly the emergence of conversational search.

This update favors websites providing high quality content that reads well for searchers and provides helpful answers;

- o 2012 Google Penguin – Updated the algorithm for link quality. Websites with low quality directories, blog spam, and purchased links are negatively impacted in search results; and

- o 2011 Google Panda – Updated the algorithm for quality of content. Lower quality content, including duplicate content, will negatively impact search results.

Search Engine Journal - (Journal, 2018)[17];

Search Engine Land - (History of Google Algorithm Updates, n.d.)[18];

**Content Removal**

Sometimes content can be removed.  Where feasible, content removal can be a more permanent solution, but may be prohibitively expensive because of the time investment required. Additionally, there are no guarantees for successful removal or deindexing of target links through search engines.

It is important to acknowledge that Mr. Ludwin has already invested a substantial amount of time and effort to rebuild his reputation. As an attorney, Mr. Ludwin reached out to the websites and publications where the false information about him, his firm and his wife was listed to request immediate removal of content. He was unsuccessful. Proving the aforementioned is false was inherently difficult without an internet defamation judgment verifying the innocence of Mr. Ludwin and Ms. Zeitlin.

Section 230 of the Communications Decency Act (CDA) of 1996 certainly facilitated the development of today's internet by encouraging innovations and new business models. Its primary goal is to safeguard the business owners of any "interactive computer service" from culpability for anything published by third parties. It states that "no provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."

At the same time, one cannot ignore that the legal provision provides protection to internet companies, which may host trillions of communications, from being prosecuted into oblivion by somebody who feels offended by something published by a third party. The simple interpretation of this section is that if these companies are acting in "good faith," it permits social platforms to regulate the services by removing content that is obscene or that violates the standards of the service. The courts have widened the spectrum of this section, thereby expanding the scope of immunity that can cover criminal activities as well. It is in this capacity that the United States harbors websites that want to provide a platform for controversial speech and a free legal environment for such expression. The extensive use of the internet, the expansion in the variety of "interactive computer services," the popularization of smartphones, and the introduction of social networking sites have all led to an explosive increase in online crime. Section 230 was a crucial step in the early era of internet services, but with the advancement in technology, it requires urgent amendments to ensure that internet companies are transparent about their judgments while removing online content and when they should be obliged for the speech they modify.

Adam Ludwin reports and has provided substantial documentation supporting his claim that he has made significant expenditures of time researching the websites and domain providers where Defendant's defamatory publications are held. Adam Ludwin advised that he reviewed, read their

terms and conditions and followed their stated procedures attempting to get the defamatory publications removed. The websites refused to take down the posts.

Please refer Appendix G which is indicative of the previous efforts made by Mr. Ludwin to restore his and his law firm's as well as his wife's online reputation.  It is evident that Mr. Ludwin has already invested his time in removing the defamatory content existing online.

**From:** Adam Ludwin
**Sent:** Wednesday, May 15, 2019 2:02 PM
**To:** dmca@thedirty.com
**Subject:** RE: DMCA

Understood. Thank you! Respectfully, can you please confirm that you will take down the posts that I mentioned which are attributable to dirty.com? I am happy to do anything on my end that I can to make things better for you or your department as well. I am happy to jump through whatever hoops you need. Please understand that you are doing a good and honest thing here. If you are available for a phone call to discuss this matter further, I am available at your convenience. Thanks again.

Best regards,

Adam
561-613-7392

**From:** dmca@thedirty.com <dmca@thedirty.com>
**Sent:** Wednesday, May 15, 2019 1:46 PM
**To:** Adam Ludwin <adam@ludwinlaw.com>
**Subject:** RE: DMCA

Appendix G & Page 9

**From:** adam@ludwinlaw.com <adam@ludwinlaw.com>
**Sent:** Thursday, November 1, 2018 8:21 AM
**To:** Ripoff Report <editor@ripoffreport.com>
**Cc:** Ripoff Report Legal Department <legal@ripoffreport.com>; adam@ludwinlaw.com; valorie@ludwinlaw.com
**Subject:** FW: Gatsby Yacht Group, LLC v. M/Y "Eastbound and Down" | USDC for NY - Case No. 18-cv-04242-ADS-GRB | Subpoena re: Report #1461427 and Report #1462591

Good morning,

The below communication with the attachments was just sent to my office. This subpoena was served on Ripoff Report on  October 16, 2018, two weeks ago. The subpoena has a deadline for compliance of November 5, 2018, four days away. However, the communication requests that I give the anonymous poster 7 days to object to the subpoena before Ripoff Report will comply with the subpoena. Respectfully, this request appears to be both arbitrary and untimely as seven days is beyond the deadline for compliance set forth in the subpoena and the authority quoted in the letter states that the notice need only be reasonable, not seven days.

In addition to the foregoing, the letter/ checklist appears to infer that the additional requirements will be dispensed with if I obtain an order from the judge requiring compliance with the subpoena.

Please give me a call to discuss this matter in greater detail.

Sincerely,

Adam M. Ludwin, Esq. | Managing Counsel
LUDWIN LAW GROUP, P.A.
85 S.E. 4th Avenue, Suite 105  | Delray Beach, FL 33483
O:  (561) 455-4455
M: (561) 613-7392
Email: Adam@LudwinLaw.com

Appendix G & Page 35

We invest resources in the study and development of all options for the negotiated, legal, and strategic removal of the information causing the negative reputational damage. With multiple pieces of damaging information, our approach to reputation management incorporates the following four removal strategies:

1.  Negotiated (sympathetic) removal via direct outreach;
2.  Relationship driven removal via our network of agency & publisher partnerships;
3.  Strategic (technical) removal at source search engine or hosting company; and
4.  Court or attorney assisted removal

**Negotiated (sympathetic) removal via direct outreach.**

Websites are often run by practical, but very busy people. As such, we are persistent and respectful in negotiating the removal of digital liabilities. We articulate the purpose of the outreach and separate the people from the problem to focus on the best interests of our clients. Because of our partnership model with other agencies, we usually mention ways that we may be

able to collaborate in the future should we reach an agreeable outcome with respect to the issue in question.

Web domain owners and key players at the target media company may receive many outreaches from disgruntled individuals frustrated with a particular link hosted on their website. We recognize that such communications can be time consuming and frustrating. We are 'soft' on the people, but 'hard' on the problem when representing our clients. We outline the best alternatives to a negotiated agreement.

Reaching out to a news organization website owner and administrator with humility and kindness may yield results for our clients. Our research and analysis often include:

- Review of each of the prominent links' website properties for information in support of sympathetic removal inquiries;
- Research of key stakeholders, executives, and employees for identification contacts;
- Signed letter to company address requesting removal of identified links with supporting documentation; and
- Direct outreach via phone to website owner and administrator.

**Relationship driven removal via our network of agency and publisher partnerships.**

The second strategy relies upon our established proprietary network of PR, media, and publication partners who may have relationships with publications or their parent companies. As our network of PR partners expands in perpetuity, so does our ability to remove links via those strategic relationships.

**Strategic (technical) removal at source search engine or hosting company.**

Strategic removal is another option where technicalities are identified, and cases made in favor of removal. Every website platform host or service provider has contractual agreements in place with the owner of a particular website domain. For instance, to receive hosting services from godaddy.com or bluehost.com, you must remain in compliance with thousands of terms and conditions. As such, a negative post may be in violation and subsequently justify removal from the corresponding authority. In one search result, there can be more than fifty thousand points of regulatory consideration.

It is important to note that this type of removal is done independent of any conversation or notification to the website owner or administrator. With technological innovation, integration, and investment, the ORM industry is rapidly evolving. Cutting edge analysis and resources are expanding the opportunities to repair an online reputation with confidence. The following are required when identifying technicalities and exploring strategic removal:

- Hosting requirements and terms;
- Analysis of ISP (internet services provider) terms protocol;
- Hosting site mandates and guidelines;
- Background of author and/or website media company;
- Intent and motivations of website purpose; and
- Google quality terms of use.

**Google Removal Policies**

Google seeks to organize the world's information and make it universally accessible, but there are specific instances where they will remove content from their search results.

Google will remove content from search results if it includes:

- Child sexual abuse imagery;
- Content in response to valid legal requests, such as copyright notifications that meet the requirements of the Digital Millennium Copyright Act.

With respect to personal information, Google will remove certain types of sensitive personal information from Google Search Results. How Google decides whether or not to remove a piece of personal information is dependent upon the following:

- Is it a government-issued identification number?;
- Is it confidential, or is it publicly available information?;
- Can it be used for common financial transactions?;
- Is it a personally identifiable nude or sexually explicit photo or video shared without consent?; and
- Can it be used to obtain more information about an individual that would result in financial harm or identity theft?

**Court or attorney assisted removal**

Website domains and hosting companies may not have a legal obligation to remove content unless a court determines that the information that harms the interested party is false or defamatory in nature. In other words, it must be proven that the content is defamatory as outlined in Section 230 of the U.S. Communications Decency Act of 1996 (CDA).

 To prove defamation, the following criteria must be met:

- The subject information is false and not factual;
- The negative information is now public and seen by others (at least one person); and

**Page 61 of 120**

- The reputation of the individual has been adversely affected by the publishing of the content.

It is material to note that even the most stubborn or difficult owners and administrators – those who have a policy of no removal or deindexing of content – are strongly averse to any risk of litigation. When representing clients, we recommend legal correspondence from an attorney for the removal of content, noting any adverse impact on reputation and identifying any content that may be defamatory, scandalous, or implying false facts, even when a legal claim to remove the content may not have a substantial likelihood of success. We have experienced success removing adverse content with this strategy, accompanied with tactful and persistent follow-up.

When approaching reputation repair cases with even the most reputable organizations, a compelling letter authored by a legal ally in our network may achieve results.

## Section 6: Internet Defamation Legal Cases

----------------------------------------

Internet Defamation Legal Cases, Decisions and Awards

**Internet Defamation Legal Cases, Decisions and Awards:**

1. Bouveng v. NYG Capital LLC 175 F. Supp. 3d 280, 336–44 (S.D.N.Y. 2016)

**Facts in Brief:**

The plaintiff, Hanna Bouveng, brought this action against the defendants for quid pro quo sexual harassment, defamation, and two other claims. The plaintiff was employed with the defendant, wherein she alleged to have encountered several sexual overtures at the hands of Wey, her superior. On refusing to engage in sexual activities with him, Wey allegedly sent emails to her family and friends with the intention of humiliating her, and terminated her from her employment. Later, Wey published six blog articles containing 66 defamatory statements.

**Decision and Award:**

The plaintiff was awarded $1.5 million on her defamation claim against all defendants, in addition to other damages awarded pursuant to her other claims in the suit.

The jury further stated that "in the internet age in which we live, an individual's online presence is as important—perhaps more important early on—than her physical presence. Acting out of pure malice and spite, Defendants used the internet to ensure that no prospective employer would interview Bouveng, much less hire her, by intentionally disseminating scores of the most professionally damaging lies and falsehoods about her that they could conceive of. She is entitled to compensation for the damage Defendants have caused to her professional reputation, and they will not be heard to complain that she has not listed the interviews she never obtained, or the jobs she lost, as a result of their egregiously defamatory falsehoods. Having caused the harm, Defendants cannot escape the liability."

**Ratio:**

It was held that "[t]he unique nature of [defamation] cases is well established." "In actions for other torts there is generally … some standard by which the reasonableness of an award of damages may be tested, but it is seldom so in actions for libel and slander where the elements of wounded sensibilities and the loss of public esteem play a part." Quoting from Yammine v. DeVita, 43 A.D.3d 520, 521, 840 N.Y.S.2d 652 (3d Dept.2007).

"For that reason, the amount of such damages is peculiarly within the jury's province[,] requiring prudence and restraint by a trial court in the exercise of its discretion over these awards." See Cantu v. Flanigan, 705 F.Supp.2d 220, 227 (E.D.N.Y.2010). "Due to the uncertainties in calculating [non-economic] damage awards [in defamation cases], New York courts have consistently held

that deference to the jury's findings is required in considering whether to reduce a jury's award." Citing Calhoun v. Cooper, 206 A.D.2d 497, 497, 614 N.Y.S.2d 762 (2d Dept.1994).

"Jurors are uniquely positioned to assess the evidence presented at trial and assign a monetary value to the plaintiff's non-economic damages." Cantu, 705 F.Supp. 2d at 227.

"In calculating non-economic damages in a defamation case, including humiliation, mental suffering and damage to Plaintiff's reputation, a jury may properly consider a number of factors." Id. Here, the jury was instructed to consider "plaintiff's standing in the community, the nature of the statement made about plaintiff, the extent to which the statement was circulated, the tendency of the statement to injure a person such as plaintiff, and all of the other facts and circumstances in the case." [Trial Tr. (Dkt. No. 244) at 1629; see also Cantu, 705 F.Supp.2d at 227–28 (listing same factors)] "Additionally, the jury may consider all future harm to the plaintiff's reputation, as well as any humiliation or mental anguish that plaintiff would suffer in the future." (citing Cantu, 705 F.Supp.2d at 228).

"Regarding the magnitude of punitive damage awards, due process requires that they be 'reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.'" quoting Hill v. Airborne Freight Corp., 212 F.Supp.2d 59, 75 (E.D.N.Y.2002) aff'd.

**Relevance:**

In this case, the Plaintiff suffered injury as a result of defamatory statements made by Defendant through blog publications, which he allegedly posted with the sole intention of humiliating the Plaintiff and destroying her reputation. Similarly, in the present case, Mr. Proman posted online defamatory content regarding Mr. Ludwin, his law firm, Ludwin Law Group, and his wife, Ms. Zeitlin. These posts were likely seen by thousands if not millions of people. They continue to be viewed today. All the statements were made by Mr. Proman with the sole intent of hurting Mr. Ludwin and his family and destroying his career. Mr. Proman also attacked Ms. Zetlin and accused her of being an escort and prostitute and posted slanderous statements knowing they were false and with the intention of causing harm.

