```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

------------------------------X Docket#
GATSBY YACHT GROUP, LLC,       : 18-cv-04242(GRB)(ARL)
                               :
              Plaintiff,       :
                               :
      - versus -               : U.S. Courthouse
                               : Central Islip, New York
                               :
M/Y "EAST BOUND & DOWN",       :
                               : October 10, 2018
              Defendant        : 11:51 a.m.
------------------------------X
```

            TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
                  BEFORE THE HONORABLE GARY R. BROWN
                  UNITED STATES DISTRICT JUDGE


**A  P  P  E  A  R  A  N  C  E  S:**


**For the Plaintiff**:         **Adam Ludwin, Esq.**
                            Ludwin Law Group, P.A.
                            85 SE 4th Avenue, Ste 108
                            Delray Beach, FL 33483


**For Defendant**:             **George M. Chalos, Esq.**
                            Chalos & Co., P.C.
                            55 Hamilton Avenue
                            Oyster Bay, NY 11771



**Transcription Service**:     **Transcriptions Plus II, Inc.**
                            61 Beatrice Avenue
                            West Islip, New York 11795
                            RL.Transcriptions2@gmail.com




Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  Calling case cv-2018-4242, *Gatsby*
2  *Yacht Group LLC v. M/Y "East Bound & Down"*.
3          Counsel, please state your appearance for the
4  record.
5          THE COURT:  Wait.  Are we on?
6          THE CLERK:  Yes.
7          THE COURT:  Okay.  Go ahead.
8          MR. LUDWIN:  Good morning, your Honor.  Adam
9  Ludwin on behalf of the plaintiff and intervening
10  plaintiffs.  The plaintiff is Gatsby Yacht.
11          THE COURT:  Okay.  All right.
12          MR. CHALOS:  Good morning, your Honor.  George
13  Chalos of Chalos & Co. on behalf of the defendant.
14          THE COURT:  Okay.  Mr. Ludwin, my understanding
15  is the reason we're here today  is the oral argument on
16  your order to show cause motion.  Is that correct?
17          MR. LUDWIN:  It was a motion for a temporary
18  injunction.
19          THE COURT:  Yes.  Okay.  Have a seat.  Use the
20  mic.
21          Which you brought on by an order to show cause,
22  yes?  No?
23          MR. LUDWIN:  It was a motion for an injunction,
24  an emergency motion for an injunction.
25          THE COURT:  All right.  It's been referred

3

Proceedings

1   to -- yes, you're right.  You titled it a verified motion

2   for injunction which has been referred to me for review

3   and report and recommendation.

4            Now, have you discussed this with opposing

5   counsel?

6            MR. LUDWIN:  We have, your Honor.

7            THE COURT:  Okay.  And have you made any

8   progress?

9            MR. LUDWIN:  No, your Honor.

10           THE COURT:  Okay.  So the contention, as I

11   understand it, is that there have been some statements

12   published on the internet about you.  Yes?

13           MR. LUDWIN:  And my client.

14           THE COURT:  What were the statements about your

15   client?

16           MR. LUDWIN:  There were several statements,

17   your Honor.  August 30th there was a statement saying

18   that my client will try to come up with a scheme to steal

19   anybody's money that he works with so think twice before

20   they work with him.

21           On September 19th, there was a statement posted

22   on ripoffreport.com saying that my client preyed on his

23   own clients, has been charged with stealing more than

24   $500,000 worth of boat parts equipments and contents for

25   trailers across Newport, Rhode Island and Palm Beach.

4

Proceedings

1  Moreover, Shane M. Ramos, who is the principal for my

2  client, could face more than 40 charges for theft,

3  possession of stolen property, trafficking in stolen

4  property, and fraud.  And that Shane got busted when

5  someone later learned they had purchased the stolen

6  equipment on Craig's List.

7          And then Shane Ramos has been linked to other

8  thefts and faces charges in several jurisdictions.  And

9  then the posts states anyone who may have been victimized

10  by Shane M. Ramos of Gatsby Yacht Group is asked to call

11  your local law enforcement.  And then it posts Shane's

12  contact info.  That was the second post.

13          The third post posted a week later, right after

14  we had received that post.  We received that post from

15  one of my client's potential customers stating that he

16  was no longer comfortable with working with my client

17  because he found this post.  He was about to buy a boat

18  and that got the deal over.  We also have an affidavit

19  from that individual stating to that effect.

20          As soon as I received that, I sent a cease and

21  desist letter to opposing counsel.

22          THE COURT:  Just back up a little bit.  The

23  last part you said someone who directly implicates the

24  defendant in making the statements?

25          MR. LUDWIN:  I do not have somebody directly.

5

Proceedings

1  The affidavit that I have states that upon discovering

2  those statements on the internet that they backed out of

3  the deal which my client brokered.

4           THE COURT:  Okay.  So that demonstrates the

5  home from it but it doesn't necessarily demonstrate the

6  author of the statements.