Mr. Proman also attacked Ms. Zetlin through his vulgar posts and accused her of being an escort and a prostitute. He posted these slanderous statements knowing them to be false with the intention to cause harm. Along with these comments, he posted Ms. Zeitlin's number, address, where she worked, etc. Mr. Proman doesn't know her at all, so he used this method to defame her as it is easier to call a woman, a prostitute to bring down her reputation.

Consequently, Mr. Ludwin had no choice but to file litigation against Mr. Proman. This inherently caused stress and anxiety to Mr. Ludwin and Ms. Zeitlin because of the loss of reputation and business.

2. Margaret Hosseini v. Christine Hansen, Margaret D. Rice, Bonnie Poe, Nancy Wireman, Sarah Christian Hany, and Tracy Ross, Hosseini v. Hansen, No. 04-17-00790-CV (Tex. App. Mar. 20, 2019)

**Facts in Brief:**

Margaret Hosseini runs a tax preparation business and advertises those services on Facebook. She is also a primate trainer and owner who runs several online communities that provide resources about primates and works with the Legislature to advocate for primate ownership. On Facebook, she visited pages that interest her, particularly pages regarding primates, and came across a disturbing page promoting bestiality, which was posted by a group to which several of the appellees belonged. Hosseini reported the page to Facebook authorities, who removed it. According to Hosseini, because she reported the disturbing page, appellees posted threats and false statements on her personal and business Facebook pages. Hosseini sued the appellees and two other Facebook users, Margaret D. Rice and Nancy Wireman, alleging thirteen causes of action including defamation and stalking, and seeking damages, a temporary restraining order, and temporary and permanent injunctive relief. Hosseini alleged that the defendants posted libelous statements on her Facebook page, and because of these statements, her tax business decreased in value and she suffered a loss of reputation.

**Decision and Award:**

The District Court in Texas reversed the judgment of the trial court on appeal. It held that the defendants were liable for Hosseini's defamation claim, and that there were reasonable grounds and evidence to award general damages, reputational damage, and mental anguish, among other things.

**Ratio:**

Defamatory statements are published if they are "communicated orally, in writing, or in print to some third person who is capable of understanding their defamatory import and in such a way that the third person did so understand." Quoted from Exxon Mobil Corp. v. Rincones, 520 S.W.3d 572, 579 (Tex. 2017).

"When viewing the evidence in the light most favorable to the verdict, we conclude the jury could have reasonably inferred from the activity on Facebook that the postings were communicated in writing or print to a third person who was capable of understanding, and did understand, their

defamatory import. See id. We therefore hold the evidence is legally sufficient to establish the element of publication."

"Whether a plaintiff must prove the existence and amount of damages caused by the defamatory statement depends on whether the defamation claim is defamatory per se or defamatory per quod." Quoted from Cullum, 399 S.W.3d at 181.

"As opposed to defamation per quod, if an alleged statement is categorized as defamatory per se, general damages are presumed without requiring specific evidence of harm to the plaintiff's reputation. Id. Thus, a plaintiff may recover general damages, including damages for injuries to reputation and mental anguish, without proof of injury."

"A statement is considered defamatory per se if the statement injures a person in his office, profession, or occupation; charges a person with the commission of a crime; imputes sexual misconduct; or accuses one of having a loathsome disease." Quoted from Hancock v. Variyam, 400 S.W.3d 59, 66 (Tex. 2013).

Reputation damages are recoverable if the evidence shows a loss. Id. at 621. The evidence must show "that people believed the statements and the plaintiff's reputation was actually affected." Id. Reputation damages are not susceptible to precise calculation, and "the jury has discretion to estimate the amount that will reasonably compensate the plaintiff.

"A damage award for mental anguish is sufficient when the record contains 'direct evidence of the nature, duration, and severity of [the plaintiff's] mental anguish.'"

**Relevance:**

Similar to the above case, there were several defamatory posts with slanderous statements made by Mr. Proman, which can be traced back to his IP address. Almost all the IP addresses were ghosted except for one which came down to Mr. Proman. Even his google search history was about Mr. Ludwin and his wife and he took steps to avoid detection from the beginning evidenced in the fact that his search history shows that he also searched "how to conceal the IP address on maps". He knew how damaging his actions were and also knew how to avoid getting caught.

Therefore, there is an obvious case for defamation per se rooted in malice. Hence, the general damages shall be presumed, and the amount shall be as decided by the court to be just and reasonable. Also, there is reputational damage because Mr. Ludwin lost many business opportunities. Additionally, his and his wife's reputation among their friends, family, and clients have been compromised. This has caused them mental anguish and resulted in ongoing psychological trauma and anxiety. This case clearly supports the need for damages.

3. Roland Van Liew v. Philip Eliopoulos 92 Mass. App. Ct. 114 (2017)

**Facts in Brief:**

In 2007, Chelmsford's fire department and department of public works began considering options for a new fire station headquarters. One of the sites considered was a 2.41 acre property near the center of town, owned by Eastern Bank (the "Property"). Ultimately, however, the fire department and department of public works decided not to purchase the Property.

In 2008, a local real estate developer, Michael Eliopoulos, approached the bank about purchasing the Property. Michael Eliopoulos is the father of Philip Eliopoulos. Philip served as Chairman of the Chelmsford Board of Selectmen (the "Board") in 2007 and, thus, was familiar with the town's previous interest in purchasing the Property. Michael negotiated the sale of the property with Eastern Bank. Philip, a real estate lawyer, reviewed the draft agreements for his father and served as his real estate counsel. For a part of these negotiations, Philip remained in his position as Chairman of the Board.

In 2009, after his term on the Board had ended, Philip assisted Michael with development of the Property. Together, they created a plan for rehabilitating a historic house on the Property, and for constructing a new four-unit, family-owned office building. Philip represented Michael's corporation throughout the permitting process, and in several hearings before the historic district commission, conservation commission, and planning board.

Vociferous opposition to the project to develop the Property was led by a local business owner, Roland Van Liew. Mr. Van Liew ``published statements criticizing Philip for engaging in self-dealing and conflicts of interest at the expense of Chelmsford[,]" and he "flooded Chelmsford residents with his messaging, accusing Philip and other Chelmsford officials of violating State and local ethics laws". Mr. Van Liew's actions were intended to "conjur[e] up unsavory images of shady 'backroom' dealing at Chelmsford town hall, influence peddling, and fixed governmental proceedings." Mr. Van Liew's messaging went to extremes, and was communicated across several avenues including mass emails, letters, a DVD sent to thousands of Chelmsford residents, website postings, a "glossy newsletter entitled 'Why Perjury Matters', lawn signs, bumper stickers, letters to newspapers, automated telephone calls, and video recordings of conferences and meetings."

**Decision and Award:**

At trial, the jury found Van Liew liable for defamation and awarded Philip $2.9 million dollars in damages. Van Liew filed several post-trial motions, all of which were denied. Left with no alternative, Van Liew appealed the decision to the Appeals Court.

The central thrust of the Appeals Court decision dealt with whether Philip proved the elements of defamation of a public official. The Appeals Court ultimately held that the evidence was

sufficient to support the jury's finding that Van Liew defamed Philip, and concluded that the $2.9 million dollar award was appropriate.

Van Liew moved for judgment notwithstanding the verdict, a new trial on the counterclaim verdict, and a remittitur on the damages award. He claimed that the judge had hampered his ability to present his case and improperly admitted prejudicial evidence, that the proof of defamation was legally insufficient, and that the damages awarded were excessive. The judge denied all of the post-trial motions, and Van Liew raised the same claims on appeal.

With respect to Philip's time as Chairman of the Board, Van Liew had alleged that "Eliopoulos was simultaneously serving as Chairman of the [Board] and voted against [Chelmsford] purchasing [the Property]" in 2009. Van Liew's statement in this regard was false, as neither Philip nor the town voted against purchasing the property in March of 2009, or at any other time. Van Liew knew this statement to be false because he admitted at trial that "he had possession of the board minutes and had watched the video recording many times before making and repeating the false statement about the board vote."

The decision was upheld, and it was affirmed that the jury's award of reputational and emotional distress damages, amounting to $2.9 million, was neither punitive, disproportionate to the injuries proved, nor excessive.

**Ratio:**

To prove defamation, a plaintiff must establish that "Defendant was at fault for the publication of a false statement … regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss." White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 66, 809 N.E.2d 1034 (2004).

In determining whether an assertion is a statement of fact or opinion, "the test to be applied… requires that the court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a *908 particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published." Downey v. Chutehall Constr. Co., 86 Mass. App. Ct. 660, 663-664, 19 N.E.3d 470 (2014).

An appellate court, when faced with a defamation case, must independently review the record as to each defamatory statement to make certain that it supports the jury's finding of actual malice. Id. at 49, 865 N.E.2d 746, citing Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 514 & n.31, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

"A plaintiff in a successful defamation case is entitled … to fair compensation for actual damages, including emotional distress and harm to reputation (and any special damages that have been pleaded and proved)." Murphy, 449 Mass. at 67, 865 N.E.2d 746.

**Relevance:**

In this case, Mr. Van Liew, along with his company, made 29 defamatory statements and published them through various media including emails, letters, video conferencing, website postings, newsletters, newspapers, etc., that reached thousands of Chelmsford residents and damaged the reputation of Mr. Eliopoulos, causing him serious harm.

Similarly, Mr. Proman made multiple defamatory statements intended to harm Mr. Ludwin and Ms. Zeitlin to disrupt their business and personal life. The Defendant's statements included allegations that Mr. Ludwin was defrauding banking institutions and customers alike along with being incompetent in his profession as an attorney. Not satisfied with the results from these initial defamatory statements, Mr. Proman expanded both the scope of his audience and the severity of his campaign and accused Mr. Ludwin's then fiancée and now wife, Ms. Zeitlin, of being an escort/prostitute who had allegedly slept with over 500 men, most of them married.

Mr. Proman made these slanderous statements knowing fully well that Mr. Ludwin's profession depends largely on the relationship of trust founded over many years of service to his clients.

Mr. Proman also knew that his statements and accusations were false and he intentionally defamed Mr. Ludwin and Ms. Zeitlin out of malice.

4. Rombom v. Weberman 309 A.D.2d 844 (N.Y. App. Div. 2003)

**Facts in Brief:**

The defendant, A.J. Weberman created and maintained three websites on the internet that displayed statements pertaining to the plaintiff, Steven Rombom. An additional defendant, Mordechai Levy, contributed material concerning Rombom to Weberman that was placed on one of the websites. Weberman and Levy were members of Defendant Jewish Defense Organization, Inc. The plaintiffs commenced the present action, inter alia, to recover damages for defamation, and for a permanent injunction preventing further publication of the alleged defamatory material on the websites.

**Decision and Award:**

The jury returned a verdict in favor of the plaintiffs, awarding compensatory and punitive damages. The jury further ordered a permanent injunction to the extent of "directing the defendants to remove any and all published statements about plaintiffs and plaintiff Rombom's

family from their websites * * * found by the jury to have been libelous, and to the extent possible, from all mirror [s]ites upon which defendants caused those statements to be published, and prohibiting defendants from publishing any statements about plaintiffs and plaintiff Rombom's family found by the jury to have been libelous".

The jury awarded $8,510,000 on the defamation claim.

**Relevance:**

Similar to the above case, Mr. Proman in the present case published various defamatory statements against Mr. Ludwin,  his law firm, Ludwin Law Group and his wife, Ms. Zeitlin on various websites and even created fake accounts in Mr. Ludwin's name on Linkedin and Avvo, causing damages to the Plaintiffs for which they should be compensated.

5.  Cohen v. Hansen, Case No. 2:12-CV-1401 JCM (PAL) (D. Nev. Apr. 27, 2016)

**Facts in Brief:**

The plaintiffs, Steven Cohen and CAM, initiated this matter after the defendants, Hansen, created a defamatory website comparing the plaintiff[s] to notorious fraudster Bernie Madoff. Cohen testified that: (1) CAM lost "a $21 million dollar deal," allegedly because of the website; (2) his insurance provider did not want to renew his policy because of the website, but Cohen did not mention a specific dollar figure and the provider eventually did insure him; (3) one client was investing approximately $130 million with CAM at the time the website was online; and (4) he was so intent on making the website less prominent in internet search results that he spent between $100,000 and $200,000 on search engine optimization.

**Decision and Award:**

Cohen and CAM's evidence of economic harm was the type of competent evidence that served as a basis for their presumed general damages. After a seven-day trial, the jury unanimously found in favor of Cohen, awarding him a total of $35.3 million in compensatory damages and an additional $3 million in punitive damages.

The trial judge barred Hansen and his co-defendants from republishing the false and defamatory statements on their websites, ordered the defendants to take down the remaining website, and assigned the websites' domain names to Cohen.

**Ratio:**

"Because an allegedly defamatory statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability." "Where an expression of opinion implies a false assertion of fact, the opinion can

constitute actionable defamation." Quoting Sanders v. Walsh, 219 Cal. App. 4th 855, 864, 162 Cal. Rptr. 3d 188, 195-96 (Cal. Ct. App. 2013). "Moreover, simply stating that a factual assertion is an opinion does not make it so." Quoting Milkovich v. Lorain Journal Co., 497 U.S. 1; 19 (1990).

"General damages are presumed upon proof of the defamation alone … 'because of the impossibility of affixing an exact monetary amount for present and future injury to the plaintiff's reputation, wounded feelings and humiliation, loss of business, and any consequential physical illness or pain.'" Bongiovi, 138 P.3d at 448 (emphasis added) Quoting K Mart Corp. v. Washington, 866 P.2d 274, 284 (Nev. 1993).

"[A]n award of presumed general damages must still be supported by competent evidence but not necessarily of the kind that assigns an actual dollar value to the injury." Bongiovi v. Sullivan, 138 P.3d 433, 448 (Nev. 2006).