7           MR. LUDWIN:  Yes, your Honor.  And if you want

8  to go directly to the offering of the statement, your

9  Honor --

10          THE COURT:  What I saw in the papers, to be

11  fair, it seemed to indicate that you say it can't be

12  anybody else.

13          MR. LUDWIN:  Well, that's the --

14          THE COURT:  There's nobody else with a motive.

15          MR. LUDWIN:  That's the first issue.  My client

16  and I have never had a personal or professional

17  relationship prior to this case.  The only contact that

18  we have together who would have an ax to grind is Mr.

19  Proman.

20          THE COURT:  Okay.

21          MR. LUDWIN:  The time periods that these posts

22  are alleging, I haven't even known my client, I hadn't

23  been retained by my client.  Also, as far as the

24  admission, as far as the who part of your question and

25  the how, in the cease and desist letters we state, I

6

Proceedings

1   stated unequivocally and accused Mr. Proman of making

2   these statements.  And you know, I was professional.  I

3   said listen, the clients need to work together.  Your

4   client, I sent opposing counsel, I said your client is

5   making these posts online.  Please have him take it down.

6   He needs to cease and desist this kind of behavior.  My

7   client has already had financial harm and reputational

8   harm and it needs to stop right away.  In response to

9   that I received nothing, no denial, no anything.

10          A week goes by after my cease and desist and

11   now my client is getting a little nervous.  So he's

12   looking online for these things and finds another post

13   which now includes not only an implication of fraud

14   against my client, and theft against my client, but

15   myself.  And that's where it comes into.  There's no --

16   had it only been my client, again, there's a possibility

17   that maybe it could have been somebody else.  But he is

18   the only contact we have in common.

19          Again, I sent a cease and --

20          THE COURT:  And are any of the statements,

21   forgive me, because I read them all I believe but I just

22   don't remember, are any of them joint?  In other words,

23   are the defamatory statements, do they mention both of

24   you in the same post or the same --

25          MR. LUDWIN:  Yes, yes.  The September 26th

7

                          Proceedings

1    statement, your Honor, it says, "Adam Ludwin from Ludwin

2    Law Group in Delray Beach, Florida is responsible for

3    nearly $2 million in losses related to false loan

4    application and other fraudulent conduct including

5    stealing our customers' banking information and opening

6    credit cards in their names."

7              And then it goes on to say that, "Beginning in

8    March of 2017, Adam M. Ludwin executed schemes to defraud

9    our banking institution through a series of false loan

10   applications for boats allegedly sold and concocted a

11   bankruptcy scheme to conceal property rightfully

12   belonging to the creditors of the business.  In addition,

13   Ludwin's scheme by luring our clients, by listing their

14   yachts, boats with GatsbyYachts.com or purchasing an

15   already listed yacht to potential buyers.  Ludwin would

16   then collect the victims' social security number, date of

17   birth and banking information and populate that data with

18   banks to issue credit card, fraudulent credit cards."

19             THE COURT:  Okay.

20             MR. LUDWIN:  "Over seven victims have already

21   come forward to us."  And then the post ends with, "Think

22   twice before retaining Adam M. Ludwin for his services.

23   I hope this post saves more people from becoming victims

24   of Ludwin."

25             After receiving this, I sent a second cease and

8

Proceedings

1  desist letter and then called opposing counsel on the

2  phone.  I said what's going on here?  I said I've sent

3  you a cease and desist letter.  I've received nothing in

4  response to that, no denials, no explanation, no

5  statement that you were going to get this done, have your

6  client stop posting and take down what's already been

7  posted.

8          And in response to me, opposing counsel stated,

9  he said listen, I'm not trying to minimize this.  I

10  understand that this is a huge deal.  He said to me I am

11  on a deadline with the Second Circuit today.  He said

12  please give me, if you will, till tomorrow morning to

13  address this with my client.

14          And I said, you know, reluctantly I said to

15  him, I said well you know, I appreciate you stating that

16  you're understanding that this is such a big deal, but I

17  am willing to give you till tomorrow to resolve this.

18  This was the 26th I believe which was a Thursday.  That

19  gave him till Friday morning.

20          Friday comes, nothing.  Saturday, Sunday,

21  Monday, Tuesday.  And you know, I stated in my cease and

22  desist letters that if nothing were to come of my

23  attempts to resolve this outside of the court that I was

24  going to take this before the Court.  At that point, I

25  really had no choice but to take this before the Court,

9

Proceedings

1   your Honor.

2          THE COURT:  Am I right in assuming or believing

3   that the record of these sorts of attacks as such has

4   gotten worse since you filed the papers?  In other words,

5   are there more?

6          MR. LUDWIN:  No, your Honor.  Since my filing,

7   or since the initial cease and desist there was a second

8   posting which included myself.  Since filing my motion

9   for the injunction, I don't believe there's been

10  anything.

11         THE COURT:  Okay.  Did you include in your

12  motion -- somebody had suggested that you had been

13  arrested for securities fraud violations.  Is that in

14  here?