**Relevance:**

The facts of the above case are relevant to the Ludwin case. The Plaintiff was defamed by the Defendant, who published statements on a website falsely claiming that Mr. Cohen was a criminal and comparing him to convicted Ponzi scheme operator Bernie Madoff. The published content was viewed by thousands of people, and the Plaintiff suffered heavy business losses because of the shadow of doubt cast over his reputation. As a result, he was awarded compensatory and punitive damages. As for the case at hand, Mr. Proman defamed Mr. Ludwin, his firm, and his wife, Ms. Zeitlin, by posting slanderous statements known to be false on the internet and even created fake social media accounts posing as Mr. Ludwin, all in an attempt to ruin Mr. Ludwin's reputation and career. Mr. Ludwin suffered similar damages to those highlighted in the case above as his career depends on building relationships and cultivating the trust of his clients, all of which was lost as a result of the many defamatory statements made by Mr. Proman. Also, Mr. Ludwin was forced to give up a federal case in New York because of a conflict of interest. This was a direct result of Mr. Proman's foregoing actions, and it resulted in significant monetary loss to Mr. Ludwin. He had taken the federal case on a contingency basis and despite spending hundreds of hours working on it. Mr. Ludwin was unable to continue on it and could not recover the fee. Similar principles are applicable and damages should be awarded accordingly.

6. Cantu v. Flanigan, Civil Action No. CV-05-3580 (DGT/RLM) (E.D.N.Y. Aug. 27, 2007)

**Facts in Brief:**

The plaintiff, Cantu, was a successful industrialist in Mexico, and had been slandered and defamed through the circulation of an amicus brief prepared by the defendant, Flanigan, in which very serious allegations were made against Cantu. They included bribing the President, drug

peddling, the killing of children due to involvement in drugs, etc. Due to this defamatory publication, Cantu lost many business deals which that he could have otherwise converted.

**Decision and Award:**

Cantu filed the complaint against Flanigan in this action alleging defamation and seeking economic damages to compensate for his lost contracts, as well as noneconomic damages to compensate for the harm to his reputation, as well as humiliation and mental anguish. Cantu did not seek punitive damages. However, the court felt that this was a fit case to award punitive damages (even though the plaintiff did not seek them) to the tune of $150,000,000 on top of the presumptive damages of $38,000,000.

**Ratio:**

In assessing the amount of damages to award for defamation, a jury is not limited to compensating the plaintiff for 'economic' losses, such as demonstrable lost profits. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974). A plaintiff may suffer 'noneconomic' injuries as well. Among these is the loss of reputation, which includes the loss of professional status and the ability to earn wages, as well as any humiliation or mental suffering caused by the defamation. See Mattox v. News Syndicate Co., 176 F.2d 897, 901-02 (2d Cir. 1949). "[I]t is universally agreed that the damages recoverable in libel are the plaintiff's loss of reputation in the minds of those who know him or know about him, together with this mental suffering as a result of the libel."; see also Lundell Mfg. Co. v. Am. Broad. Co., 98 F.3d 351, 364-65 (8th Cir. 1996).

"It is settled that the amount of damages to be awarded in a defamation action is peculiarly within the jury's province, and that … the discretion of a … court over damage awards should be exercised sparingly." (internal citations omitted). Jurors are uniquely positioned to assess the evidence presented at trial and assign a monetary value to the plaintiff's non-economic damages. Therefore, although courts cannot avoid their duty to conduct a section 5501(c) review of the jury's verdict, the discretion to reduce such an award should be "exercised sparingly" under New York law.

In calculating non-economic damages in a defamation case, including humiliation, mental suffering, and damage to a plaintiff's reputation, a jury may properly consider a number of factors. In the above case, the jury was instructed to consider: "(1) the plaintiff's standing in the community, (2) the nature of the defendant's statements made about the plaintiff, (3) the extent to which the statements were circulated, (4) the tendency of the statement to injure a person such as the plaintiff, and (5) all of the other facts and circumstances in the case."

**Relevance:**

Though the facts of the above case are somewhat different than what we have in the Ludwin case, the effect is the same: Mr. Cantu, Mr. Ludwin, and Ms. Zeitlin were defamed by their respective Defendants, and the Plaintiffs in both cases suffered huge reputational, business, and personal loss because of defamatory statements published. The jury awarded sums as compensatory and punitive damages to the Plaintiff in the above case in appreciation that the reputational damage caused was immense. The same principles apply to the Ludwin case, as Mr. Proman used every opportunity to defame Mr. Ludwin, his law firm, Ludwin Law Group, and his wife, Ms. Zeitlin, by publishing untrue and defamatory statements against all of them. The extent of damage suffered by the Plaintiffs is huge, and damages can be awarded on similar grounds.

7.   Dial v. Hammond, North Carolina State Court (2015)*

In a heated Facebook exchange, Jaqueline Hammond implied that a previous business rival, Davyne Dial, had gotten drunk and caused the death of her own child. Dial's adolescent son had passed away in a tragic accident almost forty years previously. Dial used screenshots of the Facebook exchange to bring a lawsuit for defamation, intentional infliction of emotional distress, and negligent infliction of emotional distress. The lawsuit resulted in a $500,000 settlement for Dial, which is an unusually high amount for a private defamation lawsuit.

8.   Lawrence M. Destefano, Appellant/Cross-Appellee, v. Adventist Health System Sunbelt, 973 So. 2d 492 (Fla. Dist. Ct. App. 2008)

**Facts in brief:**

This action originated in Orlando, Florida, where Lawrence Destefano sued Rollins Bedford Corporation d/b/a Sunbelt Healthcare and Subacute Center ("Rollins"), among other defendants, for libel and slander. Mr. Destefano's mother had been a patient at Rollins in between hospital stays at a Florida hospital and another health care facility in Orlando. She suffered from Alzheimer's Disease and was in need of hospital care because of an infection in a wound on her foot. She was very ill. The cause of Mrs. Destefano's foot infection was key here: Mr. Destefano had a note from a Rollins employee that confirmed his mother had been neglected, and that improper medical care was the reason she had the infection. The note would be proof of malpractice, a "smoking gun" of sorts and that is what Rollins, as well as the other health care providers, found threatening and dangerous. Efforts were made to get back the note from Mr. Destefano so as to  defend against the claims of medical neglect. However, he refused to return the same. Mr. Destefano later discovered that his mother's medical records were filled with notations that discredited him and his character. If they were believed to be true, then his credibility as a plaintiff would be harmed.

Specifically, there were handwritten notes in his mother's medical charts that he had engaged in "inappropriate sexual conduct" with his mother. Details were provided that included descriptions

of the son "inappropriately kissing" his mother and "inappropriately" laying with her on her hospital bed.

And, the statements were spoken; these statements were also spoken to hospital employees, the Orlando Police Department, an elder abuse hotline, and the Department of Children and Families (elder abuse agency).

Sadly, Mrs. Destefano died. And, after her death, Mr. Destefano sued both individually and as the personal representative of his mother's estate for defamation (as well as other things).

**Decision and Award:**

The jury believed the son was a victim of libel and slander. They awarded him $1,000,000 in punitive damages and $1,000,000 in compensatory damages. However, the jury reduced his compensatory award by half because the defendants argued that by putting his complaints on picket signs, Destefano contributed to the damage of his own character. The appeals court didn't agree. The self-publication was deemed irrelevant to what Rollins had done in the first place. Destefano received the entire award of $2 million dollars.

**Relevance:**

In this case, the Florida appellate court not only affirmed the judgment that the plaintiff was a victim of defamation and upheld a punitive damage award of $1 million, but it increased his compensatory damage award to $1 million. The facts of this case are different from the facts of the case at hand. However, the effect of defamation on the Plaintiffs has been the same in both the cases. Mr. Ludwin and Ms. Zeitlin's character has been assassinated through the series of defamatory posts made by the defendant. They are victims of defamation and should be compensated fairly based on the severity of this case.

9.  Lipsig v. Ramlawi, 760 So. 2d 170 (Fla. Dist. Ct. App. 2000)

**Facts in brief:**

This story begins with a lawsuit filed against Zahid Ramlawi by Miami Columbus, Inc., and three other companies seeking the return of personal property as well as the repayment of some loans and return of what was alleged to be excess salaries. These companies were owned and operated by members of the Dahlawi family.

Ramlawi defended against these claims by filing a counterclaim back at the companies, arguing that there had been a breach of the partnership agreement he had with them, as well as defamation. In his counterclaim, he asked for salaries to be paid to him as well as severance and vacation benefits, along with the monies he had put into the companies and for defamation

damages. As part of his counterclaim, he sued Dahlawi's attorney, Daniel Lipsig("Lipsig"), for among other things, slander. He also sued one of the companies' employees, Nasim Rahman ("Rahman") for defamation damages.

It was found that Lipsig, Rahman, and two of the principals of the companies, Amin Dahlawi and Hassan Dahlawi, "falsely and maliciously" called Ramlawi all kinds of bad things, like:

- Crook;
- Thief;
- Embezzler; and
- Poor businessman.

They also said that he took "kickbacks." And they didn't whisper among themselves, either.

These statements were made many times and in many places, including "throughout the City of Miami." Lipsig was said to have made these defaming statements on the instructions of his clients, the Dahlawis.

**Ratio:**

First, under Florida law, a defamatory statement does not need to be stated "verbatim" to state a cause of action for slander. Edward L. Nezelek, Inc. v. Sunbeam Television Corp., 413 So.2d 51, 55 (Fla. 3d DCA 1982).

Second, if a statement implies the existence of undisclosed defamatory facts, then it's defamation. For example, oral communication is slander and grounds to recover damages if people hearing the comment "`… might have taken it to mean that the plaintiff was a person with whom commercial relations were undesirable.'" Wolfson v. Kirk, 273 So.2d 774, 778 (Fla. 4th DCA 1973)), rev. denied, 718 So.2d 170 (Fla.1998).

Third, under Florida law, truth "is only a defense to defamation when the truth has been coupled with good motive." Boyles v. Mid-Florida Television Corp., 431 So.2d 627 (Fla. 5th DCA 1983).

**Decision and Award:**

The jury trial took almost 5 months. Ramlawi won on his business counterclaims and on his defamation claims.

The jury held that three statements were defamatory:

1. a statement made by Lipsig to Tony Angelos, where Angelos was told that Ramlawi had taken money from the companies and that was why the Dahlawis and Ramlawi had "parted company";
2. a statement made by Rahman to Mr. Gerald Zadikoff that Ramlawi was a "thief;" and

3.  a statement made by Amin to Mr. Gerald Zadikoff that Ramlawi had misappropriated company money for his personal use.

It was found by the jury that he had been defamed on 3 separate occasions. He was awarded $10,000,000 in punitive damages and $175,000.00 against each defendant in compensatory damages.

**Relevance:**

In the case above, the Plaintiff was defamed on three separate occasions and was accused of theft, misappropriation, and embezzlement. Additionally, he was called a crook and a poor businessman. These terms were falsely and maliciously used against the Plaintiff to publicly ridicule him. Similarly, in the present case, Mr. Ludwin, Ludwin Law Group, and Ms. Zeitlin have been maliciously and falsely defamed by Mr. Proman. Defendant has accused Mr. Ludwin of an offense as grave as money laundering and also called him a conman through his posts on various websites. He has also maliciously targeted Mr. Ludwin's wife, Ms. Zeitlin, by posting false statements, calling her a cheating wife and an escort that has slept with more than 500 men.

Mr. Ludwin has had this feeling when he is out alone or with his wife that people know all the false information and they're judging him. Things like that creep in and affect him a lot. He feels a burden on his shoulders that he has never felt and now he has something to prove and that is why he has to work so much harder for that.

Clearly, the Plaintiffs have severely been defamed on multiple occasions by Defendant and deserve adequate damages with regard to the reputational harm.

# Section 7: Assessment of Damages

----------------------------------------

Inventory of Mr. Adam Ludwin's and Ms. Zeitlin's Links and Media – Appendix C

Negative Link Analysis – Appendix D

Examination of Reputational Impact Due to Online Search Keyword List Representing the Internet Defamation of Mr. Adam Ludwin and Ms. Zeitlin

Rationale for Recommendation of Damages

Summary Findings

Economic, Reputational and Rehabilitative Damages

Compensatory and Punitive Damages

**Inventory of Mr. Adam Ludwin's and Ms. Zeitlin's Links and Media – Appendix C**

**Negative Link Analysis – Appendix D**

**Examination of Reputational Impact Due to Online Search**

I first developed an initial understanding of the case and its adverse impacts, both qualitative and quantitative, on the professional life of Mr. Adam Ludwin and Ms. Joanna Zietlin. I then followed a methodology to examine the current and long-term reputational impact of search engine results originating from the defamatory content created and published by the Defendant.

- To develop a better understanding of the reputational impact of the defamatory content, I conducted an investigation to determine the entirety of the search terms that might be used by casual searchers to receive more information on the plaintiff's case. Tools utilized for assessing both current and past search engine results for the first twenty-five pages of each keyword included Google Keyword Planner, Keyword Tool, Moz, SpyFu, Ahrefs, Semrush, Serpstat, SEMScoop, and The Wayback Machine. Collectively, this information helped me better understand the most-searched keywords, and the extent of the damage to Mr. Ludwin and Ms. Zietlin, evidenced in Appendix C and Appendix D.
- Generally, what happens to individual victims like Mr. Ludwin and Ms. Zeitlin is that when a sensational falsehood envelopes the internet, people develop an interest in the story. This manifests in their own searches of key terms. Though the person-in question's name is an obvious keyword, curious searchers tend to insert additional terms after the name to get more information. As a result, the keywords are optimized organically. Please see the below "Keyword List" from Appendix C. Search engines like Google, Bing, and Yahoo may then flash the viral and defamatory posts, layering further credibility and harm atop the damage already caused.