15         MR. LUDWIN:  No, that wasn't myself.  I don't

16  believe I included something that stated anybody got

17  arrested for securities fraud violations.  The defendant

18  had been involved in securities for violations in the

19  past and was actually barred for life because he --

20  barred for life for participating with any members of the

21  National Association of Securities Dealers because he had

22  hired a imposter to take the Series 7 exam for him and

23  was caught doing that.

24         THE COURT:  All right.  We'll come back to that

25  issue.

Proceedings

1           Counsel, what would you like to say to all of

2     that?  First of all, have you filed any papers in

3     response?

4               MR. CHALOS:  We have, your Honor.

5               THE COURT:  Okay.  Making sure.

6               MR. CHALOS:  In fact, we followed the Court's

7     guidance and filed papers timely two days ago.

8               THE COURT:  Okay.

9               MR. CHALOS:  I can share my copy if it's

10    helpful to --

11              THE COURT:  I'm not sure if I have it in front

12    of me but go ahead.

13              MR. CHALOS:  Our position -- I'm assuming that

14    means the Court hasn't read them and I can summarize the

15    arguments.

16              THE COURT:  Don't assume I haven't read them.

17    I have 500 cases, so I may have read them, I just don't

18    remember what they said right now.

19              MR. CHALOS:  I understand.

20              THE COURT:  So go ahead.

21              MR. CHALOS:  Then let me -- if it's okay, I'll

22    summarize --

23              THE COURT:  Please.

24              MR. CHALOS:  -- the position.  Our client has

25    unequivocally from the beginning denied any involvement

11

Proceedings

1  with this.  The cease and desist orders, as far as we

2  were concerned, were of no moment because there was

3  nothing to cease and desist from and that was made clear

4  to opposing counsel.  Now, what we find here --

5         THE COURT:  I apologize, I do have your papers

6  here.  I thought I didn't.  Okay.  Go ahead.  Yes.  All

7  right.

8         MR. CHALOS:  So we noted in our opposition

9  submission that plaintiff failed to cite to any law,

10  plaintiff failed to cite to any evidence, plaintiff

11  failed to cite or even include any sworn testimony in its

12  initial application.  And what we made clear was that the

13  four prong test for seeking injunctive relief, if the

14  Court even has the authority to do that in a maritime

15  matter, was not met.  And we factually based our

16  opposition on our client's sworn declaration where he set

17  out in unequivocal terms that he didn't do it, he didn't

18  know about these posts, he didn't direct anybody to do

19  it, he doesn't know who's done it, and you've got the

20  wrong guy.

21         THE COURT:  Okay.

22         MR. CHALOS:  And that's sworn to under the

23  penalty of perjury.

24         Now in contrast, plaintiff's submission is all

25  upon information and belief.  There is no sworn

Proceedings

1  testimony.

2        And what I find really amazing, Judge, and it's

3  something that we've come across in our practice and

4  other areas, that if someone puts a post online that is

5  in any way incorrect or defamatory or even just

6  pejorative, you contact the website and say take that

7  down.  In fact, we've done that for overseas clients in

8  the past, in the recent past.  And what's amazing here is

9  the plaintiff doesn't take that action.  The plaintiff

10 runs into this courthouse and tries to put the skunk in

11 the proverbial jury box unfairly.

12        Now, there's a reason for it and I would share

13 with the Court a little bit broader of a background of

14 the story.

15        THE COURT:  I mean the underlying case is a

16 financial case involving a boat, right?  I mean it's not

17 a --

18        MR. CHALOS:  This is a very straightforward

19 simple case with very little money, modest money in

20 relative terms at stake.

21        THE COURT:  I never have heard the expression

22 put the skunk in the jury box, but I'm just not sure this

23 is the kind of case that would call for that kind of

24 conduct, right?

25        MR. CHALOS:  It was the proverbial skunk in the

13

Proceedings

1    jury box and --

2              THE COURT:  Yes, yes, yes.

3              MR. CHALOS:  Yeah.  And let me explain why.

4    Plaintiff has a gripe with our client.  Our client has

5    great with plaintiff.  And they're competing claims.

6    Basically, plaintiff says that you commissioned work on

7    your boat and you need to pay me.  And my client says I

8    didn't commission.  What you did and the work that you

9    did do destroyed my boat and I'm going to prove it.

10             There was an attempt to have a sit down between

11   the two principals.  And I think there are emails or

12   other electronic commissions to that.  Instead of having

13   the sit down that our client requested, plaintiff ran

14   into court and sought an ex parte Rule C arrest order.

15             Now, as a matter of law, we're very clear that

16   there is no merit to the Rule C, ex parte Rule C lien

17   claim because there's no claim, lien claims as a matter

18   of law.  But what plaintiff didn't expect, Judge, and

19   this is where it goes off the rails, what they didn't

20   expect was that our client would defend the case.  They

21   didn't ask back there client would say wait a minute, I

22   am not putting up substitute security for this boat

23   unless you put up some counter security for my

24   counterclaim under Rule E of the supplemental rules.