**Keyword List** Representing the Internet Defamation of Mr. Adam Ludwin and Ms. Joanna Zeitlin

1. Adam M Ludwin
2. Adam Ludwin
3. Ludwin Law Group
4. South Florida Attorney Adam M Ludwin
5. Adam M Ludwin, Esq., of Ludwin Law Group
6. Attorney Adam M Ludwin
7. Adam M Ludwin false loan applications
8. Adam M Ludwin fraudulent conduct
9. Adam M Ludwin stealing customers banking information
10. Victims of Adam Ludwin
11. Beware of Adam Ludwin
12. Adam M Ludwin scammed me
13. Adam M Ludwin defrauded me
14. Adam Ludwin Attorney
15. Adam M. Ludwin, Sleazy Lawyer
16. victims of Shane M Ramos
17. Shane M Ramos
18. Shane M Ramos several jurisdictions
19. Gatsby Yachts by Shane M Ramos
20. Adam Ludwin Esq
21. dating Joanna Zeitlin
22. Joanna Zeitlin
23. Joanna Zeitlin Johnson and Johnson executive
24. Joanna Zeitlin account executive from Johnson & Johnson.
25. joanna Zeitlin boyfriend
26. Joanna Zeitlin escort
27. Joanna Zeitlin prostitute
28. Adam Ludwin Joanna Zeitlin
29. Adam M. Ludwin Joanna Zeitlin
30. Joanna Zeitlin Adam Ludwin
31. Joanna Zeitlin Adam
32. Joanna Zeitlin Adam Ludwin
33. Joanna Zeitlin Adam M. Ludwin
34. Joanna Zeitlin Ludwin
35. Plaintiff Ludwin Law Group, P.A.
36. Plaintiff Joanna Zeitlin
37. Adam Ludwin and Joanna Zeitlin
38. Adam Ludwin and Joanna Zeitlin Wedding
39. Adam Ludwin and Joanna Zeitlin Marriage
40. Plaintiff: Adam Ludwin, Joanna Zeitlin
41. Plaintiff: Adam Ludwin, Joanna Zeitlin, Ludwin Law Group, P.A.
42. Plaintiff: Adam Ludwin and Joanna Zeitlin, Ludwin Law Group, P.A.

43. Plaintiff: Adam Ludwin, Joanna Zeitlin, Ludwin Law Group, P.A. and Adam M. Ludwin, Esq.
44. Adam M Ludwin Attorney
45. Adam M Ludwin Esq.
46. Adam M Ludwin Lawyer
47. Joanna Zeitlin Adam M Ludwin Esq. Lawyer
48. Joanna Zeitlin Adam M Ludwin Esq.
49. Joanna Zeitlin Adam M Ludwin Lawyer
50. Joanna Zeitlin Adam M Ludwin Esq. Lawyer
51. Joanna Zeitlin Johnson and Johnson
52. Joanna Zeitlin Ludwin and Ludwin Law Group, P.A.
53. Joanna Zeitlin Phone Number
54. Adam M Ludwin Phone Number

People primarily search these viral or featured individuals via their name, leading to the formation of the first and foremost searched keywords for them. When you type their name in the search bar, defamatory contents may flash on your screen, and a completely unaware person develops the basic understanding of the perceived case because of the well-optimized snippets of the defamatory posts. This likely took place in this case, with Mr. Ludwin and Ms. Zeitlin flashing across several prominent media platforms, websites as well as professional networking platforms like LinkedIn and Avvo.

- Along with the posts, there are many images that appear in the search results that contribute to the defamatory effect on the plaintiff's reputation. This creates a new layer of reputational issues related to images, whereby additional keywords are tagged for each image. For example, in "Google Images" within Appendix C, keywords 'Adam M Ludwin', 'Adam Ludwin', 'Ludwin Law Group, 'South Florida Attorney Adam M Ludwin', 'Adam M Ludwin, Esq., of Ludwin Law Group', 'Attorney Adam M Ludwin' features photos of Mr. Ludwin and his wife Ms. Joanna from the false and erroneous content created by Mr. Proman to harm them and their digital presence.

- Next, I investigated the search phrases that produced top results on the search results page. For example, searching 'Joanna Zeitlin Adam Ludwin', 'Joanna Zeitlin Adam' or 'Ludwin Law Group' populates the false and defamatory posts about both Mr. Ludwin and his wife because their names were mentioned in those posts along with their personal mobile number and email ids.

- Mr. Proman used various platforms to create false posts about Mr. Ludwin, his business and his wife. He even created fake Linkedin and Avvo accounts in the name of Mr. Ludwin to directly target his business and tarnish his reputation as a lawyer. We researched the various platforms used by him to disseminate the said content and found that the

defamatory information continues to define their online reputation to date. These posts have  caused reputational damage.

- Additionally, the case documents stemming out of the defamation, encompassing all the negative and false details about the three Plaintiffs, are available online and add to the existing defamatory posts initially created by Mr. Proman. The  result is that  whenever someone searches Mr. Ludwin,  his law firm or  his wife, Ms. Zeitlin's name, the person will end up viewing the said documents reflecting all  three Plaintiffs in bad light and perceive them the same way.

- As we study the search engine results of each keyword outlined in Appendix C, we see that restoring the plaintiffs' reputation will also require suppressing the negative posts that currently define their erroneous digital presence. We use the criterion that the negative material must first be relocated past the tenth page of search results to successfully repair the reputation of all the three Plaintiffs. This has to be performed separately for each and every search phrase identified in Appendix C. However, to rehabilitate a reputation and minimize the likelihood of someone finding negative information, we must often suppress false and negative content past page twenty-five.

- I conducted further research into the search terms and results that may be found in any of five major search engines: Google, Bing, Yahoo, Duckduckgo, and Searchencrypt. I found that regardless of the search engine, the results from the Appendix C referenced keywords are compromised by the erroneous and defamatory content. Please reference the 'Google Search Result', 'Bing Search Result', 'Yahoo Search Result', 'Duckduckgo Search Result', and 'Searchencrypt Search Result' within the Internet Defamation Link Analysis Section in Appendix C.

- The findings of my research in following the aforementioned considerations are attached in Appendix C, Appendix D, and Appendix E. The documents demonstrate the defamatory content that still exists today.  It also highlights diverse search terms that feature the false and erroneous content on Mr. Ludwin and Ms. Zeitlin. Additionally, the documents clearly articulate the damage from a geographic perspective, whereby the defamation is not limited to one area in the United States where either the plaintiffs or defendant live, but rather ubiquitously (defined as present, appearing, or found everywhere) throughout the world. Please consider all the 'Location' entries within each 'Keyword' within the Google Results by Location Section in Appendix C.

**Rationale for Recommendation of Damages**

In my opinion, the present case is one of the most, if not the most, severe, malicious, and alarming examples of how a professional as well as personal life can be harmed and ruined from intentional internet defamation. The posts created on various websites against Mr. Adam Ludwin and his wife, Ms. Joanna Zeitlin, are slanderous and defamatory; they have a direct bearing on the extensive losses and injury caused to the Plaintiffs.

The slander/defamation agitated here in the current suit is against Mr. Proman, who has brazenly flouted federal and state laws against defamation and erroneous statements. The defendant is directly responsible for the creation and propagation of the defamatory content over the internet, as outlined. The continuous amounts of posting and reposting the same false content by Defendant was his calculated way of spreading the said content over the internet. He undoubtedly surpassed all other mediums of expression. As evidenced in Appendix C, Appendix D, and Appendix E, the content did reach an audience, and completely compromised Mr. Ludwin's, his law firm's, and Ms. Zeitlin's online identity and reputation.

The Plaintiffs were clearly slandered and defamed, especially when considering the sensitivity of legal matters. Mr. Adam Ludwin, an actively practicing attorney, is engaged by clients at least in part based on his reputation and ability to foster trust, all of which are permanently affected by Mr. Proman's internet defamation. The potential consequences of Mr. Proman's intentional acts have been catastrophic to Mr. Ludwin's professional reputation.

It is evident that such a defamatory campaign initiated by Defendant is entirely based on intent of malice, rooted in the fact that Mr. Ludwin was the attorney representing his client in a suit against the then Defendant, Mr. Proman. In other words, Mr. Ludwin was forced to go through this humiliation for merely doing the job for which he had been hired. As a result, Mr. Proman decided to threaten and attack Mr. Ludwin and his family.

Defendant at first targeted Mr. Ludwin by posting entirely false statements about him on various internet platforms, calling him a "scammer" and "fraud". Defendant defiantly and maliciously published a succession of escalating false and defamatory posts even after a cease- and-desist notice was sent by Mr. Ludwin.

As if attacking Mr. Ludwin was not sufficient, Defendant then escalated the damage and undue pressure against Mr. Ludwin by attacking and publishing false and malicious posts regarding Ms. Zeitlin, Mr. Ludwin's then-fiancée and now wife, who had nothing to do with the federal case against Defendant beyond the fact that she was Mr. Ludwin's fiancée. Ms. Zeitlin thus became a target of the Defendant. In an attempt to harass, intimidate, and subject

Mr. Ludwin to such an overwhelming degree of shame that Mr. Ludwin would either comply with the Defendant's demands or withdraw as an attorney on the case altogether, thus leaving Mr.Ludwin's clients in the federal case are in an extremely disadvantaged and vulnerable position.

Defendant stooped to a new low by calling Ms. Zeitlin an "escort" and a "prostitute" in his posts over various other websites. He posted and reposted lewd statements about Ms. Zeitlin in order for it to reach a larger audience. This has catastrophically impacted Ms. Zeitlin's reputation at her workplace, and among family, friends, and society at large. Ms. Zeitlin continues to feel humiliated as a result of those posts.

Defendant also created fraudulent accounts under Mr. Ludwin's identity on Linkedin and Avvo in an attempt to post false information about him and further damage his reputation.  Additionally, what makes the current scenario even worse is that the case documents involving Mr. Ludwin and Ms. Zeitlin are available online and add to the defamatory posts already existing against them. This has further ruined Mr. Ludwin's professional reputation, since anyone searching for him online to potentially hire him would perceive him differently as a result of those documents. The case documents may show him as an incompetent professional with a negative reputation.

The Defendant's defamatory actions against all the three Plaintiffs were known to be untrue and purposely defamatory. Mr. Proman created and posted the content with impunity. He clearly not only turned a blind eye to the consequences of the slander/defamation against all the three Plaintiffs—Mr. Ludwin, Ludwin Law Group, and Ms. Zeitlin—but also openly conducted the smear campaigns with no consideration of the plight of Mr. Ludwin and his wife.

**Summary Findings**

1. Damage Was Caused to the Plaintiffs' Local, National, and International Reputation

As highlighted in Appendix C, Appendix D and Appendix E, the online reputation of Mr. Ludwin, his firm, Ludwin Law Group, and his wife, Ms. Zeitlin, has been completely ruined. The defamation compromises Mr. Ludwin's as well as Ms. Zeitlin's professional standing, ability to live a normal life, and ability to represent themselves accurately as working professionals. Because of the concentration of activity and the viciousness of the attacks, a large percentage of people that both Mr. Ludwin and Ms. Zeitlin interact with as an attorney and a sales executive respectively, are aware of the negative sentiment and judge them accordingly. On many occasions, past, current, and prospective clients have questioned Mr. Ludwin about the negative press and accusations made by Mr. Proman (Appendix C, Appendix E).

2. Damage Was Caused to the Plaintiffs' Reputation in the United States

As highlighted in Appendix C, Appendix D and Appendix E, the exponential posting and reposting of the negative content has completely compromised Mr. Ludwin's and Ms. Zeitlin's reputation within the United States and across international boundaries. No matter where they move or visit, someone will likely develop an unfavorable opinion of them after searching their name on the internet. As outlined in Appendix C, if they move their jobs or family to California, New York, Chicago, London, or Sydney, the negative sentiment would persist. There is an almost certain probability that people considering interacting with Mr. Ludwin or his wife, personally or professionally, will search for their names on the internet. These people will likely develop an unfavorable or suspect opinion about them based on the false and defamatory content viewed. Additionally, the business at Mr. Ludwin's law firm has been severely impacted by the defamatory campaign Defendant orchestrated and the firm will continue to lose business as potential clients search online for information about it and develop an unfavorable opinion.

3. Damage Was Caused to the Plaintiffs' Global and International Reputation

As highlighted in Appendix C, Appendix D and Appendix E, the expansive portfolio of the negative content existing online (including the court documents) completely compromises Mr. Ludwin's as well as Ms. Zeitlin's personal and professional reputation on a global basis. Appendix C highlights the fact that if you search for 'Joanna Zeitlin Adam Ludwin', 'Joanna Zeitlin Adam' or 'Ludwin Law Group' in London or Sydney, the erroneous posts about them on various websites are featured prominently, which will impact Mr. Ludwin's as well as Ms. Zeitlin's professional and personal life.

4. Without Restoration Measures, the Damage Will Define the Plaintiffs' Professional Online Identities

As clearly outlined in Appendix C, Appendix D and Appendix E, Mr. Ludwin's and Ms. Zeitlin's false reputation currently defines their perceived identity. Mr. Proman was the originator of the defamatory posts and republished the same content on various websites so it could reach a greater audience. The availability of the court documents over the internet posted by Mr. Proman could even make the public believe that such false allegations against the Plaintiffs are true to some extent. The Plaintiffs' online reputation will remain tarnished until the negative and erroneous content is mitigated. This has impacted the Plaintiffs' professional opportunities and especially Mr. Ludwin's ability to engage with clients as an attorney on his own merits.

5. Plaintiffs' Previous Digital Presence Cannot Be Fully Restored

We can only mitigate some of the damage and alleviate a portion of the current negative footprint. Negative information about Mr. Ludwin, his law firm, and Ms. Zeitlin will likely remain discoverable forever. Target material may be hidden when suppressed to lower pages, potentially away from the eyes of casual searchers or prospective clients, but anyone interested in finding and tracking the erroneous content will be able to do so if they investigate deep enough into the search engine results pages.

We collaborate with a diverse group of public relations, digital marketing, and law firm partners. Depending on the nuances of the case and the client's overall objectives, we consider the most appropriate partners for creating high quality content and strategic PR placement. We shared the names of the three plaintiffs with several of our PR and branding strategic partners, seeking preliminary guidance on how they would approach such a case (a routine practice for prospective digital reputation repair clients).

We highlight here one of the responses we received that aptly aligns with our own conclusions:

"If Mr. Ludwin and Ms. Zeitlin were to come to our agency asking to repair their online presence, the first thing I would make clear is that it's impossible to return to the online reputation they previously had. We could certainly improve their presence over time—perhaps even significantly—but it would require a lot of patience and a lot of work.