25             So this boat has been sitting basically for

14

Proceedings

1  three months and every day significant custodial expenses

2  continue to accrue and the plaintiff doesn't have the

3  money to pay.

4          So what's happening here, Judge, is there's

5  been a lot of sideshow action whether to rattle the saber

6  or to bring us before court or to cause our client to

7  incur costs unfairly.  But what is not before the Court

8  is a good faith application where there's any evidence or

9  scintilla of suggestion that our client has done what is

10  being claimed here which leads us to our request which is

11  in our papers, for the cost and fees and expenses of

12  having to appear here today to beat back what's very

13  clear on the paperwork as a frivolous application.

14          THE COURT:  Well, counsel, I'll say this.  If

15  you were on the other side of this problem, you suddenly

16  found yourself and your client in your view being defamed

17  with false information and so forth, you might not know

18  what to do.  Right?  It might be --

19          MR. CHALOS:  Oh no, I'd know what to do.  I

20  would call the website, I'd send a letter to the website.

21  I would do everything I possibly could to have the

22  posting removed.

23          THE COURT:  Right.  But in other words, sitting

24  here today when I first looked at the papers, I was

25  reading your material where you said there's no proof

15

Proceedings

1   that it was my guy and my guy says no.  Okay.  I get it.

2   What I'm sitting here asking counsel why do you think

3   it's him?  I mean you're an attorney, you've been

4   involved in collections matters.  There's lots of angry

5   people in the world.  He said whoever this anonymous

6   poster is has named me and my client together.  This is

7   the only matter we have together.  So the only person

8   who's mad at us about this matter is the defendant on

9   some level.  That's far from conclusive proof.  But it

10  makes a certain amount of sense, does it not?

11          MR. CHALOS:  Well, I'm not sure, your Honor,

12  because I don't know what these postings refer to and nor

13  does my client.

14          THE COURT:  But you have them.

15          MR. CHALOS:  Well, I've read them but it

16  doesn't mean I know --

17          THE COURT:  But you have them.  I mean you can

18  see that someone wrote things about the attorney and his

19  client in different contexts, no?

20          MR. CHALOS:  That's true, your Honor.  But I

21  mean it very well may be -- and our client insists it's

22  not him, it's someone else.  And I have no idea what

23  other relationship exists where -- the only posting, it's

24  one single posting, where Mr. Ludwin's identified and it

25  talks about unrelated to a boat repair and talks only

Proceedings

1   about some bankruptcy filings and people being scammed

2   out of money with bankruptcy filings on boats that were

3   being sold or something like that.  I mean it has nothing

4   to do with the subject matter we're talking about.

5          THE COURT:  Counsel, hold on for one second.

6              (Pause in proceedings)

7          THE COURT:  All right.  So anyway, going back

8   to your point, here's the other point.  I agree with you

9   in terms of to the extent one can remediate these things

10  by writing to Google and saying don't include that in

11  your searches and go to the site and say you better get

12  this down because it's not true.  Maybe counsel should be

13  doing that as well.  Right?

14         MR. CHALOS:  Right.

15         THE COURT:  I understand though I don't think

16  he's here without some basis.  Is it a sufficient basis?

17  I don't know.  Have I looked at the jurisdictional

18  aspects of the maritime law?  Believe it or not, I know a

19  lot more about the maritime law than you might think

20  because I spent years doing forfeiture law and we used

21  the maritime principles in the rules.  So I understand

22  your point in an in rem action.

23         On the other hand, I spent years in the

24  computer industry, in the software industry.  And what I

25  know is this.  If there's someone out there doing this,

17

Proceedings

1  eventually they'll figure out a way to figure out who it

2  is.  Right?  The right subpoena to the right website,

3  it's going to give you a code, it's going to give you an

4  IP address, it's going to give you something.  If it

5  comes back to your client, there's going to be problems

6  whether it's here or he files a defamation case somewhere

7  else.  There's going to be problems.

8          MR. CHALOS:  Well, your Honor, I can share with

9  the Court we have probed this issue and have advised our

10 client appropriately on the need to be as truthful as

11 possible in all assertions to the Court and we've been

12 very clear what it means to put in an affidavit under the

13 penalty of perjury.

14         THE COURT:  It's a big deal.

15         MR. CHALOS:  We understand.

16         THE COURT:  It's a difficult problem.  And it's

17 a difficult problem for you, counsel.  I'm not putting

18 you in harm's way here.  I'm just telling you you're the

19 one that is answering today for the defendant.

20         Mr. Proman is where, by the way?

21         MR. CHALOS:  I think Hewlett Harbor maybe.

22 It's western Nassau County.

23         THE COURT:  I presume you don't have him here

24 today, correct?

25         MR. CHALOS:  No.

Proceedings

1          THE COURT:  Okay.

2          MR. CHALOS:  I will certainly obtain a copy of

3   today's transcript and pass on the Court's admonition.

4          THE COURT:  I would expect you to do no less.

5   But I have to think about what other steps we're going to

6   take here.  Let me go back to your adversary.