"These categorically false, misleading, and defamatory statements are what Mr. Ludwin, his law firm and Ms. Zeitlin are known for. Improving their online presence will require proving to search engines (and searchers themselves) that there is other content that is more important than the series of posts that now represent them on the internet. That's a hard case to make."

Mr. Ludwin, his firm Ludwin Law Group, and his wife, Ms. Zeitlin, have a few notable points working against them here:

- There are not just one or several negative links showing up for their names; the first several pages of search results across many keywords comprise damaging information created by the Defendant.
- Anyone performing an internet search to learn about "Adam Ludwin" may add "attorney" or "lawyer" after his name, especially when considering his law firm. Search engines now strongly affiliate Mr. Ludwin's name with the series of false stories and accusations fabricated by the Defendant. It is inherently challenging to prove to Google that content unrelated to these stories is just as important, if not more so. Additionally, Ms. Zeitlin's uncommon and rather unique name (Joanna Zeitlin) when Googled by people would affiliate her name with the series of defamatory posts created by the defendant. In her professional life as a business development executive, she has to foster trust as a means for being successful, and when people Google her, which they inevitably do, her reputation is compromised.
- Mr. Ludwin and Ms. Zeitlin had to embarrassingly explain to each family's relatives and their respective parents that Mr. Ludwin was not a criminal and Ms. Zeitlin was not a prostitute, because the numerous posts made by Defendant were the first to appear in internet searches browsers when family and friends browsed their wedding registry online.
- The combination of content sources published and ranking for Mr. Ludwin's and Ms. Zeitlin's name are highly authoritative and notoriously difficult to push down.

6. Statements made by Defendant through his posts are Defamatory Per Se and were made with an Intent of Malice.

Another strong consideration here that affirms the seriousness of this case and justifies the magnitude of recommended damages is that this is a clear instance of statements being defamatory per se, made solely with the intent of malice. We reach this definitive conclusion in alignment with the opinions of the cases highlighted in this report and cited in Appendix F

According to the Florida law on defamation, there are four types of statements that are considered defamatory per se. These are:

- Statements made about a person committing a felony.
- Statements asserting a person possesses a disease.
- Statements and imputations that a person possesses characteristics unfit for business.
- Statements asserting a woman has acted promiscuously.

Mr. Proman has made multiple erroneous statements about Mr. Ludwin and Ms. Zeitlin that

clearly qualify as defamatory per se with regard to the Florida statute. Mr. Proman has

recklessly accused Mr. Ludwin of committing serious offenses such as money laundering.

Additionally, Mr. Proman has accused Mr. Ludwin of scamming him and many others. He has also openly questioned Mr. Ludwin's standing with the Florida Bar as an attorney, indicating that he is incompetent. Mr. Proman claimed that Mr. Ludwin has had a history with controlled substances and possesses a bad temper. Mr. Proman has clearly intended to tarnish Mr. Ludwin's reputation as an attorney knowing that the very heart of Mr. Ludwin's profession is based on his reputation and how he is perceived.

Mr. Proman has repeatedly targeted Mr. Ludwin and his wife, Ms. Zeitlin, through the defamatory posts in furtherance of ruining their career and reputation. Mr. Proman made a series of false and scandalous statements about the Plaintiffs claiming that they are both famous in Florida for their ''anything goes'' swinger parties. Mr. Proman via his posts has claimed that Ms. Zeitlin is an escort/prostitute who has slept with over 500 men and has been working as one for the past 10 years.

The above-mentioned false statements originated and were reposted several times by the Defendant and qualify as defamatory per se according to the Florida laws.

"Under Florida law, a false and defamatory statement accusing someone of a crime, as here, is considered to be per se, actionable without proof of special damage." Miami Herald Publishing Co. v. Brautigam,127 So.2d 718, 722 (Fla. 3d DCA), cert. denied, 135 So.2d 741 (Fla. 1961), cert. denied, 379 U.S. 821, 82 S.Ct. 828, 7 L.Ed.2d 786 (1962).

"In a per se action, the injurious nature of the statement is apparent from the words in the statement itself and the court consequently takes notice of that fact." Scobie v. Taylor, No. 13-60457-CIV-Scola, 2013 WL 3776270, at *2 (S.D. Fla. July 17, 2013) (citing Campbell v. Jacksonville Kennel Club Inc., 66  So.2d 495, 497 (Fla. 1953)).

In Alan v. Wells Fargo Bank N.A. 604 F. App'x 863, 865 (11th Cir. 2015), it was held that,  "A written publication constitutes libel per se under Florida law if, when considered alone and without innuendo, it (1) charges that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession."

Another decided case law by the Supreme Court of Florida in Richard v. Gray, 62 So. 2d

597 (1953), Supreme Court of Florida, en Banc. where the court opinionated on the statements that qualify as actionable per se. In this case, the appellant was an attorney and was also a city

councilman of the city of Miami Beach, Florida. The appellee was a radio commentator. The statements complained of were made by the appellee in a radio broadcast over a radio station in Dade County, Florida. A transcript of the entire broadcast was attached to the appellant's complaint. Here, the appellant made a statement to the St. Louis Post Dispatch

(which story was also carried by Miami newspapers) to the effect that he had received a bribe offer of $200,000 to allow punchboards to operate. Most of this particular broadcast by the appellee was devoted to comment on the appellant's statement to the St. Louis Post Dispatch respecting the offer of a bribe, and it is this comment that formed the basis for the suit for libel.

The court was of the opinion that there was no doubt the publication in this case was actionable per se. After hearing the appellee's broadcast, a "common mind" could reach no other conclusion than that the appellant had been guilty of conduct so heinous as to warrant his removal from office as a city councilman. The imputation of dishonesty on the part of the appellant is also indisputable. And the fact that the appellee shrouded in secrecy the exact nature of such conduct and left it to the conjecture of his listeners adds to rather than detracts from the opprobrium of his remarks. The appellees' statements necessarily tended to subject the appellant to distrust, contempt, and ridicule, and to injure him in his professional, official, and personal relations, and they are actionable per se.

Similarly, Mr. Proman's posts were directly aimed at injuring Mr. Ludwin and Ms. Zeitlin's professional, official, and personal relations. The statements made through the posts unquestionably qualify as actionable per se.

These posts are a mixture of ridicule comments and some facts (like pictures, address, place they work at). It makes the third person believe that it is true. Both Mr. Ludwin and Ms. Zeitlin even had to clarify the situation to their parents.

Again, in the case of Ford v. Rowland, 562 So. 2d 731, 733 (Fla. Dist. Ct. App. 1990), the appellant, Sue Ford, an incumbent port commissioner of the Canaveral Port Authority, was the Plaintiff in an action against multiple Defendants for libel, conspiracy to defame, and intentional infliction of emotional distress.

The action concerned a poem written by a former deputy director of the Port Authority, Ken Karpinski. After circulation of the poem at a Cocoa Beach Area Chamber of Commerce social function on September 3, 1986, Ford sued Karpinski and the Port Authority (Port), as well as the chamber of commerce, Tom Newbern (port commissioner), Charles Rowland (port director), Wes Houser (former port commissioner), and the latter's wife, Charlotte Houser. The poem apparently was written and circulated after a contested election for two seats on the Port Authority. The court was of the opinion that it was readily apparent that the "Suzy Commissioner"

in the poem referred to Sue Ford; moreover, the poem reasonably could be read, although not necessarily so, as referring to Ford as a "hooker".

Another opinion was that the terms "junkie" and "hooker" in the eighth stanza referred to Tom Dolan and Diana Greer, respectively. Statements which impute unchastity on the part of a woman Plaintiff is libelous per se. See Campbell v. Jacksonville Kennel Club, 66 So.2d 495, 497 (Fla. 1953).

It was noted that the term "hooker" without dispute, refers to a prostitute. Thus, if the finder of fact determined that the term "hooker" factually referred to Ford, libel per se would be established—unless the poem could not reasonably be read as describing an actual fact about Sue Ford or an actual event in which she participated. See, e.g., Hustler Magazine v. Falwell, 485 U.S. 46, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988); Dworkin v. Hustler Magazine, Inc., 668 F. Supp. 1408 (C.D. Cal. 1987), aff&#39;d, 867 F. 2d 1188 (9th Cir. 1989).

As stated in Dworkin, a defamatory publication must "convey to a reasonable reader the impression that … [it] describe[s] actual facts about the Plaintiff or activities which she participated in to be actionable."

Finally, it was held that a line can be drawn between real and fictional name calling in the world of defamation. The line in a poem that called someone a hooker was considered defamatory, because hookers are real—while the line in the poem calling someone a witch was not considered defamatory, because witches are not real.

Similarly, Mr. Proman published several posts alleging that Ms. Zeitlin was a prostitute for ten years and accused her of sleeping with more than 500 men. These allegations without a doubt qualify as defamatory per se.

Our understanding of a statement being defamatory per se also references the case of Hancock v. Variyam, 400 S.W. 3d 59, 66 (Tex. 2013) (Refer Appendix F). A statement is considered defamatory per se if the statement injures a person in his office, profession, or occupation; charges a person with the commission of a crime; imputes sexual misconduct; or accuses one of having a loathsome disease.

In the present case, the posts made by Mr. Proman against Mr. Ludwin falsely accuse Mr. Ludwin of an offense as grave as money laundering and state that he is a fraud, clearly substantiating that this is an obvious case of defamation per se. Mr. Proman also made statements against Mr. Ludwin questioning his veracity of truthfulness as an attorney. While statements that are successfully proved as defamatory per se hold a firm ground and strengthen the Plaintiff's case, they also provide a framework for assessing the quantum and proof of damages that should be awarded by the court in this "textbook" case of internet defamation.

Where a statement has successfully been proved to be defamatory per se, the plaintiff need not prove the actual damages in the court of law; they shall be presumed. Even the statements made by Mr. Proman against Ms. Zeitlin through the defamatory posts, calling her an "escort"' and accusing her of earning money as a "prostitute" are clear examples of how Mr. Proman targeted Mr. Ludwin and his wife both personally and professionally and how one's reputation can be ruined by statements that are defamatory per se.

On that note, refer to the case of Allen v. Ariz. Dep't of Corr., 1 CA-CV 07-0242, 2009 WL 2382026 (Ariz. Ct. App. Aug. 4, 2009) (citing Boswell v. Phoenix Newspapers Inc. 152 Ariz. 1, 6 n. 4, 730 P.2d 178, 183 n. 4 (Ct. App. 1985)) (Refer Appendix F), where it was said that in defamation per se claims, proof of actual damages is not required as damages shall be Presumed.

In this case, since the statements made by Mr. Proman are defamatory per se, the Plaintiffs are entitled to claim significant damages without the need to prove damages were actually caused. Thus, they may recover general damages, including damages for injuries to reputation and mental anguish without proof of injury.

Citing another notable case in Margaret Hosseini v. Christine Hansen, Margaret D. Rice, Bonnie Poe, Nancy Wireman, Sarah Christian Hany, and Tracy Ross (Refer Appendix F): Hosseini, the owner of a tax preparation business and operator of several online businesses, was defamed by the defendants after she reported that their Facebook page that promoted bestiality. The defendants posted threats and false, libelous statements on her personal and business Facebook pages that led to a loss of reputation and her tax business decreasing in value. Hosseini sued the defendants, alleging thirteen causes of action including defamation and stalking, and sought damages, a temporary restraining order, and temporary and permanent injunctive relief. The court held that defendants were liable for Hosseini's defamation claim and that there were reasonable grounds and evidence to award general damages, reputational damages, and damages for mental anguish, among other things.

As in the Hosseini case above, there were several defamatory posts made by Mr. Proman that he eventually reposted on other websites so as to maximize the viewership of the defamatory content. Therefore there is no doubt that Mr. Proman's statements amounted to defamation per se. Hence, general damages shall be presumed and the amount shall be as decided by the court to be just and reasonable. Also, there is reputational damage because Mr. Ludwin continues to lose business opportunities. Mr. Ludwin's and his wife, Ms. Zeitlin's, name is tarnished among their friends, family, and current and prospective clients.

Another significant consideration that makes this case more disturbing is that the false statements made by Mr. Proman against my clients were not only limited to the posts. Defendant created fake profiles of Mr. Ludwin on LinkedIn and Avvo to defame him further. The Defendant's

actions were not only defamatory per se, but also indicated credible evidence of intent of malice, hatred, ill will, and spite. There was absolutely no standing in the claims made by the defendant. His intention to harm Mr. Ludwin and his wife in numerous ways gives us a clear view of his intention to defame them.

When we talk about the intent of malice as an important ingredient to prove a case of defamation, we would specifically like to highlight the landmark judgment New York Times Co. V. Sullivan (refer to Appendix F) that established the New York Times' actual malice standard in the entire United States. Thus, it was ruled that one had to prove that the statements published knowing they were false or with reckless disregard for the truth to justify the intent of actual malice.

It is pertinent to note that the standard requires proof of a "state of mind" in persons who are responsible for the publication. Since the Defendants are unlikely to admit they knowingly or recklessly published a falsehood, the Plaintiff must rely on circumstantial evidence to prove the required mental state.

This judgment assists us in justifying that, even in our case, there was an element of actual malice involved since Mr. Proman knew his posts and statements about Mr. Ludwin and his wife were false and held no basis in truth whatsoever. The statements were made with the intent to defame Mr. Ludwin and his wife and ruin their reputation, while simultaneously harming their business and their ability to earn a living and provide for their family. Mr. Proman's statements affected Mr. Ludwin's business considerably—he was forced to answer innumerable questions thrown at him. He suffered significant losses in terms of potential clients. Mr. Proman's mental state here clearly held an absolute intention to inflict harm.

The intent of actual malice is again a strong point of consideration for the court when deciding on the amount of damages to be awarded to the Plaintiffs. It broadens the ambit of damages to which Plaintiffs are entitled.

The mere reason why Mr. Proman started defaming Mr. Ludwin was that he wanted Mr. Ludwin to drop the case against him and discontinue his representation as an attorney in the initial case. Mr. Ludwin, in order to protect him and his family, was forced to drop the case due to conflicted interest.