7          Counsel, first of all, have you taken the cons

8   of steps that counsel suggested where you do the

9   Millennium Copyright Act type notice to the websites or

10  defamation notices to the website saying this is not

11  true, get this off?  Have you done that yet?

12         MR. LUDWIN:  Absolutely, your Honor.

13         THE COURT:  Okay.  Good.

14         MR. CHALOS:  And the website told me that as

15  the -- that they are not the publisher, they're a mere

16  intermediary and it's their policy that they do not take

17  down the post because they were to take down the post

18  every time somebody asked, then that would defeat the

19  entire purpose.

20         THE COURT:  Understood.  It's a wild new world

21  we live in.

22         MR. LUDWIN:  Yes, your Honor.

23         THE COURT:  What about identifying the poster?

24  Is there a way to do that?

25         MR. LUDWIN:  Yes, your Honor.  I've done

19

Proceedings

1  research and all this really happened on short order and

2  I wasn't sure which way this is going to go which is --

3  and what the Court was going to require of me which is

4  also why this is just, it's a preliminary injunction.  We

5  intend to amend our complaint to include a defamation

6  action.  And based on my research, your Honor -- because

7  I've never had anything posted negatively.  I've never

8  been involved in anything negative that's been posted on

9  the internet in my life other than this instance.  And

10 what I --

11         THE COURT:  So Mr. Ludwin, I just have to put

12 something out there and I'm going to ask you a question.

13 I think I know the answer.  And please don't take

14 offense.  All right?  I just am trying to get to the

15 bottom of a difficult issue.

16         MR. LUDWIN:  Yes, your Honor.

17         THE COURT:  In an effort to see the post

18 myself, I came across something else which I asked my

19 clerk to go print a copy for you.  Am I right in assuming

20 that in October of 2017 you were not arrested for

21 securities fraud violations.  Is that fair?

22         MR. LUDWIN:  Never your Honor.

23         THE COURT:  Okay.  I suspected as much.

24         MR. LUDWIN:  When was the --

25         THE COURT:  Hold on, hold on, hold on.

20

Proceedings

1          MR. LUDWIN:  Sorry.

2          THE COURT:  I'll explain the whole thing.  All

3    right?  I suspected as much.  I also looked around to see

4    if there's any sort of, how do I say this, other

5    information sources that would confirm that kind of thing

6    because if a lawyer got indicted for securities fraud

7    violations it's a big deal, right?

8          MR. LUDWIN:  Yes, your Honor.

9          THE COURT:  So there's a website called The

10   Dirty, D-I-R-T-Y, dot com which has a report that was

11   posted on it looks like October 1, saying that.  I tell

12   you that not to upset you but because since I came across

13   it, I want everyone to know what I saw.  I'm going to

14   give you all copies.  I don't know if it has anything to

15   do with this although it feels similar.  I'm going to

16   share that with you.  Okay?  So I just put that out there

17   because I came across it.

18          I understand the difficulties of the problem

19   and you can sort of chase this down by going after the

20   websites, take it down.  They're saying no or whatever.

21          Counsel may be right on some of the

22   jurisdictional issues.  I don't know if you're entitled

23   to a preliminary injunction here.  I don't know what we

24   can do.  I'm also a magistrate judge so my world tends to

25   revolve around discovery.  Right?  So my first thought is

21

Proceedings

1   perhaps the motion for expedited relief should focus on

2   the notion of discovery, meaning I'll give you whatever

3   subpoenas you want.  I'll sign orders compelling

4   whatever.  I don't know where these websites are based.

5   I don't know what information they have.  I don't know

6   how hard it's going to be to get them to comply.  Maybe

7   they're offshore.  I have no idea.

8            But my first thought is that might be the

9   expedited remedy for today's purposes.  In other words, I

10  let you loose with the discovery tools of the federal

11  court which are broad and can be powerful.  What we're

12  going to run into I don't know.  But my thought is in

13  absence of direct proof that the defendant did it, if the

14  defendant did it, I don't know.  Counsel's telling me his

15  client says no.  His client signed a sworn statement.

16  That's evidence.  Right?  You have a theory.  He has

17  evidence.  It's something.  Everyone should walk away

18  from here knowing that if this is the path we go down,

19  and I'm not making a decision right now, I'm throwing it

20  out for discussion from everybody, in the end the truth

21  usually outs.  Right?  At some point we're going to find

22  some link to some email account.  At least something I'm

23  going to find out which would be all the more reason, and

24  counsel understand when I say to you and I'm looking at

25  defendant's counsel right now, you can tell Mr. Proman to

22

Proceedings

1    do certain things and some clients listen, some clients

2    don't.  I'm not saying he doesn't.  I don't know if he

3    did this.  Right?  This could be anything.  Right?  This

4    could be somebody's ex-girlfriend or something.  Right?

5    I have no idea.  But the client should be warned that if

6    it comes out and it's him, that would be very, very

7    serious and there would be very serious repercussions.