Mr. Adam Ludwin talked about how and when the defamation comments were brought to his knowledge. Mr. Proman had made a post about Mr. Ludwin's client and his company. Mr. Ludwin's client got worried as the company started to lose business. Looking at the internet posts, they came across another post that talked about frauds and that Mr. Ludwin had been working with the company to defraud his clients. Mr. Ludwin didn't even consider it a possibility

as to how these comments would affect his life and relationships. Clearly, Mr. Proman's actions sprouted out of his intent of malice to destroy Mr. Ludwin by attacking him and his wife merely because he was an opposing attorney in one of the cases.

On similar lines, in the case of Gertz v. Robert Welch Inc. (Refer Appendix F), the court held that states may not allow punitive damages in libel cases unless the Plaintiff has at least established that Defendant acted with actual malice (knowledge of falsity or reckless disregard for the truth). Welch received $100,000 compensatory damages and $300,000 in punitive damages. The court of appeals was concerned about the injury to Gertz's reputation and the unmistakable proof of actual malice.

Similarly, in our case a comprehensible intent of actual malice can be demonstrated through the chain of posts made and reposted against the Plaintiffs along with the fake profiles created. Mr. Proman's initial set of statements made through the posts, accused Mr. Ludwin of money laundering and defrauding, and scamming him, along with false claims that Mr. Ludwin was an incompetent attorney because of a history with controlled substances (all false). Mr. Proman also falsely accused Mr. Ludwin of being engaged with criminals and called him armed and dangerous. Mr. Proman clearly made remarks challenging Mr. Ludwin's standing as an Attorney.

The second wave of Mr. Proman's defamatory campaign was aimed at attacking Mr. Ludwin's wife, Ms. Zeitlin, falsely claiming she was a prostitute who had slept with more than 500 men and had been working as a prostitute for the past ten years. Mr. Proman's lewd statements also included accusations that she gained financial success in the escort industry and was known in the secret community for "kinky roleplaying services" and "unique acts and techniques" and making her clients' fantasies come true." Mr. Proman stooped to a new low when he accused Ms. Zeitln of cheating on her husband. Mr. Proman's allegations were blatantly untrue and are evidence of actual malice on his part. The posts about Joanna were vulgar and were clearly aimed at tearing down her reputation as a woman.

Defendant also created fraudulent accounts under Mr. Ludwin's identity in "LinkedIn" and "Avvo" in an attempt to post false information about Mr. Ludwin and further damage his reputation.

The defamatory campaign orchestrated by Mr. Proman was rooted in malice since he used it to harm Mr. Ludwin and his family after Mr. Ludwin refused to conform to his demands and settle the case. Defendant took advantage of Mr. Ludwin's vulnerable position and made physical and verbal threats to both repeatedly. He called Mr. Ludwin and said that he was coming to their house to physically hurt them "in New York style". This led to a change in the lifestyle of both. They were always armed wherever they went. They even installed cameras 360 degrees because this was the first time Ms. Zeitlin got violent threats. As a result, she did not feel safe. All these

incidents make her sick that Mr. Proman has invaded his life and privacy because she has to constantly think about this and work on this defamation case.

Beyond online defamation, Mr. Proman, planned and implemented a fraudulent and criminal scheme wherein he filed a false police report stating that Mr. Ludwin threatened to murder him.

In fact, Defendant falsely reported to the Beverly Hills Police Department that Mr. Ludwin stated to the Defendant, "I'll put a bullet in your f*ckinghead and you won't be missed." See Copy of the foregoing Police Report filed by Defendant with the police (Appendix E).

Mr. Proman then took the false police report and filed a fraudulent complaint for a restraining order against Mr. Ludwin, which was directly based on the allegations in the aforementioned false police report, and Defendant even presented the false report as evidence to get the Court to grant an injunction against Mr. Ludwin.

Mr. Proman also made false statements under oath in his complaint for injunctive relief against Mr. Ludwin. The complaint attached in Appendix E includes quotes from transcripts of FBI-recorded telephone calls wherein Defendant had intentionally, falsely, and maliciously accused Mr. Ludwin of threatening to kill him. The quotes further reaffirm that Mr. Proman intended to make Mr. Ludwin and his family suffer. Mr. Proman indicated that he would make Mr. Ludwin's life difficult. The Defendant's actions were intentional, were with malice, and were made with reckless disregard for the truth.

With such a clear portrayal of Mr. Proman's intent of malice, Mr. Ludwin and Ms. Zeitlin are entitled to receive adequate damages—both punitive and compensatory. In the case cited, an injury to Gertz's reputation along with an unmistakable proof of actual malice led to the court awarding him compensatory as well as punitive damages.

The case at hand also bears clear evidence of actual malice and harm to Mr. Ludwin's as well as his wife, Ms. Zeitlin's reputation by Mr. Proman. The posts and erroneous comments on websites as well as the case documents available online can be viewed by anyone at any time, to this day. The websites have 265k visitors per month and these posts are directly viewed online through foregoing reposting. This extra step had a multiplicative impact on the overall reach of defamation. This is one of the many ways Mr. Proman maliciously used social media to ruin Mr. Ludwin's reputation as a lawyer. We cannot possibly know exactly how many people saw the content, but it is important to note that people have viewed the content and engaged with it.

This case is not just based on merit of actions but is also a standalone deterrent for anyone considering compromising the reputation of an innocent individual or business as the case with Mr. Ludwin. Mr. Proman has not only openly shown his malicious intentions against Mr. Ludwin

and his wife, Ms. Zeitlin, by way of threatening them and making their lives difficult, he has also made malicious and racist remarks about Mr. Ludwin's former client, who is a person of color.

To give an example, the following is an excerpt from Mr. Proman's conversation with Mr. Ludwin, where he is heard stating how he is going to come after Mr. Ludwin as well as his former client, referring to him with the N-word, which is of course extremely offensive and controversial.

|  |  |  |
|---|---|---|
|  |  | lawyers for fucking three weeks? You won't see a fucking dollar. Okay? |
| Matthew Proman: | 02:06 | And if I don't fight that insurance company you won't see a fucking dollar either. I'll fucking let them take the money, let them keep it. So, fuck you on that. Tell your client, fuck you on that. Okay? So, he wants to play the fucking game he won't get a fucking dollar. Keep going and going and going. I'm ready to file personal bankruptcy. I'll do whatever I have to do to not pay that guy a fucking dollar. He's a piece of shit. So, that being said, what do you want to do? I'm willing to give the guy fifty fucking grand and tell him to get the fuck out of my life. I'll save you guys, I'll fucking spare you guys, spare you fucking sons of bitches, and I'll move on with my life. That's what I'm willing to do. |
| Adam Ludwin: | 02:44 | You should want to move on with your life. That's all I'm trying to … I'm trying to get you guys to a resolution. I am your best hope and getting you guys to a resolution, not your worst enemy. |
| Matthew Proman: | 02:54 | His best outlook at getting to a resolution. If he values his life as it is, he better hope he comes to a resolution. You understand me? I don't fucking care. |
| Adam Ludwin: | 03:05 | It has to be both of you. It has to be both of you. |
| Matthew Proman: | 03:06 | But what is the worst that can happen to me? Nothing. What are you going to do? You're not going to get my house. That's fucking gone already. You ain't gonna get that, no one's going to give you that. What are you going to do, you're gonna chase the insurance money? I'll turn around and call the insurance company tomorrow and say, you know what? I don't think it was your fault based on the report and now you don't get fucking shit. Now what do you get mother fucker? |
| Adam Ludwin: | 03:25 | You don't think it's whose fault? |
| Matthew Proman: | 03:27 | I can turn around and say listen, you know, it wasn't covered under the policy. |
| Adam Ludwin: | 03:32 | What did you tell them? |
| Matthew Proman: | 03:34 | None of your fucking business. |
| Adam Ludwin: | 03:35 | Well it is my business, that's my client's lien that you sought out to destroy. |

Adam Ludwin - conversation with Matthew Proman 4... (Completed  08/03/19)      Page 2 of 7
Transcript by Rev.com

Ludwin000055

Appendix E & Page 58

A clear assessment of the above cases has led us to the conclusion that Mr. Ludwin and Ms. Zeitlin have been falsely accused of offenses they never committed. They have been maliciously defamed via false online posts and statements made by Mr. Proman. It holds the statement defamatory per se, and Mr. Ludwin and Ms. Zeitlin are entitled to damages that account for intentional infliction of mental distress as well as harm to reputation and business.

7. The Court Documents Surfacing Online Further Add to the Defamatory Posts Created by the Defendant and are Damaging Evidence against the Defendant.

The very fact that Mr. Ludwin had to litigate and sue Mr. Proman has resulted in an entirely new set of defamatory content created related to the case. When potential clients are considering engaging Mr. Ludwin and look him up online, they can easily view the court documents and believe Mr. Ludwin to be involved in a legal proceeding. This creates a negative and clouded image of Mr. Ludwin and there is an automatic erosion of trust whereby someone would have to spend a considerable amount of time looking into what actually happened—which wouldn't make it clear that Mr. Ludwin himself is a victim of defamation. Sometimes, a person might assume that Mr. Ludwin is not a credible attorney since he is involved in cases where he is tangled in proceedings, leaving people to think he is guilty or incompetent as an attorney. It is natural that potential clients might hesitate to engage an attorney who has his own legal battles to fight. The fact that there are documents out there is just another layer of internet defamation built upon the foundation of posts created by Mr. Proman. These documents are the result of Mr. Ludwin's having to defend himself against the defamatory acts of Mr. Proman. Those documents are definitively in the damaging evidence that we found in assessing Mr. Ludwin's and Ms. Zeitlin's online reputation.

8. Defendant is a Regular Offender.

Mr. Proman has been a regular offender since he has defamed innocent individuals online before he targeted Mr. Ludwin and Ms. Zeitlin. There have been pending cases against Mr. Proman since 2006. There is a previous case in California where Mr. Proman has defamed eight other people online and did other criminal activities. When one researches him, there exists a long list of people where he has done wrongful activities to people. This is a clear pattern of behavior since the 90s. The laws are in his favour about the internet companies. This shows how Mr. Proman has a disturbing history of mercilessly defaming individuals and causing them intentional distress and harm. It indicates that Mr. Proman is a regular offender. To escape the liabilities of a lawsuit, he takes such cheap shots at innocent people.

This shows how Mr. Proman has a disturbing history of mercilessly defaming individuals and causing them intentional distress and harm. Below are a few examples of such posts made by Mr. Proman against Emily Malinowski, George M. Chalos, Shane M Ramos, and his business,

Gatsby Yachts, with derogatory and maliciously false information showing the said individuals in bad light.



Appendix E & Page 87

4/9/2019                    Gatsby Yachts Group by Shane M Ramos - Yacht rental and repairs, Review 1054646 | ComplaintsBoard

ComplaintsBoard.com uses cookies. By using this website you are agreeing to our Cookies Policy.   ✕

Create an account or   Sign In

Search for business or product          SUBMIT A COMPLAINT

› Other › yacht rental and repairs

## Gatsby Yachts Group by Shane M Ramos / yacht rental and repairs

Add a Comment

Newport , RI, United States

**Contact information:**
gatsbyyacht.com

A marine yacht consultant from Gatsby Yachts Group alleged to have preyed on his own clients has been charged with sealing more than $500, 000 worth of boat parts, equipment, and contents trailers across Newport, RI, and North Palm Beach, FL.

Shane M Ramos could face more than 40 charges for theft, possession of stolen property, trafficking stolen property, and fraud.

Shane got busted when someone later learned they had purchased his stolen equipment on Craigslist. Since then Shane Ramos has been linked to other thefts and faces charges in several jurisdictions.

"Some boat owners were not even aware their yacht contents had been stolen until the police contacted them to say the item had been recovered", says a victim of Shane Ramos. "That is a huge problem", he said.

Anyone who may have been victimized by Shane M Ramos or Gatsby Yacht Group is asked to call your local law enforcement.

Shane M Ramos contact info:
[protected] or [protected]@gatsbyyacht.com

Appendix E & Page 89



Appendix E & Page 89



Appendix E & Page 94

## Comments

 **Anonymous**   Sep 26   #1569300

Whats more on Shane M Ramos: Crime Details - 11/19/2017 - NEWPORT, RI OffenseDescription1: DOMESTIC VIOLENCE - FELONY ASSAULT AND/OR BATTERY Case Number: N2-2018-0161A Crime County: NEWPORT Status: OPEN Crime Type: FELONY OffenseCode: 11-5-2(B) AND12-29(A)(2) DegreeOfOffense: FELONY Charges Filed Date: 05/24/2018 Case Type: FELONY Court: NEWPORT COUNTY SUPERIOR COURT Offense Date: 11/19/2017 Crime Details - 11/19/2017 - NEWPORT, RI OffenseDescription1: DOMESTIC ASSAULT BY STRANGULATION Case Number: N2-2018-0161A Crime County: NEWPORT Status: OPEN Crime Type: FELONY OffenseCode: 11-5-2.3 AND12-29(A)(16) DegreeOfOffense: FELONY Charges Filed Date: 05/24/2018 Case Type: FELONY Court: NEWPORT COUNTY SUPERIOR COURT Offense Date: 11/19/2017 Crime Details - 11/19/2017 - RI OffenseDescription1: FELONY ASSAULT USE DEVICE SIMILAR APPEARANCE FIREARM - SERIOUS BODILY INJURY Case Number: 22-2018-00682 Status: OPEN Crime Type: FELONY OffenseCode: 11-5-2.1 AND 12-29-2(A)(2) DegreeOfOffense: FELONY Charges Filed Date: 04/13/2018 Case Type: FELONY Court: 2ND DIVISION DISTRICT COURT Offense Date: 11/19/2017 Possible Employers (1 Found) Business Name: GATSBY ENTERPRISES LLC (03/17/2017 to 08/31/2017) Phone: (401) 253-2989 (ET) GATSBY ENTERPRISES LLC Address: 10 CHESTER AVE, BRISTOL, RI 02809 (BRISTOL COUNTY)

**Reply**

Helpful?   Yes 0   No 0   ⚐

Appendix E & Page 95

NOTICE! Those consumers who consumers-say-thank-you/ripoff-report-in-the-media), citizens of any GDPR applicable countries, non-residents/consumers are considered complied from accessing this site. Read our Terms of Service (/terms-of-service) to learn more. By using our site you understand and agree to these terms. Don't blame us... blame Europe! This site uses cookies to store information on your computer which may track your browsing behavior on our site and provide you with ads or other offers that may be relevant to you. Some are essential to make our site work; others help us improve the user experience. Read our Privacy Policy (/privacy-policy) to learn more.