8    I'm sure you shared that with him when he was signing a

9    sworn statement with you.  But I would just emphasize

10   that for today's purposes.

11           MR. CHALOS:  Your Honor, for the Court's

12   knowledge, without divulging any client confidences, I

13   can share that our client has been appropriately

14   counseled on the topic, has been appropriately counseled

15   on the issues of penalty of perjury and false statements.

16   And post our consultation on these very serious matters

17   proceeded to draft and sign the declaration which is

18   before the Court and our opposition submission.

19           THE COURT:  Counsel, I would expect nothing

20   less.  I assumed that was the case.  But I also know,

21   I've spent years as a lawyer, you have to deal with

22   clients and sometimes -- all right.

23           Karen, here's what I'm going to do.  Would you

24   just give each one of the counsels this?  I'm going to

25   hand out the website posting that I found which came up

23

Proceedings

1  first when I looked for your name because I was trying to

2  look at what it looked like online just to get a sense of

3  what this was like which the Second Circuit says we're

4  allowed to do.  They recognize that judges have computers

5  now.  So I looked at this just to get a sense and I came

6  across this.  Mr. Ludwin, I don't think this mentions

7  your client.  I could be wrong.  I didn't study it in

8  great detail.  When I realized it was different than the

9  post you were complaining about, I didn't spend much

10  more time looking at it.  But I give you both that by way

11  of reference for something else you might want to look at

12  if it's part of this.  And maybe it's not.  Maybe it's

13  something else.

14           I did not believe that you had been arrested

15  for securities fraud last year.  I want the record very

16  clear on that.  All right?  As soon as I saw it I said oh

17  this can't be.  And I even did a little checking around

18  and I saw no other what I'm going to call legitimate news

19  sites that said that which would be out there if that

20  were the case.  So I give you that just so you can follow

21  up on it as you think appropriate.

22           So Mr. Ludwin, let me ask you, if the

23  resolution for today is to say we're going to withdraw

24  this without prejudice to renewal giving you a period of

25  time to do some intense expedited discovery, and I'm

24

Proceedings

1  talking about whatever you need, right?  You need

2  subpoenas, you got them.  If you want me to sign orders,

3  I'll do it.  What do you think about that?

4         MR. LUDWIN:  Well, I think that would be a good

5  starting point, your Honor.  And part of the analysis on

6  this matter that I want to make sure is not overlooked

7  that while we do not have a smoking gun saying he is the

8  person who made the post, the repeated accusations, being

9  advised that if these matters are not resolved I'm going

10 to take it before the Court to opposing counsel who, and

11 the defendant in his affidavit stated that he received on

12 the days that I sent them and the fact that I demanded

13 responses and all I received was silence I believe is a

14 very strong adoptive admission.

15        THE COURT:  You do have an affidavit now though

16 in which his client denies it.  Right?

17        MR. LUDWIN:  And quite frankly, your Honor,

18 what other choice did he have?  The first time that he

19 denied it was --

20        THE COURT:  Admitting it is one other choice,

21 right, if that were the case.  But maybe it's not.  I

22 don't know what happened here.  Right?

23        MR. LUDWIN:  The first time he denied it was

24 under order of this Court to file a response.  There was

25 nothing received before that, and not in the phone call.

Proceedings

1      THE COURT:  But counsel could have relied on

2  the fact that in his view you didn't have sufficient

3  evidence to implicate his client.  He didn't do that.  He

4  came forward with a sworn statement from his client which

5  changes the balance a little bit.  Right?  It may change

6  what we can do here.  You know, I haven't looked at all

7  of the jurisdictional issues.  There's a lot of

8  questions.  You may have to re-file your complaint with

9  defamation claims.  You may have to file someplace else.

10  I have no idea.

11      But I'll say this much.  We have this issue

12  before us.  We're going to get to the bottom of it.  How

13  much time would you need for that?

14      MR. LUDWIN:  I don't exactly know the answer to

15  that, your Honor, because from what I've looked into

16  already, the subpoena that -- for example, even after

17  drafting and having the subpoena recorded in this Court,

18  for example, if Rip Off Report's only -- they're based in

19  Arizona.  I then have to take that to Arizona and under

20  Arizona law have them issue their own subpoena to get the

21  IP address from the internet website which I then need to

22  take and figure out the proper internet service provider

23  and find out --

24      THE COURT:  Sadly, counsel, I'm very familiar

25  with the long process you're talking about because I'm

26

Proceedings

1   involved in it all the time.  So yes, but I have to get

2   a -- well, hold on one second.  Do you object to the

3   procedure that I suggested for today?  Meaning we're

4   going to withdraw the application without prejudice for

5   renewal and allow counsel a period of time to do

6   discovery on this.

7           MR. CHALOS:  I don't object to that, your

8   Honor, but my concern is it jumps off the page at me as

9   we're talking about it particularly with this latest Rip

10  Off Report or the Dirty or whatever the post that the

11  Court shared with us --

12          THE COURT:  I didn't mean to make the problem

13  more complicated but I had it and I felt it was unfair

14  for me not to share that.