(https://www.facebook.com/RipoffReportWebsiteSocialPage/)   (https://twitter.com/ripoffreport)

Complaints Reviews Scams Lawsuits Frauds Reported.™ (https://www.ripoffreport.com/lists/list_all)

**Ripoff Report**
(/)

FILE A REPORT ...it's Free! **(/file-report)**

| Company Name or Report # | SEARCH |

Review Latest Reports (/reports/latest-reports)   Advanced Search (/reports/advanced)
Browse Categories (/categories)

| Latest Reports (/reports/latest-reports) | Advanced Search (/reports/advanced) |

Report: #1461427

## Complaint Review: Gatsby Yachts Group by Shane M Ramos - *Newport Rhode island*

**Submitted:** Tue, September 18, 2018   **Updated:** Tue, September 18, 2018
**Reported By:** angry — **Newport RI** United States

**Gatsby Yachts Group by Shane M Ramos**

Newport, Rhode island
United States
**Phone:**
**Web:** www.gatsbyyachts.com (http://www.gatsbyyachts.com)
**Category:** Boat Brokers (https://www.ripoffreport.com/reports/sports-recreation/boat-brokers), Boat Dealers (https://www.ripoffreport.com/reports/sports-recreation/boat-dealers), Boat Repair Services (https://www.ripoffreport.com/reports/sports-recreation/boat-repair-services-)

## Gatsby Yachts Group by Shane M Ramos Gatsby Yachts Shane M Ramos Stolen Property & Equipment from boat Newport Rhode Island

LUDWIN000095

Appendix E & Page 98



Like 0    G+    Tweet

**REBUTTAL BOX™ | Respond to this Report! (/file/comment/1461427) | Consumer Comment (/file/comment/1461427)** ?

Repair your reputation the right way
**Corporate Advocacy Program** (/corporate-advocacy-program/change-report-from-negative-to-positive) ? (/corporate-advocacy-program/change-report-from-negative-to-positive)

Show customers why they should trust your business over your competitors...

Add Rebuttal to this Report (https://www.ripoffreport.com/file/comment/1461427) ?

File New Report (/file-report) ?

⟵ Is this
**Ripoff Report**
About you?

**Ripoff Report**
A business' first
line of defense
**on the Internet.**

If your business is
willing to make a
commitment to
customer satisfaction

**Click here now.. (/corporate-advocacy-program/change-report-from-negative-to-positive)**

Appendix E & Page 99



Appendix E & Page 110

This is an extension of establishing the Defendant's malicious intent to harm the Plaintiffs and act deliberately, with the specific intent to injure the Plaintiffs. All the opinions cited above affirm Mr. Ludwin's and Ms. Zeitlin's claim in this court against the Defendant, Mr. Proman. The plaintiffs should be compensated with damages that reflect the quantum of reputational damage, loss of business, and implied mental anguish.

The above cases clearly indicate the in-depth damage that online defamation can cause to an individual's reputation, be it personal or professional and suggest that there is a reasonable amount of compensation that should be provided to them. The unforgiving nature of such content across the many websites already cited in the report substantiate the harm caused to the Plaintiffs' professional and personal lives. We believe that all the three Plaintiffs—Mr. Ludwin, Ms. Zeitlin, and Ludwin Law Group—should be fairly compensated for the same.

**Damages**

**Economic & Rehabilitative Damages**

The unique nature of this case necessitates a careful analysis in assessing the economic damages.

1. Mr. Ludwin's Rehabilitation Damages: Costs required to rehabilitate Mr. Ludwin's reputation and mitigate some of the negative sentiment against him.  For Mr. Ludwin's reputation repair campaign, please reference 'Section 4: Online Reputation Management', and 'Section 5: The Nuances of Digital Reputation Repair' for context on our process and approach. Our goal is to rehabilitate Mr. Ludwin's reputation so that he can return to a normal professional life. While we cannot bring his internet presence back to where it was prior to the defamation, with a great deal of effort we can create a neutral or favorable presence for him. Our timeline and target pages reflect the severity of the case and volume of content.

Additional considerations for the campaign include:

Process

- An effective suppression campaign requires ongoing analysis and testing. Close attention is given to a comprehensive, yet fluid list of all search results that populate for a particular keyword. We will first focus on an initial group of 25 important keywords, with the remaining keywords gaining priority as results are achieved.
- Our process is first applied to each keyword within the Google search engine. As the campaign yields results, a similar framework is implemented for the keywords on four other major search engines: Bing, Yahoo, Duckduckgo, and Searchencrypt.
- We map separate mandates for image and news section results. We will begin the image optimization process in the sixth month after some measurable progress on the standard search results. We will focus on optimizing the images provided by the client to suppress any negative images that are currently present on the internet.
- Throughout the campaign we will create backlinks that strengthen the digital assets. The Google algorithm places heavy weight on the backlinks metric when ranking specific pages. A web page with a higher number of backlinks features more prominently on the search results relative to similar websites without the comparable interlinking strength.
- A hallmark of our client experience is transparency. We provide monthly progress reports highlighting work performed and results starting at the end of the second month. While some of our strategies are proprietary, we often include backlinks, profiles, articles, and other tangible updates.
- Please note that the timeline is an estimate and the case could easily require more time. There is no way to know exactly how long it will take to clear each keyword within each

search engine and across target domestic and international geographies. As explained, our efficacy is at the mercy of Google's algorithm.

- Please note that we will also explore the possible removal of content.

Content & Publication

- 300+ Positive Digital Assets will need to be created to displace and suppress the negative content outlined in Appendix C, Appendix D and Appendix E. New positive links are required to rank. Given the limited scope of content that Mr. Ludwin may be comfortable with, we will likely have to engage a group of both internal writers and external PR professionals. Initial information for content creation, biographical information, topics, and sources will be identified and collected.
- Building and maintaining high authority profiles that can rank on specific Search Engine Results Pages (SERPS) will be one core element of our process.
- A plan for promotion and demotion of existing content within each keyword is required. Appendix C, Appendix D and Appendix E show the severity, depth, and breadth of the content, and gives us an understanding of the resources required from a technical perspective.
- Given the unique nature of Mr. Ludwin's legal practice working discreetly and inconfidence with clients, posting new social media content is a particularly sensitive issue. Mr. Ludwin does not want a flashy or active presence on the internet, especially one that could detract from how he is perceived by clients and prospective clients. This poses a real challenge for the campaign. We want to use social media profiles because they are hosted on some of the most authoritative websites (Facebook, Instagram, Twitter, LinkedIn). Naturally, having any content on some of these mediums may not be agreeable to Mr. Ludwin. We will have to work thoughtfully and patiently to leverage social media, which is usually a pillar of our campaigns.

2. Ludwin Law Group Rehabilitation Damages: Costs required to rehabilitate Mr. Ludwin's law firm, Ludwin Law Group's reputation and mitigate some of the negative sentiment against it. For Ludwin Law Group's reputation repair campaign, please reference 'Section 4: Online Reputation Management', and 'Section 5: The Nuances of Digital Reputation Repair' for context on our process and approach. Our goal is to rehabilitate the firm's reputation so that clients can contact them based on mutual trust and credibility. While we cannot bring the firm's internet presence back to where it was prior to the defamation nor can we bring back the business lost, with a great deal of effort we can create a neutral or favorable presence of it. Our timeline and target pages reflect the severity of the case and volume of content.

3. Ms. Zeitlin's Rehabilitation Damages: Costs required to rehabilitate Ms. Zeitlin's reputation and mitigate some of the negative sentiment against her.  For Ms. Zeitlin's reputation repair campaign, please reference 'Section 4: Online Reputation Management', and 'Section 5: The Nuances of Digital Reputation Repair' for context on our process and approach. Our goal is to rehabilitate Ms. Zeitlin's reputation so that she can return to a normal professional life. While we cannot bring her internet presence back to where it was prior to the defamation, with a great deal of effort we can create a neutral or favorable presence for her. Our timeline and target pages reflect the severity of the case and volume of content.

**Three suppression campaigns to rehabilitate the reputations of the three plaintiffs.**

The campaign for plaintiffs Adam Ludwin and Ludwin Law will overlap. The campaign for Joanna Zeitlin will be unique.

- Target key words: 46
- Target pages: 10
- Targets on each search engine: Main search, Video search, Image search and News search.
- Target search engines: Google, Bing, Yahoo, Duckduckgo and Searchencrypt
- Geography priority: Florida, New York, Chicago, Los Angeles, London, the United States, and select developed market international locations, including the UK, Australia, and Canada.
- Target number of negative links: 20
- Estimated timeline: 18 - 24 months
- Estimated costs for suppression campaign, inclusive of both SEO & and approved content by Mr. Ludwin: [Range $55,000 - 65,000] x 24 months = $1,320,000 - $1,560,000

**Reputational Damages**

Reputational damages form a part of presumed damages. It is certain to assume that a person has suffered reputational damage and losses as a result of defamation since it is meant to attack the reputation. The risks and ramifications of reputational damages are intense and there is no set standard to determine the actual value associated with it. The courts rely on multiple factors when awarding damages to one's reputation. It is impossible to reverse the past damage and completely rehabilitate the reputation of the three plaintiffs. The fact that there is permanent and intentional (malicious) harm to all three plaintiff reputations necessitates strong consideration for a reputational damage award.

**Compensatory and Punitive Damages**

The Plaintiff's entitlement to both punitive and compensatory damages is an integral part of the lawsuit. These damages are awarded essentially to compensate the Plaintiff and restore his

position as a result of the Defendant's actions being grounded in malice. The size of damages that a plaintiff receives depends largely on how the court assesses the impact of the case.

Emotional Distress Damages are an important constituent of Compensatory Damages as a way to make the victim's position better and compensate them for the emotional suffering caused due to personal injury.

The Plaintiffs have suffered severe psychological damages. All these chains of events have affected Mr. Ludwin's health as he has been on antidepressants and anti-anxiety medications. He has had panic attacks and his anxieties were pervasive, especially in the beginning. He was in denial until one day he started feeling tightness in the chest, which he initially thought was a heart attack. He called 911 and the ambulance came, the doctors stated that he was having an anxiety attack. Mr. Ludwin has been on medication ever since. As for Ms. Zeitlin, she has felt every emotion in extreme. She feels hatred against Mr. Proman, who she has not even met once in her life. Mr. Proman's posts have subjected her to ridicule and humiliation. It is important to note that the Plaintiffs will continue to feel ridiculed and humiliated for as long as the defamatory content exists online and should be entitled to emotional distress damages as against the emotional trauma that they would continue to endure for years to come.

"Under Florida law, a Plaintiff must plead the following elements in order to state a claim for intentional infliction of emotional distress: 1) extreme and outrageous conduct; 2) an intent to cause, or reckless disregard to the probability of causing, emotional distress; 3) severe emotional distress suffered by the Plaintiff and 4) that the conduct complained of caused the plaintiff's severe emotional distress." Broberg v. Carnival Corp., 303 F. Supp. 3d 1313, 1317 (S.D. Fla. 2017).

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Metro. Life Ins. Co. v. McCarson, 467 So. 2d 277, 278–79 (Fla. 1985).

In the present case, Mr. Proman initiated a well calculated plan to attack Mr. Ludwin, his firm Ludwin Law Group, and wife, Ms. Zeitlin. As a result of the Defendant's malicious acts in the form of various posts, Mr. Ludwin and Ms. Zeitlin have experienced significant psychological damage. The attacks were extremely distressing to Mr. Ludwin and Ms. Zeitlin. Mr. Ludwin began experiencing anxiety attacks for the first time in his life. These anxiety attacks were so extreme that at one point, 911 had to be called and Mr. Ludwin needed an ambulance because he thought he was experiencing a heart attack. Mr. Ludwin has been required to take anti- anxiety medication ever since. Both Mr. Ludwin and Ms. Zeitlin have been seeking professional help by consulting a therapist who is providing them treatment and rehabilitation.

In the case of Punitive Damages, it is extremely difficult to assign a dollar value, because reputations are intangible. In the present case, punitive damages have arisen through allegations of intentional misconduct. Intentional misconduct is expressly defined by Florida Statutes:

"Intentional misconduct" means that Defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage (Fla. Stat. 768.72(2)(a) (emphasis added).

Here, Mr. Proman was well aware of the severe nature of his acts rooted in malice and still pursued the same to defame the Plaintiffs. The application of the punitive damages rule was recently made by the Fourth District Court of Appeal in Lawnwood Med. Ctr. Inc. v. Sadow, 43 So. 3d 710 (Fla. 4th DCA 2010), where a surgeon (Dr. Samuel H. Sadow) brought an action against a hospital for breach of contract and slander per se seeking compensatory damages for both claims and punitive damages for the slander per se action.  In the trial court proceeding, the jury found the hospital liable on the breach of contract claim and fixed damages at $2,817,000, reduced to $1,517,000. In separate proceedings on the slander per se claim, the jury found Lawnwood liable for slander; that Lawnwood specifically intended to harm him by its per se slanderous statements; that, in fact, it had actually injured him by the statements and that he suffered no compensatory damages from the slanders but that he was entitled to punitive damages of $5,000,000 from the hospital. Id. at 712.  The Fourth District Court of Appeal affirmed the punitive damages award and set forth the following interesting discussion in its supporting opinion.

…[W]hen the claim is defamation per se, liability itself creates a conclusive legal presumption of loss or damage and is alone sufficient for the jury to consider punitive damages. […] To sum up, Florida's unusually high protection of personal reputation derives from the common consent of humankind and has ancient roots. It is highly valued by civilized people. Our state constitution and common law powerfully support it. This is a value as old as the Pentateuch and the Book of Exodus, and its command as clear as the Decalogue: "Thou shall not bear false witness against thy neighbor." The personal interest in one's own good name and reputation surpasses economics, business practices or money. It is a fundamental part of personhood, of individual standing and one's sense of worth. In short, the wrongdoing underlying the punitive damages in this case has Florida law's most severe condemnation, its highest blameworthiness, its most deserving culpability.  For slander per se, reprehensibility is at its highest.