15          MR. CHALOS:  Well, but I think it is more

16  complicated and I don't think the Court's created the

17  problem.  Does this now disqualify Mr. Ludwin from this

18  case because he becomes a witness if he's going to amend

19  the complaint?

20          THE COURT:  Not yet.  Not today.

21          MR. CHALOS:  Well, that's what I'm saying.

22  It's --

23          THE COURT:  No, it's a fair question and again,

24  it's another issue we can raise at a certain point in

25  time.  But for today's purposes I mean look, I could do a

27

Proceedings

1   lot of things.  I could order a hearing.  I can get your

2   client in here and make him start testifying, whatever.

3   But I think maybe getting a better factual record

4   developed first.

5           MR. CHALOS:  Yeah.  I agree with that.

6           THE COURT:  Okay.  Good.

7           MR. CHALOS:  And I don't think as a matter of

8   practice, your Honor, and it's been a while since I've

9   looked at this particular issue, I don't think this Court

10  has to issue the subpoena and then it gets recognized in

11  a different district.  I think you can go directly to the

12  alternative district and seek it in aid of a proceeding

13  in this Court.

14          THE COURT:  Right.  What I'll say is I agree

15  but I don't even know where we're going yet.  Right?

16  Where are these websites based.  There's a lot of

17  questions.

18          So I want to come up with the period of time

19  and I don't want it to be too long, but at the same time

20  I want to give you enough time.  Right?  So do we want to

21  see we'll regroup in 45 days and see where we are?  Is

22  that too long?  Is that too short?

23          MR. LUDWIN:  I think it's a good starting

24  point, your Honor, because I just have no concept of how

25  long this is going to take and I think as long as we're

28

Proceedings

1   being diligent in our efforts --

2           THE COURT:  Right.  That's my best guess.  And

3   I'm going to say to you that whatever you need in terms

4   of the subpoenas have to be so ordered or whatever,

5   because I know a lot of these websites or computer

6   providers require different things, right?  I do this all

7   the time.  I'll get you what you need and I'll try to

8   turn around as quickly as possible because I recognize

9   the significance and the seriousness of the situation.

10          Now, I'm going to say one other thing to

11  defense counsel which is this.  I've already kind of

12  suggested to you you pass on to your client the

13  information that I have no idea what's going on.  I don't

14  know who's doing whatever.  And obviously it would be not

15  in his interest.  But you know, there's other situations

16  in the world.  Sometimes one could posit a thought

17  experiment which it wasn't your client but somebody who

18  was trying to help him or somebody --  you know, to the

19  extent that this doesn't continue, that would be good.

20  To the extent that anyone who might have been involved or

21  might have any input can withdraw any of these things, I

22  think it would be better.  Right?  I think it would get

23  better if this went away because he's already documented

24  one situation in which his client reportedly lost money

25  because of one of these reports.  The longer it stays out

29

Proceedings

1  there, the worse this gets.  So to the extent that

2  there's any discussions to be had or any conversations,

3  and I don't want to intrude on attorney-client, but if

4  there's anything out there that can be done to in any way

5  influence this, it's going to make it easier.

6         MR. CHALOS:  Your Honor, we will certainly

7  report this very carefully and thoroughly.  As stated in

8  our client's declaration --

9         THE COURT:  He says he didn't do it.  I got

10 that.

11        MR. CHALOS:  But he goes further than that.  He

12 says that not only is he not the person who's done it, he

13 is unaware of who would do it and he has taken no role to

14 encourage or ask anyone else to do something like this.

15 So I will certainly pass on the Court's comments.  But

16 I'm not sure that it would result in any fruit.

17        THE COURT:  It may not help.  It may not help

18 but it's free, right?  Because you're here anyway.  If I

19 say a few words, if it helps --

20        MR. CHALOS:  Absolutely, your Honor.

21        THE COURT:  All right?  All right.  So why

22 don't we do this?  Why don't we adjourn for today.  We'll

23 deem the motion withdrawn pending the resolution of this.

24 Okay?  We're just going to hold it in abeyance.  And we

25 can re-file it just by saying we're back on.  Okay?  But

30

Proceedings

1  I'm just going to put that in abeyance so this way it's

2  not -- the district court isn't bothering you about

3  motions or dates or anything like that.  So we'll just

4  hold everything in abeyance pending a period of

5  discovery.  45 days from now do you want to come back in?

6  Do you want to just write me a letter, let me know where

7  you are?  What do you want to do?

8          MR. CHALOS:  Can we do a phone conference or a

9  letter?

10          THE COURT:  Phone conferences I find hard

11  particularly in these circumstances.  So I rather you'd

12  have a written letter or if you want to come in, you come

13  in.  And the letter could be we've got to come back in.

14  So and I'll set you up very quickly.  So you tell me.

15          MR. LUDWIN:  The letter would be ideal, your

16  Honor.  I'm based in Palm Beach.

17          THE COURT:  Okay.  Yes, no, I know.  And I

18  don't want to make you schlep, that's a word we use in

19  New York and probably in Palm Beach, all that way if it's

20  not necessary.