Lawnwood, 43 So. 3d at 727-29, review denied, 36 So. 3d 84 (Fla. 2010), and cert. denied, 131 S. Ct. 905 (U.S. 2011)

Florida legal precedents have awarded punitive damages when a Defendant's action was intentional or grossly negligent. In my opinion, this is unquestionably one hundred percent the

case with respect to the Defendant, Mr. Proman's, malicious actions in defaming Mr. Ludwin, Ludwin Law Group, and Ms. Zeitlin.

Drawing inferences from the following United States cases, it is safe to say that awarding substantial damages to the Plaintiffs, Mr. Ludwin, his firm, Ludwin Law Group, and his wife, Ms. Zeitlin, is justified and in support of deterring similar situations that will inevitably arise in the future.

In Cantu V. Flanigan (Refer Appendix F), the Plaintiff, Mr. Cantu, a successful industrialist in Mexico, was slandered and defamed through the circulation of an amicus brief prepared by the defendant, Mr. Flanigan, in which very serious allegations were made against Mr. Cantu. The allegations included supposedly bribing the President, drug peddling, the killing of children due to involvement in drugs, etc. Due to this defamatory publication, Mr. Cantu lost many business deals that he could have otherwise converted.

Mr. Cantu filed the complaint against Mr. Flanigan in this action alleging defamation and seeking economic damages to compensate for his lost contracts, noneconomic damages to compensate for the harm to his reputation, and humiliation and mental anguish. Mr. Cantu did not seek punitive damages. However, the court felt that this was a fit case on merit to award punitive damages (even though the Plaintiff did not seek them) to the tune of $150,000,000 in excess of presumptive damages of $38,000,000. Naturally, the facts of the above case differ from the present case of defamation, but the effect is similar: both Mr. Cantu and Mr. Ludwin, as well as Ms. Zeitlin, were defamed by the respective Defendants, and all three suffered huge reputational, business, and personal losses due to the defamatory statements published. The jury awarded huge sums as compensatory and punitive damages to the plaintiff in the above case, recognizing that the reputational damage caused was immense.

Similar logic must be applied to the facts at hand here. Mr. Proman used every opportunity to defame Mr. Ludwin and Ms. Zeitlin by publishing untrue and defamatory statements against them. Thus, damages in this case should be awarded on similar reasoning, facts, and legal precedence.

Another case, where the jury awarded $8,510,000, is the defamation claim Rombom v. Weberman 309 A.D.2d 844 (N.Y. App. Div. 2003) (Refer Appendix F). Here, the Defendant, A.J. Weberman, created and maintained three websites that displayed statements pertaining to the Plaintiff, Steven Rombom. An additional Defendant, Mordechai Levy, contributed material concerning Rombom to Weberman that was placed on one of the websites. The Plaintiff commenced the action, inter alia, to recover damages for defamation and for a permanent injunction preventing further publication of the alleged defamatory material on the websites. The jury returned a verdict in favor of the Plaintiffs, awarding compensatory and punitive damages.

The jury further ordered a permanent injunction to the extent of directing the Defendants to remove any and all published statements about Plaintiff and Plaintiff Rombom's family from their websites … found by the jury to have been libelous, and to the extent possible, from all mirror [s]ites upon which Defendants caused those statements to be published, and prohibiting defendants from publishing any statements about plaintiffs and Plaintiff Rombom's family found by the jury to have been libelous.

As in the case above, Mr. Proman published false and defamatory statements on different websites to ignite the sentiment of hate against the Plaintiffs. Another case of note that justified awarding the Plaintiff economic damages was Cohen v.

Hansen (refer to Appendix F). Here the Plaintiffs, Steven Cohen and Cohen Asset Management, initiated the matter after the Defendants, Ross Hansen, created a defamatory website comparing the Plaintiff[s] to notorious fraudster Bernie Madoff. Mr. Cohen testified that (1) CAM lost "a $21 million deal" allegedly because of the website; (2) his insurance provider did not want to renew his policy because of the website, but Mr. Cohen did not mention a specific dollar figure and the provider eventually did insure him; (3) one client was investing approximately $130 million with CAM at the time the website was online; and (4) he was so intent on making the website less prominent in internet search results that he spent between $100,000 and $200,000 on search engine optimization. Mr. Cohen and CAM's evidence of economic harm served as a basis for their presumed general damages.

After a seven-day trial, the jury unanimously found in favor of Mr. Cohen, awarding him a total of $35.3 million in compensatory damages and an additional $3 million in punitive damages. The trial judge barred Mr. Hansen and his co-defendants from republishing the false and defamatory statements on their websites, ordered the defendants to take down the remaining website, and assigned the websites' domain names to Cohen.

Similarly in the present case, the economic damage that the plaintiffs have suffered is vast. The estimated costs for a suppression campaign inclusive of SEO amount to $1,320,000 - $1,560,000. Therefore, the Plaintiffs are entitled to said damages.

Another celebrated case that paid heed to the Plaintiff's reputational and implied distress through compensatory damages was the case of Roland Van Liew v. Philip Eliopoulos 92 Mass. App. Ct. 114 2017 (Refer Appendix F). Van Liew, along with his company, made 29 defamatory statements and published them through various media including emails, letters, video conferencing, website postings, newsletters, newspapers, etc. The internet defamation reached thousands of local residents and damaged the reputation of Eliopoulos, causing him serious harm. The court found Van Liew liable for the same and awarded $2.9 million in damages to Eliopoulos: reputational damages of $2.5 million, emotional distress damages of $250,000, and compensatory damages of $150,000. It was affirmed that the jury's award of reputational and

**Page 113 of 120**

emotional distress damages, amounting to $2.9 million, was neither punitive, disproportionate to the injuries proved, nor excessive.

Similarly, in the present case, Mr. Proman made numerous defamatory statements referring to the plaintiff as a "scammer" , ''fraud'' and his wife as a ''prostitute''. All of these statements were false and baseless. All of Mr. Proman's statements were false, and made with the intent of harming the Plaintiffs' reputation and destroying their career. The defamatory content published by Mr. Proman damaged Mr. Ludwin's and Ms. Zeitlin's reputation, and will continue to have serious effects on their career and work profile.

The above cited cases do not even justify a fraction of what Mr. Ludwin and Ms. Zeitlin had to endure in terms of harm to their business and reputation, and the mental anguish suffered. Defendant took full advantage of methods that amplify the reach of false and misleading posts. The series of attacks by Mr. Proman show both a complete lack of consideration and a disturbing maliciousness towards the Plaintiffs. The disregard for the law must be addressed by the court to protect future victims of internet defamation.

Mr. Ludwin feels that he failed his wife as he couldn't protect her from all that happened. He believes that these posts and comments over the internet are not just like an article in the magazine. These posts are going to be there forever and are accessible to everyone every time. It is a primary source of information for people and these posts are a constant reminder of what Mr. Ludwin and his wife had to endure.

Because internet defamation law and our increasing reliance on digital presence being forever amalgamated with your actual life and reputation, it is incumbent upon the Florida courts, in my opinion, to deter Mr. Proman and others from repeating the same behavior.

Having served as an expert witness in a variety of cases involving attorneys, medical professionals, celebrities and other innocent citizens of the United States, we are long overdue in setting a clear message to potential perpetrators of internet defamation that these acts shall not go unpunished.

As we may have articulated that today when somebody is making a personal or professional judgment about someone as explained or find someone online, there is a perception based on the existing content. This is hypersensitive and amplified when you are an attorney because the very reason why  you go to an attorney is due to a situation that is confidential and requires someone's help typically related to the law, this is compromised for an attorney.

This case is one of the most compelling and egregious demonstrations of malice, and the misuse of our right to freedom of expression to harm or 'get back at' another person. It is worth noting that Mr. Ludwin simply represented opposing parties in lawsuits against Mr. Proman. He has

never made an offensive statement about Mr. Proman, or even responded to his aggressive, defamatory smear campaign.

**Damages Cited from Internet Defamation Cases:**

1. Cantu v. Flanigan

   Punitive Damages: $150,000,000

   Presumptive Damages: $38,000,000

2. Rombom v. Weberman

   Total Damages: $8,510,000

3. Cohen v. Hansen

   Punitive Damages: $3,000,000

   Compensatory Damages: $35,300,000

4. Roland Van Liew v. Philip

   Total Damages: $2,900,000

   Reputational Damages: $2.5 million

   Emotional Distress: $250,000

   Compensatory Damages: $150,000

5. Lawnwood Med. Ctr., Inc. v. Sadow, 43 So. 3d 710 (Fla. 4th DCA 2010)

   Punitive damages: $5,000,000

6. Lawrence M. DESTEFANO, Appellant/Cross-Appellee, v. ADVENTIST HEALTH SYSTEM SUNBELT, 973 So. 2d 492 (Fla. Dist. Ct. App. 2008)

   Compensatory Damages: $1 million

   Punitive Damages: $1 million

7. Lipsig v. Ramlawi, 760 So. 2d 170 (Fla. Dist. Ct. App. 2000)

   Punitive Damages: $10,000,000

   Compensatory Damages: $175,000.00 against each defendant

Based on the above mentioned case precedents, we suggest the following damages:

Compensatory Damages Adam Ludwin:  $2,500,000
Compensatory Damages Joanna Zeitlin:  $2,000,000
Compensatory Damages Ludwin Law:  $2,000,000.
Punitive Damages (total): $4,000,000
Economic and Rehabilitative (total): $1,560,000

# Works Cited

1. Featherly, K. (n.d.). *ARPANET*. Retrieved from britannica: https://www.britannica.com/topic/ARPANET

2. Kemp, S. (2017, March 6). *The incredible growth of the internet over the past five years – explained in detail*. Retrieved from Thenextweb: https://thenextweb.com/news/the-incredible-growth-of-the-internet-over-the-past-five-years-explained-in-detail

3. Johnson, J. (2021, September 10). *Global digital population as of January 2021*. Retrieved from Statista: https://www.statista.com/statistics/617136/digitalpopulation-worldwide/

4. (2018, August 9). Retrieved from CareerBuilder: https://press.careerbuilder.com/2018-08-09-More-Than-Half-of-Employers-Have-Found-Content-on-Social-Media-That-Caused-Them-NOT-to-Hire-a-Candidate-According-to-Recent-CareerBuilder-Survey

5. Reid, K. (2017, November 21). *How many Google searches per day on average in 2022?* Retrieved from Ardorseo: https://ardorseo.com/blog/how-many-google-searches-per-day/

6. Lewis, C. (2015, June). *Social Media - Cyber trap door to defamation*. Retrieved from Research Gate: https://www.researchgate.net/publication/281231900_Social_Media_-_Cyber_trap_door_to_defamation

7. O'flaherty, M. (2015, June 5). *2 - International Covenant on Civil and Political Rights*. Retrieved from Cambridge.org: https://www.cambridge.org/core/books/abs/united-nations-and-freedom-of-expression-and-information/international-covenant-on-civil-and-political-rights-interpreting-freedom-of-expression-and-information-standards-for-the-present-and-the-future/437BE740F36A

8. Lehr, A. (n.d.). *Positive or Negative, Here's Why Content Goes Viral*. Retrieved from Influenceandco: https://blog.influenceandco.com/positive-or-negative-heres-why-content-goes-viral

9. Dewey, C. (n.d.). *Study finds 6 in 10 of us share links without reading one word*. Retrieved from https://digitaledition.chicagotribune.com/tribune/article_popover.aspx?guid=23f1618f-7764-4cfe-8f4f-cf3226870f9d

10. Cooper, B. B. (2013, 5 21). *Novelty and the Brain: Why New Things Make Us Feel So Good*. Retrieved from Life Hacker: https://lifehacker.com/novelty-and-the-brain-why-new-things-make-us-feel-so-g-508983802

11. O'Neil, L. (2017, March 28). *Go Viral Or Die Trying*. Retrieved from Esquire: https://www.esquire.com/news-politics/a54132/go-viral-or-die-trying/

12. Lehrer, J. (2010, August 3). *The Itch of Curiosity*. Retrieved from Wired: https://www.wired.com/2010/08/the-itch-of-curiosity/

13. Starbird, K. (2017). *Research on Crowds and Crises*. Retrieved from Washington.edu: http://faculty.washington.edu/kstarbi/research-on-crowds-and.html

14. Kato, B. (2021, August 31). *What is cancel culture? Everything to know about the toxic online trend*. Retrieved from Nypost: https://nypost.com/article/what-is-cancel-culture-breaking-down-the-toxic-online-trend/

15. Mishan, L. (2020, December 3). *The Long and Tortured History of Cancel Culture*. Retrieved from NyTimes: https://www.nytimes.com/2020/12/03/t-magazine/cancel-culture-history.html

16. Somal, S. (2020, May 12). *Have Controversial Opinions on The Current Crisis? Here's How to Manage Your Online Reputation*. Retrieved from Blue Ocean Global Tech: https://www.blueoceanglobaltech.com/blog/have-controversial-opinions-on-the-current-crisis-heres-how-to-manage-your-online-reputation/

17. Journal. (2018). Retrieved from https://www.searchenginejournal.com/seo-guide/

18. *History of Google Algorithm Updates*. (n.d.). Retrieved from https://www.searchenginejournal.com/google-algorithm-history/

# Appendices

----------------------------------------

**Appendix A:**

Articles Authored & Featuring Sameer

Recent Speaking Engagements & References

Continuing Legal Education (CLE) Programs

**Appendix B:**

Sample Campaign Websites and Profiles

**Appendix C:**

Inventory of Mr. Adam Ludwin's and Ms. Zeitlin's Links and Media

**Appendix D:**

Negative Link Analysis

**Appendix E:**

Inventory of Mr. Adam Ludwin's and Ms. Zeitlin's Links, Media& Case Evidence

**Appendix F:**

Internet Defamation Legal Cases