21          So get me a letter in 45 days from today.  Do

22  me a favor and I'm going to ask you to confer with

23  counsel before you send that letter.  Just let him know

24  where you are and what's going on.  And so maybe there's

25  other discussions to be had to try to work things out.

31

Proceedings

1  Right?

2         MR. LUDWIN:  Of course, your Honor.

3         THE COURT:  My inclination in all of these

4  cases, normally I would like to talk to you about the

5  underlying case.  We should resolve that too.  But we're

6  not going to do that today.  Okay?  I'm going to send you

7  off on this path but we should have some discussions

8  about settling the case because I think it's a commercial

9  type dispute that should be resolved at some point

10  without it turning into *Texaco v. Pennzoil* for those of

11  you old enough to remember.

12         MR. LUDWIN:  We couldn't agree more, your

13  Honor.

14         THE COURT:  Say again?

15         MR. LUDWIN:  We couldn't agree more.

16         THE COURT:  Yes.  I know.  I think that's

17  right.  Counsel?

18         MR. CHALOS:  Your Honor, one thing that I think

19  would help progress the case.

20         THE COURT:  Please.

21         MR. CHALOS:  There are some applications

22  pending and I think it could come to your Honor, but it's

23  definitely with the district judge.  In this case,

24  because it was an ex parte Rule C lien arrest case --

25         THE COURT:  Right.

32

Proceedings

1          MR. CHALOS:  -- the defendant has sought

2    counter security for counterclaims pursuant to Rule E.

3          THE COURT:  Okay.

4          MR. CHALOS:  I know that's not on for today and

5    we can certainly argue that motion at a future point in

6    time, but that application is pending and the resolution

7    of which we envision would be the plaintiff is either

8    ordered to post counter security or the arrest gets

9    vacated to the extent it's even a valid arrest.  That's

10   what the jurisprudence says and that's how the case law

11   comes out.

12          But without arguing that motion and giving a

13   full recitation of our points, I just call to the Court's

14   attention that that motion, that application is pending

15   and if we can somehow get that in the wheel to be

16   reviewed, that might help progress it.

17          THE COURT:  Okay.  So let me say this is Judge

18   Spatt's case.  Am I correct?

19          MR. CHALOS:  It is.

20          THE COURT:  For those of you who don't him,

21   he's the greatest.  Right?  He's the man.  He's one of

22   our great jurists.  So what I'm about to say to you may

23   not be that attractive but I can take the case for all

24   purposes if the parties agree.  There's no prejudice for

25   not doing that.  And I'll allow you to discuss it.

33

Proceedings

1  Because there's no prejudice I don't like to say oh I'll

2  do it but he won't.  So just talk amongst yourselves.  If

3  you can agree on that, Karen has a little stip you can

4  sign, we can get that done.  If not, I will look into

5  that application for you.  I don't know if that's claim

6  dispositive or not and I don't know the format --

7            MR. CHALOS:  No, it is not.  It's an ancillary

8  relief.

9            THE COURT:  Okay.  It's a little more

10  complicated than your usual thing although as I said, I'm

11  quite familiar with the maritime rules.  I'm not sure if

12  Judge Spatt would normally refer that to me or consider

13  it part of the referral that he usually gives me which

14  involves non-dispositive -- but I'll look at that and

15  perhaps talk to him about it and whatever.  But we can do

16  that a couple of different ways.  But I'll --

17            MR. CHALOS:  I can share in other -- I'm not

18  sure it's been in this district, but certainly in the

19  southern district and other districts around the country

20  that Rule B and Rule C in the corollary Rule E actions

21  have been referred for an order and recommendation for

22  the district judge.

23            THE COURT:  Okay.  Let me look into that.  All

24  right?  Anything else we should do today?

25            MR. LUDWIN:  I would like to also address some

34

Proceedings

1   of the things that opposing counsel just said in that

2   those are not the totality of the resolutions of the --

3   or potential resolutions of the counter security motion.

4   And while he did mention all the ones that are in his

5   favor, there's more to it than that.

6          THE COURT:  Okay.  I'm happy to look at

7   anything you want me to look at to help move things

8   along.  But let's get on this first issue first and see

9   if we can get that out of the way and I'll try to move

10  the case in the interim.  Okay?

11         MR. LUDWIN:  Yes, your Honor.

12         THE COURT:  Anything else?

13         MR. CHALOS:  Nothing, your Honor.

14         MR. LUDWIN:  No, your Honor.

15         THE COURT:  All right.  Delightful seeing all

16  of you.  Good luck.

17         MR. LUDWIN:  Thank you, your Honor.

18         THE COURT:  All right.

19                 (Matter concluded)

20                      -oOo-

21

22

23

24

25

35

# C E R T I F I C A T E

       I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

       I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

       IN WITNESS WHEREOF, I hereunto set my hand this **25th** day of **April**, 2023.

*Mary Greco*

Transcriptions Plus II, Inc.